**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF VERMONT**

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2012 OCT -4  PM 2:45

CLERK

BY _____
DEPUTY CLERK

| | |
|---|---|
| IN RE GREEN MOUNTAIN COFFEE ROASTERS, INC. DERIVATIVE LITIGATION )<br><br>)<br>)<br>)<br>This Document Relates To: )<br>)<br>ALL ACTIONS )<br>) | Lead Case No. 2:10-CV-00233-WKS<br>(Consolidated with 2:10-CV-00253-WKS) |

**VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT, AND CONTRIBUTION AND INDEMNIFICATION**

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| I. | NATURE OF THE ACTION | 1 |
| II. | SUMMARY OF THE ALLEGATIONS | 3 |
| III. | JURISDICTION AND VENUE | 12 |
| IV. | THE PARTIES | 15 |
| | A. | Plaintiffs | 15 |
| | B. | Nominal Defendant | 15 |
| | C. | Individual Defendants | 16 |
| V. | DUTIES OF GREEN MOUNTAIN'S DIRECTORS AND OFFICERS | 40 |
| | A. | Fiduciary Duties | 40 |
| | B. | Company Code of Ethics | 41 |
| | C. | Duties of Members of the Board | 43 |
| | D. | Duties of Members of the Audit Committee | 44 |
| | E. | Duties of Members of the Governance Committee | 46 |
| | F. | Control, Access, and Authority | 47 |
| | G. | Reasonable and Prudent Supervision | 48 |
| | H. | Breaches of Duties | 48 |
| VI. | CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION | 49 |
| VII. | SUBSTANTIVE ALLEGATIONS | 51 |
| | A. | The Individual Defendants Consciously Disregard Their Duty to Build an Accounting and Financial Reporting Infrastructure Sufficient to Keep Pace with the Growth of Green Mountain's Operations | 51 |
| | | 1. | Background of the Company and Its Management | 51 |
| | | 2. | The Individual Defendants' Aggressive Growth Strategy Substantially Increases the Size and Complexity of Green Mountain's Operations and the Volume of Its Transactions | 53 |

B.  The Individual Defendants' Failure to Implement and Maintain an
Effective Internal Control Environment Leads to Publication of Nearly
Five Years of False Financial Statements ............................................................. 61

1.  The Individual Defendants Were Required to Implement and
Maintain Effective Internal Controls over Accounting and
Financial Reporting, and to Certify that Green Mountain's
Financial Statements Were the Product of an Effective Internal
Control Environment.................................................................................. 62

2.  Green Mountain Overstates Net Sales, Cost of Sales and Net
Income in Nearly Five Years of Financial Statements, and the
Individual Defendants Falsely Certify that the Company's Internal
Controls Over Financial Reporting Were "Effective" Throughout
These Periods ............................................................................................. 65

3.  Defendants Are Forced to Announce that Nearly Five Years of
Financial Statements Materially Misstated the Results of
Operations Due to Material Weaknesses in Internal Controls ................... 69

a.  Defendants Misleadingly Disclose "Immaterial"
Accounting Errors ......................................................................... 70

b.  Green Mountain Announces the Need to Restate Nearly
Four Years of Results Due to Material Accounting Errors ........... 71

c.  Defendants Are Forced to Admit that Green Mountain
Actually Published Nearly Five Years of Materially
Inaccurate Financial Results.......................................................... 74

4.  The Improper Accounting Practices that Required Restatement
Were Obvious, Systematic, and Sustained Violations of Basic
Accounting and GAAP Principles.............................................................. 78

a.  Failure to Eliminate Intercompany Transactions .......................... 79

b.  Improper Recognition of Revenues from Royalty Income
Acquired Through Circular Inventory Transactions ...................... 81

c.  Improper Accounting for Marketing and Customer
Incentives ...................................................................................... 87

VIII.  THE INDIVIDUAL DEFENDANTS' REMEDIATION PLAN FAILS TO
ADDRESS MATERIAL WEAKNESSES IN ACCOUNTING AND
FINANCIAL REPORTING CONTROLS......................................................................... 89

A.    The Individual Defendants Misleadingly Report that the Remediation Plan Will Address Both the Identified Material Weaknesses in Internal Controls and Other Risk Areas ............................................................................. 90

B.    The Individual Defendants' Remediation Plan Fails to Address Internal Control Deficiencies in Inventory Accounting and Revenue Recognition in Connection with Operations Outsourced to MBlock ............................................. 92

C.    Even Faced with Ongoing SEC Scrutiny, the Individual Defendants Fail to Investigate and Remediate Material Weaknesses in Controls and Supervision of Green Mountain's MBlock Operations .......................................... 96

IX.   THE INDIVIDUAL DEFENDANTS' CONSCIOUS DISREGARD FOR THE CONTROL RISKS ARISING FROM THE OUTSOURCING OF INVENTORY FUNCTIONS TO MBLOCK FACILITATES ACCOUNTING MANIPULATION AND FRAUD .................................................................................. 102

A.    The Einhorn Investigation Uncovers Credible Evidence of Accounting Fraud Conducted Through MBlock .................................................................. 103

B.    The Fraudulent Cross-Shipping Scheme Permitted Green Mountain to Inflate Revenues and Earnings in Violation of GAAP ........................................ 107

C.    The Individual Defendants Fail to Take Reasonable Corrective Action in Response to Einhorn's Allegations ........................................................................ 111

D.    The Individual Defendants Consciously Disregarded Serious Inventory Anomalies Indicating a Lack of Effective Internal Controls in Green Mountain's MBlock-related Operations .............................................................. 112

X.    THE INDIVIDUAL DEFENDANTS ISSUE SALES, REVENUE, AND EARNINGS FORECASTS WITHOUT A REASONABLE BASIS AND MISLEAD ANALYSTS AND INVESTORS ABOUT THE REASONS FOR THE COMPANY'S INCREASING INVENTORY ......................................................... 118

A.    The Individual Defendants Make Misleading Statements Touting "Strong" Demand for the Company's Products and Minimizing the Company's Apparent Lack of Control over Inventory ............................................................. 120

B.    Green Mountain Significantly Misses Fourth Quarter 2011 Sales Estimates, but the Individual Defendants Refuse to Acknowledge the Anomalous Inventory Patterns and Re-Affirm Their Aggressive Sales Forecast for Fiscal 2012 ....................................................................................... 123

C.    Green Mountain Meets Its First Quarter 2012 Estimates, but Misses Badly in the Second Quarter, Forcing the Individual Defendants to Acknowledge Their Inability to Reliably Forecast Demand or Sales ......................................... 130

|  | 1. | The Individual Defendants Issue Aggressive Guidance for the Second Quarter and Fiscal Year 2012 Based on the Spike in Holiday Sales, Heedless of Continuing Inventory Anomalies, and Data Integrity Issues in the MBlock Operations ..................................... 131 |
|  | 2. | Green Mountain Misses the Individual Defendants' Sales Growth Projections for the Second Quarter of Fiscal 2012, Sending the Stock Price Tumbling............................................................................ 136 |
|  | 3. | The Individual Defendants Admit that the Company's Demand Forecasts Were Based on Unreliable Models ......................................... 140 |

XI. DEFENDANTS STILLER AND DAVIS PLEDGE HUNDREDS OF MILLIONS OF DOLLARS OF GREEN MOUNTAIN STOCK TO SECURE PERSONAL DEBT AND CONTRIBUTE TO THE COLLAPSE IN GREEN MOUNTAIN'S MARKET CAPITALIZATION BY DUMPING STOCK TO MEET MARGIN CALLS ....................................................................................................... 144

XII. INSIDER SALES ........................................................................................ 151

A. The Timing of Defendant Stacy's August and September 2010 Sales Is Suspicious and the Circumstances Surrounding Her Reporting of These Sales Is Highly Suspicious .................................................................... 154

B. Defendants McCreary, Stiller, Carlini, Rathke, Mardy, Moran, and Del Vecchio's August 2011 Sales Were Suspicious in Timing and Amount............ 155

C. Defendants Stiller, Miller, Blanford, Davis, and del Vecchio's February 2012 Stock Sales Were Suspicious in Timing .................................... 159

D. Defendants Stiller's and Davis' May 4 and May 7, 2012 Stock Sales Violated Green Mountain's Insider Selling Policies ........................................... 161

XIII. DAMAGES TO GREEN MOUNTAIN ........................................................ 161

XIV. DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ..................................... 163

A. Demand Is Futile Because a Majority of the Board Lacks Independence and Is Dominated and Controlled by Defendant Stiller ....................................... 165

B. Demand Is Futile Because a Majority of the Board Faces a Substantial Likelihood of Liability and the Board's Actions Were Not Valid Exercises of Business Judgment.......................................................................................... 175

|  | 1. | Demand on Defendants Stiller and Blanford Is Futile ............................ 175 |
|  | 2. | Demand on the Audit Committee Defendants Is Futile ........................... 190 |

3.    Demand on the Governance Committee Defendants Is Futile ............... 197

4.    Demand on the Insider Selling Defendants Is Futile ............................ 198

C.    Other Reasons Why Demand Is Futile ............................................. 199

XV.   COUNT I ...................................................................................... 200

XVI.   COUNT II ..................................................................................... 203

XVII.  COUNT III .................................................................................... 204

XVIII. COUNT IV .................................................................................... 205

PRAYER FOR RELIEF ................................................................................ 205

JURY DEMAND ......................................................................................... 207

Plaintiffs Daniel Himmel, Lewis J. Smith, Musa Family Revocable Trust, Laborers Local 235 Benefit Funds, and Henry Cargo (collectively, "Plaintiffs"), by their attorneys, submit this Verified Consolidated Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## I.    NATURE OF THE ACTION

1.    This is a shareholder derivative action brought by Plaintiffs on behalf of nominal defendant, Green Mountain Coffee Roasters, Inc. ("Green Mountain" or the "Company"). Plaintiffs assert claims against certain of the Company's officers and a majority of it directors (collectively, "Individual Defendants"). Plaintiffs seek monetary and non-monetary remedies for breaches of fiduciary duties, unjust enrichment, and waste of corporate assets that have caused grievous injury to the Company's standing and reputation in the capital markets, among other damages.

2.    Following more than ten straight years of double-digit earnings growth, Green Mountain should be counted among the paragons of Wall Street. Instead, the Company ranks among the Street's least trusted companies due to its filing of nearly five years of misstated financial reports, continuing deficiencies in internal controls, a year-long U.S. Securities and Exchange Commission ("SEC") investigation, material unexplained balance sheet discrepancies, a marked inability to meet its own forecasts, and a management and Board of Directors ("the Board") still dominated by Green Mountain founder, Chief Executive Officer ("CEO") of twenty-five years and, until May 2012, Chairman, defendant Robert P. Stiller ("Stiller"). The Board's utter failure to exercise oversight over Green Mountain's operations, accounting, and financial reporting, and its refusal to police the fidelity of its own members to the Company's best interests, has led investors to conclude that, despite a world-class franchise in single-cup

coffee cartridges and brewers, Green Mountain management simply cannot be trusted. Billions of dollars in market capitalization has been destroyed as a result.

3.      Beginning in 2010, Green Mountain shareholders have been buffeted by a series of announcements that, taken together, demonstrate a complete failure on the part of the Board to exercise effective oversight over Green Mountain's management and even its own members.

4.      In 2010, Green Mountain announced it would have to restate nearly five years of financials dating back to 2006 due to the Board's failure to ensure that the Company's internal control infrastructure kept pace with its strategy for growing operations and transaction volumes. Green Mountain also announced that the SEC was investigating its relationship with MBlock & Sons, Inc. ("MBlock"), the order fulfillment vendor to which the Company had outsourced inventory functions accounting for more than 40% of reported sales, a key element of the Company's growth strategy.

5.      In 2010 and 2011, the Company disclosed persistently high inventory levels and falling inventory turnover rates that could not be squared with its reported rates of sales growth. Despite these red flags, the Board failed to take steps to address material deficiencies in the internal controls over the inventory and order fulfillment functions outsourced to MBlock.

6.      In 2011, prominent hedge fund manager David Einhorn ("Einhorn") of Greenlight Capital Inc. presented the results of his investigation, which revealed that Green Mountain managers had been using cross shipments through MBlock to manipulate inventory and sales figures, and evade detection by the Company's outside auditors. Defendant Stiller dismissed Einhorn's findings out-of-hand, and the Board followed his lead, again failing once again to take any effective remedial action.

7.     In 2011 and 2012, the Company announced two major sales forecast misses in just three quarters.  Green Mountain's announcement that it had substantially missed its second quarter 2012 sales and earnings forecast was accompanied by the admission that the Company could not explain why.  Following this announcement, the stock price plunged 48% from the previous day close – a loss of over $3.6 billion in market capitalization, reflecting the cumulative and devastating impact of these revelations on Green Mountain's credibility in the capital markets.

8.     The damage was amplified days later when Green Mountain revealed that then-Chairman, defendant Stiller, and then-Lead Director, defendant William D. Davis ("Davis"), had sold hundreds of millions of dollars' worth of Green Mountain shares in violation of the Company's insider trading policies to meet margin calls on stock pledged to secure mountains of personal debt.  These massive sales accelerated the sell-off that followed the second quarter 2012 miss.   The Company further revealed that Stiller's and Davis' stock pledges had been "grandfathered" following the Board's adoption of a policy prohibiting such pledges, and that Davis ignored the prohibition and pledged hundreds of thousands of additional shares after the policy was adopted on January 1, 2012.  This was the final straw for thousands of investors who sold their shares because they could not trust Green Mountain's Board to act in the Company's and its shareholders' best interests.

## II.     SUMMARY OF THE ALLEGATIONS

9.     Green Mountain is a coffee company that manufactures and sells coffee makers and specialty coffees.  Defendant Stiller founded the Company in 1981.  He served as CEO for two and one-half decades and remains on the Green Mountain's Board today.

10. Green Mountain is best known for its Keurig-brand single-cup brewing machine and patented single-serve K-Cup cartridges, which it has manufactured and sold since partnering with Keurig, Incorporated ("Keurig") in 1998. In 2006, Green Mountain acquired Keurig and appointed defendant Lawrence J. Blanford ("Blanford") as the Company's CEO. Defendant Stiller stayed on as Chairman of the Board, purportedly as an "advisor" to Blanford. In reality, Stiller stayed engaged with the day-to-day management of the Company and continued to dominate a Board made up of long-time business associates, family, and friends.

11. Following the acquisition of Keurig, defendants Stiller and Blanford led Green Mountain in an aggressive growth strategy comprised of four initiatives: (i) expanding the Company's manufacturing capacity to increase direct sales of K-Cups and brewers; (ii) entering into licensing agreements with third-party coffee roasters permitting them to manufacture, distribute, and sell K-Cups directly for Green Mountain in exchange for royalty payments; (iii) acquiring former licensees as critical K-Cup patents approached expiration; and (iv) outsourcing the Company's warehousing, inventory maintenance, order processing, and shipping functions to fulfillment vendor, MBlock. Each element of this strategy was material to Green Mountain and approved by the Board.

12. While this growth strategy succeeded in increasing reported net sales from $225 million in 2006 to over $803 million in 2009, the Individual Defendants in Green Mountain's executive group and on the Board utterly failed to ensure that the Company's investments in its internal controls infrastructure, policies and practices, training and personnel, and information technology kept pace with the growth in the scope and complexity of its operations and the volume of transactions, despite the fact that this growth in scope and complexity was the intended result of the Board approved strategy. Green Mountain's accounting and financial

- 4 -

infrastructure was so badly under-staffed, poorly trained, and ill-equipped that the Company failed to comply with the most basic accounting and reporting rules and Generally Accepted Accounting Principles ("GAAP").[1]  As a result, Green Mountain overstated its net sales, net income, and earnings per share ("EPS") in every reporting period since the inception of Green Mountain's growth strategy in 2006 until the Company's announcement in late 2010 that it would have to restate its financial results.  The accounting and reporting errors did not just coincide in time with the launch of Green Mountain's growth strategy, they arose directly out of its four core operational elements.  The Board ignored these obvious risks and utterly failed to ensure the implementation of effective internal controls that would have alerted it to multiple material accounting irregularities that plagued nearly five years of financial reports.

13.     On September 28, 2010, the Individual Defendants disclosed that the SEC had commenced an inquiry into Green Mountain's "revenue recognition practices and the Company's relationship with one of its fulfillment vendors."  Although they did not specify which fulfillment vendor, securities analysts deduced that it was MBlock – the company to which Green Mountain had outsourced its key inventory and order fulfillment, and which was responsible for over 40% of the Company's net sales by the end of fiscal 2010.[2]  That same day, the Individual Defendants also admitted that in the course of preparing Green Mountain's year-end financial results,

---

[1] GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.    SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  The Financial Accounting Standards Board ("FASB") issues Statements of Financial Accounting Standards ("SFAS") that detail accounting standards and guidance on selected accounting policies.  SFAS are issued with the expectation that all reporting companies listed on American stock exchanges will adhere to them, and comprise a substantial part of GAAP in the United States.

[2] Green Mountain's fiscal year ends in September.

management had discovered *an "immaterial accounting error"* relating to the way the Company had accounted for royalty income it received from inter-company transactions with Keurig. On November 19, 2010, the Individual Defendants disclosed that there actually were *several material accounting errors* that would require Green Mountain to restate nearly *four years* of financial statements for fiscal years 2007, 2008, 2009, and the first three quarters of fiscal 2010. The Board's Audit and Finance Committee ("Audit Committee") claimed it had discovered the new errors and misstatements during the course of an internal investigation undertaken in response to the SEC's inquiry, but, without any reasonable basis, categorically denied any accounting errors or material weaknesses in internal controls arising from the Company's relationship with MBlock. By December 10, 2010, the Individual Defendants were reporting that the restatement would extend to all financial statements filed since fiscal 2006 – nearly *five years* of false financial statements.[3]

14.     The Individual Defendants admitted that throughout this period, Green Mountain had "material weaknesses" in its "internal control over financial reporting" leading to its failure to accurately account for transactions in the areas of operation established as part of their growth initiative. The Individual Defendants were forced to admit that these material weaknesses were the result of "*the Company's rapid growth, both organically and through acquisitions, outpacing the development of the Company's accounting infrastructure.*"

15.     The Individual Defendants' remediation plan failed to address the risks the Company's relationship with MBlock posed to the integrity of its accounting and financial reporting – a conscious decision by the Board and its Audit Committee based on the dubious

---

[3] "Restatement Period" refers to the Company's financial statements filed for fiscal years 2006, 2007, 2008, 2009, and the first three quarters of fiscal 2010.

circular reasoning "none of the financial statement errors are related to the Company's relationship with M.Block."

16.     The material risks that were intrinsic to Green Mountain's relationship with MBlock were well-known to the Individual Defendants, and their failure to ensure that the remediation plan addressed these risks and established a system of internal controls over the key functions outsourced to MBlock was an egregious breach of their duty of oversight, particularly given the numerous red flags surrounding MBlock. The volume of transactions shunted to MBlock was enormous. MBlock sales amounted to over *$2 billion at least 37% of Green Mountain's net sales by fiscal 2011*. Green Mountain had just been forced to admit that the failure of its internal control infrastructure to keep pace with the Company's strategic growth initiatives had led to the publication of nearly half a decade of false financial reports due to material errors directly attributable to its growth initiatives. Moreover, material distributor relationships such as these are common targets of SEC inquiries because of their use by manufacturers to manipulate inventory, sales, and revenue. MBlock itself had already been involved in prior accounting frauds uncovered by the SEC. And, as noted, Green Mountain's relationship with MBlock was under investigation by the SEC. Finally, material, unexplained anomalies in Green Mountain's reported inventory – including increasing inventories and slowing inventory turnover at a time when Green Mountain was reporting increasing sales and an inability to meet rising demand – mounted throughout 2010 and 2011. Despite these red flags, the Board consciously failed to take any action to address the accounting and financial reporting risks presented by the MBlock relationship. The Board's inexcusable inaction permitted members of Green Mountain management to continue to use MBlock in a fraudulent accounting scheme designed to inflate the Company's reported sales and revenues, and enabled the

Company to appear to beat the Individual Defendants' sales growth projections for seven straight quarters, driving the stock to an all-time high of $111.62 on September 19, 2011.

17.     On October 17, 2011, less than one month later, noted hedge fund manager Einhorn presented the results of his investigation, which included interviews with several former MBlock employees. Einhorn revealed a "cross-shipping scheme," in which excess, expired, or otherwise unsold K-Cups were shipped to MBlock, some portion of which were recorded as sales and recognized as revenue upon shipment to MBlock. According to Einhorn, the scheme concealed massive over-production and growing inventory of obsolete goods, including efforts to hide truckloads of obsolete inventory from Green Mountain's outside auditors. Combined with the continuing deficiencies in internal controls, the scheme rendered the demand, inventory, and sales data upon which the Individual Defendants based their sales, and earnings guidance utterly unreliable.

18.     The Individual Defendants consciously disregarded the fact that the Company's inventory figures could not be squared with its reported sales growth. In the third quarter of fiscal 2010, Green Mountain began reporting sharp increases in its inventory balance each quarter, while at the same time reporting materially declining inventory turnover rates. The Individual Defendants claimed that the rising inventories were the result of conscious efforts to meet demand, and that they would "normalize" as increasing demand drew them down. That did not happen. Through 2011 and 2012, inventories continued to increase faster than sales, and the rate of inventory turnover (i.e., the rate at which inventory on hand was turned over through sales or obsolescence) continued to fall. At the same time, Green Mountain's reserve for obsolete inventory held constant relative to sales. These facts corroborated Einhorn's allegations about inventory and sales manipulation, and should have prompted the Board to conduct a thorough

- 8 -

inquiry into the quality of the Company's demand, sales, and inventory data.  Instead, just over three weeks after the Einhorn's presentation, defendant Blanford reported that the Audit Committee had completed its review of the allegations and determined there was no "misconduct."

19.     On the same day Green Mountain assured investors that Einhorn's findings were groundless, the Company reported that it had missed its sales growth estimates for the first time in over eight quarters.  The miss raised questions from securities analysts about the Company's rising inventory, but the Individual Defendants assured investors that inventory was rising to meet "strong" demand, reaffirmed their aggressive sales and earnings guidance for fiscal 2012, and failed to address the rapidly falling inventory turnover rate.

20.     On May 2, 2012, the Individual Defendants issued a press release announcing the Company's second quarter 2012 results and reporting sales growth far short of the estimates they had issued just three months before.  On this news, ***Green Mountain's stock price plunged 48%, down from $49.52 the previous day to close at $25.87*** on May 3, 2012.

21.     The Company's massive market capitalization loss was compounded by the Individual Defendants' other breaches of fiduciary duties.  The precipitous fall in the Company's stock price caused defendants Stiller and Davis abruptly to dump large blocks of Green Mountain stock into the market to satisfy margin calls on May 4 and May 7, 2012, accelerating and deepened the decline in the Company's stock price – damage that would easily have been avoided had the Board put the interests of the Company first, prohibited these improper practices and refused to grandfather Stiller's and Davis' pledges.  Only after it was revealed that the stock sales violated the Company's internal trading policies and that Davis had also violated the Company's recently adopted prohibition on further pledges did the Board strip Davis of his Lead

Director title and Stiller of his Chairmanship. Davis has since stepped down from the Board. Stiller remains a director. The Board has taken no action whatsoever to attempt to recover the Company's losses from Stiller, Davis, or any of the other Individual Defendants.

22.     When pressed by securities analysts for reasons why, despite management's repeated assurances, Green Mountain missed its guidance for the second time in three quarters, defendant Blanford was forced to admit that management did not know. Even formerly supportive securities analysts openly questioned management's credibility, which finally prompted the Individual Defendants to admit that the Company's demand forecasting practices were unreliable – the inevitable result of the Individual Defendants' failure to implement sufficient internal controls over the key inventory and order fulfillment functions outsourced to MBlock. On August 1, 2012, the Individual Defendants reduced their earnings forecast for fiscal 2012 to $2.26 from $2.50 per share, attributing the cut to purported "changes" in the Company's "[demand] forecasting methodology."

23.     Despite relatively strong results reported in more recent quarters, Green Mountain has been unable to recover the loss in value, reflecting the magnitude of the damage to its credibility in the capital markets. Securities analysts, such as William Blair & Co., L.L.C. ("William Blair"), argued that the "large sales variances, both negative and positive, experienced over the past several quarters call into question the company's ability to forecast the business and beg the question why." The *Wall Street Journal* reported that Green Mountain's repeated "over-estimating [of] how many [K-Cup] portion packs it would sell" had made "every earnings projection suspect." Dougherty & Company LLC ("Dougherty") observed that the "[h]igh inventory levels and robust [] capital expenditures" raised questions about "earnings quality and remain a risk focus for investors." *The New York Times* reported that the second quarter 2012

- 10 -

results "added weight to the contentions of hedge fund manager David Einhorn and others that the company had been inflating sales and that its high growth days were over." KeyBanc Capital Markets Inc. ("KeyBanc") concurred, reporting that "management's credibility is yet again under question."

24.     *Bloomberg* summarized the issues: "Green Mountain faces questions about how it accounted for a tripling of revenue in the past two years. The U.S. Securities and Exchange Commission is investigating, and hedge fund manager David Einhorn has hammered the company for a perceived lack of transparency." *Bloomberg* confirmed that Green Mountain's credibility issues extended to the Board, whose entrenchment ("meaning its directors have been members for too long and are insufficiently independent") had earned the Company a grade of "D" for corporate governance from a corporate governance consulting firm, GMI Ratings, a grade "shared by only about 20 percent of North American companies." According to a prominent corporate governance expert, the "question for investors is whether" Green Mountain "can shake off the influence of founder Robert P. Stiller."

25.     As a proximate result of the Individual Defendants' breaches of fiduciary duty, Green Mountain's market capitalization has declined by more than 75% from its all-time high just over one year ago and investor confidence in the Company has been shattered. Green Mountain is now the subject of three different shareholder class action lawsuits alleging securities laws violations in connection with the Company's false and misleading statements and publication of false financial statements. These lawsuits will be costly to defend and resolve. Green Mountain has incurred substantial costs in connection with the Restatement and in connection with the purported remediation of internal controls. The Company also has incurred,

- 11 -

and will continue to incur, substantial costs in responding to the SEC's ongoing investigation of its relationship with MBlock.

26.     Plaintiffs bring this litigation to seek redress on behalf of Green Mountain for the damages caused by the Individual Defendants' breaches of fiduciary duty.

## III.    JURISDICTION AND VENUE

27.     This Court has jurisdiction over the action filed by plaintiff Daniel Himmel ("Himmel") (Case No. 10-cv-00233-WKS) (the "Himmel Action") because the underlying wrongdoing results from violations of the federal securities laws. In addition, this Court has jurisdiction over all claims asserted in the Himmel Action pursuant to 28 U.S.C. §1332(a)(1) because plaintiff Himmel and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. Pursuant to 28 U.S.C. §1367(a), this Court has supplemental jurisdiction over plaintiff Himmel's other claims because they are so related to claims within the Court's original jurisdiction that they form part of the same case or controversy. The Himmel Action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

28.     This Court has jurisdiction over the action filed by plaintiff Louis J. Smith ("Smith") (Case No. 10-cv-00253-WKS) (the "Smith Action") pursuant to Article III of the United States Constitution and 28 U.S.C. §1331 because the underlying wrongdoing results from violations of the federal securities laws. In addition, this Court has jurisdiction over all claims asserted in the Smith Action pursuant to 28 U.S.C. §1332(a)(1) because plaintiff Smith and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. Pursuant to 28 U.S.C. §1367(a), this Court has supplemental jurisdiction over plaintiff Smith's other claims because they are so related to claims within the

Court's original jurisdiction that they form part of the same case or controversy. The Smith Action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

29.     This Court has jurisdiction over the action filed by plaintiff Musa Family Revocable Trust ("Musa") (Case No. 12-cv-00029-WKS) (the "Musa Action") pursuant to Article III of the United States Constitution and 28 U.S.C. §1331 because the underlying wrongdoing results from violations of the federal securities laws. In addition, this Court has jurisdiction over all claims asserted in the Musa Action pursuant to 28 U.S.C. §1332(a)(1) because plaintiff Musa and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. Pursuant to 28 U.S.C. §1367(a), this Court has supplemental jurisdiction over plaintiff Musa's other claims because they are so related to claims within the Court's original jurisdiction that they form part of the same case or controversy. The Musa Action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

30.     This Court has jurisdiction over the action filed by plaintiff Laborers Local 235 Benefit Funds ("Laborers") (Case No. 12-cv-00042-WKS) (the " Laborers Action") pursuant to Article III of the United States Constitution and 28 U.S.C. §1331 because the underlying wrongdoing results from violations of the federal securities laws. In addition, this Court has jurisdiction over all claims asserted in the Laborers Action pursuant to 28 U.S.C. §1332(a)(1) because plaintiff Laborers and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. Pursuant to 28 U.S.C. §1367(a), this Court has supplemental jurisdiction over plaintiff Laborers' other claims because they are so related to claims within the Court's original jurisdiction that they form part of the same case or

controversy. The Laborers Action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

31.    This Court has jurisdiction over the action filed by Henry Cargo ("Cargo") (Case No. 12-cv-00161-WKS) (the "Cargo Action") pursuant to Article III of the United States Constitution and 28 U.S.C. §1331 because the underlying wrongdoing results from violations of the federal securities laws.    Pursuant to 28 U.S.C. §1367(a), this Court has supplemental jurisdiction over the other claims asserted in the Cargo Action because they are so related to claims within the Court's original jurisdiction that they form part of the same case or controversy. The Cargo Action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

32.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

33.    Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (i) Green Mountain maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Green Mountain, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

- 14 -

## IV.    THE PARTIES

### A.    Plaintiffs

34.    Plaintiff Himmel was a shareholder of Green Mountain at the time of the wrongs complained of, has continuously been a shareholder since that time, and is a current shareholder. Plaintiff Himmel is a citizen of Florida.

35.    Plaintiff Smith was a shareholder of Green Mountain at the time of the wrongs complained of, has continuously been a shareholder since that time, and is a current shareholder. Plaintiff Smith is a citizen of Florida.

36.    Plaintiff Musa was a shareholder of Green Mountain at the time of the wrongs complained of, has continuously been a shareholder since that time, and is a current shareholder. Plaintiff Musa is a citizen of Arizona.

37.    Plaintiff Laborers was a shareholder of Green Mountain at the time of the wrongs complained of, has continuously been a shareholder since that time, and is a current shareholder. Plaintiff Laborers is a citizen of New York.

38.    Plaintiff Cargo was a shareholder of Green Mountain at the time of the wrongs complained of, has continuously been a shareholder since that time, and is a current shareholder.

### B.    Nominal Defendant

39.    Nominal defendant Green Mountain is a Delaware corporation with its principal executive offices located at 33 Coffee Lane, Waterbury, Vermont.  Green Mountain engages in the specialty coffee and coffee maker businesses.  The Company is made up of two business units: the Specialty Coffee Business Unit and the Keurig Business Unit.  The Company sells whole bean and ground coffee selections, cocoa, teas and coffees in K-Cup portion packs, Keurig

single-cup brewers, and other accessories. In recent years, a significant driver of the Company's growth has been the sale of K-Cups and Keurig brewing systems.

## C.   Individual Defendants

40.   Defendant Stiller founded Green Mountain in July 1981. He is a Green Mountain director and has been since 1993, and was Green Mountain's President and CEO from July 1981 to May 2007. Stiller was Green Mountain's Chairman of the Board from May 2007 to May 2012, when his Chairmanship was revoked by the Board after it found that Stiller had made margin-call related stock sales which were "inconsistent with the Company's internal trading policies."

(a)   According to the Company's Proxy Statement filed February 2, 2012 ("2012 Proxy"), as Chairman of the Board, defendant Stiller was charged with presiding over all Board and shareholder meetings, and providing advice and counsel to the Company's CEO and other Company officers regarding Green Mountain's business and operations. The 2012 Proxy acknowledges that as the Company's founder and former CEO, Stiller is uniquely qualified to provide insight, guidance, and counsel to the Company's CEO regarding the Company's operations and strategy. Indeed, in the Company's Form 8-K filed May 3, 2007, the Company noted "Stiller's deep and ongoing interest in the trusteeship of the Company" and that he would "work in partnership with Blanford [the Company's new CEO] to ensure its continued success." The Company's 2009 Proxy Statement also "recognized Mr. Stiller's unique importance to the Company as its founder and Mr. Stiller's continued role with the Company[,]" noting that during fiscal 2008, in addition to serving as Chairman of the Board, "Stiller acted as an advisor to the new [CEO]," among other things. In addition to his obligation as a director and Chairman of the Board to stay sufficiently informed about Company operations to exercise meaningful oversight

- 16 -

of the management of Green Mountain's business, Stiller's unique role as Company founder, long-time CEO and Chairman, and partner and close advisor to CEO defendant Blanford, kept Stiller involved in the day-to-day management of the Company.

(b)     By virtue of his positions as Company founder, Chairman of the Board, former CEO, and "partner" to his successor CEO defendant Blanford, defendant Stiller was in a position to control the Board. Stiller directed the Company to engage in, or at a minimum, knew or recklessly disregarded that the Company engaged in numerous improper accounting practices, including the inventory manipulation scheme conducted through MBlock, that were used to manage Green Mountain's reported revenues. Stiller knowingly or recklessly failed to ensure that the Company maintained effective internal controls over financial reporting, demand forecasting, inventory management, and accounting. Stiller signed and certified the Company's materially inaccurate financial statements for fiscal year 2006 and the first quarter of fiscal year 2007, which were required to be restated. Stiller also signed, reviewed, and/or approved the Company's materially inaccurate financial statements for fiscal years 2007, 2008, and 2009, which were required to be restated. Stiller also signed the Forms 10-K and 10-Q for these periods which improperly stated that the Company's internal controls over financial reporting "were effective." Stiller issued, reviewed, and/or approved the Company's improper earnings guidance for fiscal year 2012, which he knew or recklessly disregarded lacked any reasonable foundation and were unreliable because the Company did not maintain internal controls sufficient to permit the Company to construct accurate forecasting models.

(c)     While in possession of material, non-public information concerning Green Mountain's inadequate internal controls and improper business and accounting practices,

defendant Stiller sold 2,084,969 shares of his Green Mountain stock for $156,084,439.88 in proceeds.

(d)     While defendant Stiller was systematically breaching his duties to Green Mountain, the Company paid him the following compensation as an executive:

| Fiscal Year | Salary | Non-Equity Incentive Plan Compensation | Option Awards | All Other Compensation |
|---|---|---|---|---|
| 2011 | $262,766 | - | $495,525 | $4,765 |
| 2010 | $455,577 | $198,000 | $477,106 | $8,679 |

Green Mountain paid Stiller the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Aggregate Awards Outstanding | Total |
|---|---|---|---|---|
| 2009 | $92,000 | $434,110 | 316,243 | $526,110 |

(e)     Stiller is named as a defendant in the pending *LAMPERS* class action (Case No. 11-cv-00289-WKS), where he is alleged to have violated sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act") and sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act") by filing false financial statements in connection with the MBlock scheme. He is also named as a defendant in the pending *Fifield* class action (Case No. 11-cv-00091-WKS), where he is alleged to have violated sections 10(b) and 20(a) of the Exchange Act by making improper statements in connection with the Company's fiscal 2012 earnings guidance.

(f)     Throughout the relevant period, defendant Stiller was motivated to ensure that Green Mountain's stock price remained above certain levels because he had pledged substantial amounts of his Green Mountain stock held in margin accounts as collateral to secure hundreds of millions of dollars in margin loans he used to fund his personal business interests and lavish lifestyle.

(g)     Defendant Stiller is a citizen of Florida.

- 18 -

41.     Defendant Blanford is Green Mountain's CEO, President, and a director and has been since May 2007.

(a)     According to the Company's 2012 Proxy, as CEO, defendant Blanford is "responsible for the general management, oversight, leadership, supervision and control of the day-to-day business and the affairs of the Company, and ensures that all directions of the Board are carried into effect." Furthermore, according to the Company's correspondence with the SEC dated May 4, 2012, the CEO is the Company's "Chief Operating Decision Maker," who uses input from the Company's presidents and functional leaders to "make[] all key operating decisions, determine[] the allocation of resources, and make[] assessments of performance." The CEO receives, without limitation, the following reports utilized in connection with his decision-making: monthly business unit profit and loss schedules, weekly sales reports for the Specialty Coffee Business Unit and Keurig Business Unit, and quarterly financial management. Blanford is responsible for communicating with shareholders and securities analysts during investor conference calls.

(b)     As CEO, defendant Blanford directed the Company to engage in, or at a minimum, knew or recklessly disregarded that the Company engaged in numerous improper accounting practices, including the inventory manipulation scheme conducted through MBlock, that were used to manage Green Mountain's reported revenues. Blanford failed to ensure that the Company maintained effective internal controls over financial reporting, demand forecasting, inventory management, and accounting. Blanford signed and certified the Company's materially inaccurate financial statements for fiscal years 2007, 2008, 2009, and the first three quarters of fiscal 2010, which were required to be restated. Blanford also signed the Forms 10-K and 10-Q for these periods which improperly stated that the Company's internal controls over financial

reporting "were effective." Blanford made misleading statements concerning the demand for the Company's products on investor conference calls held on February 2, 2011, and July 27, 2011. Blanford also issued, reviewed, and/or approved the Company's improper earnings guidance for fiscal year 2012, which he knew or recklessly disregarded lacked any reasonable foundation and were unreliable because the Company did not maintain internal controls sufficient to permit the Company to construct accurate forecasting models.

        (c)     While in possession of material, non-public information concerning Green Mountain's inadequate internal controls and improper business and accounting practices, defendant Blanford sold 240,575 shares of his Green Mountain stock for \$20,217,883.64 in proceeds.

        (d)     While defendant Blanford was systematically breaching his duties to Green Mountain, the Company paid him the following compensation as an executive:

| Fiscal Year | Salary | Non-Equity Incentive Plan Compensation | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2011 | \$767,692 | \$932,000 | 1,889,708 | \$5,996 | \$3,595,396 |
| 2010 | \$660,096 | \$571,200 | 1,151,208 | \$23,703 | \$2,406,207 |
| 2009 | \$601,077 | \$707,351 | \$933,504 | \$22,350 | \$2,264,282 |
| 2008 | \$573,750 | \$589,160 | \$876,000 | \$26,312 | \$2,065,222 |
| 2007 | \$216,058 | \$176,641 | \$239,727 | \$114,720 | \$747,146 |

        (e)     Blanford is named as a defendant in the *Horowitz* class action (Case No. 10-cv-00227-WKS), where he is alleged to have violated sections 10(b) and 20(a) of the Exchange Act in connection with the Company's Restatement. He is also a defendant in the pending *LAMPERS* class action, where he is alleged to have violated sections 10(b) and 20(a) of the Exchange Act and sections 11, 12(a)(2), and 15 of the Securities Act by filing false financial statements in connection with the MBlock scheme. Finally, Blanford is a defendant in the pending *Fifield* class action, where he is alleged to have violated sections 10(b) and 20(a) of the

Exchange Act by making improper statements in connection with the Company's fiscal 2012 earnings guidance.

        (f)     Defendant Blanford is a citizen of Virginia.

42.     Defendant Frances G. Rathke ("Rathke") is Green Mountain's Chief Financial Officer ("CFO") and Treasurer and has been since October 2003. Rathke was also a Green Mountain Vice President from October 2003 to at least November 2011; Secretary from October 2003 to February 2009; and Interim CFO from April 2003 to October 2003.

        (a)     According to the Company's Form 10-Q filed May 7, 2009, defendant Rathke is charged with "managing the Company's accounting, reporting and control policies and practices; financial planning and analysis; treasury, tax planning, reporting and compliance; strategic planning and development, capital planning, credit and accounts receivables, accounts payables, risk management, and investor relations." Rathke "play[s] an integral role in driving the financial performance in the business units, channels and teams" and reports directly to the President and CEO. Further, Rathke is specifically responsible to, among other things: "[p]lan, develop, organize, implement, direct and evaluate the Company's fiscal function and performance"; "[p]articipate in the development of the company's strategic plans and programs"; "[e]nsure the timely and accurate preparation, analysis and presentation of financial reports and statements at the Company and to the SEC"; and "[d]evelop and implement cash management programs, revenue and expense forecasting techniques, financial leverage approaches, and cost savings initiatives." Rathke is responsible for communicating with shareholders and securities analysts during investor conference calls.

        (b)     As CFO, defendant Rathke directed the Company to engage in, or at a minimum, knew or recklessly disregarded that the Company engaged in, numerous improper

accounting practices, including the inventory manipulation scheme conducted through MBlock, that were used to manage Green Mountain's reported revenues. Rathke signed and certified all of the Company's materially inaccurate financial statements that were required to be restated and signed the Forms 10-K and 10-Q for these periods which improperly stated that the Company's internal controls over financial reporting "were effective." Rathke made misleading statements concerning the demand for the Company's products and the Company's inventory issues on investor conference calls held on December 9, 2010, and July 27, 2011. Rathke also issued, reviewed, and/or approved the Company's improper earnings guidance for fiscal year 2012, which she knew or recklessly disregarded lacked any reasonable foundation and were unreliable because the Company did not maintain internal controls sufficient to permit the Company to construct accurate forecasting models. Rathke failed to ensure that the Company maintained effective internal controls over financial reporting and accounting.

      (c)    While in possession of material, non-public information concerning Green Mountain's inadequate internal controls and improper business and accounting practices, defendant Rathke sold 337,500 shares of her Green Mountain stock for $32,692,612.50 in proceeds.

      (d)    While defendant Rathke was systematically breaching her duties to Green Mountain, the Company paid her the following compensation as an executive:

| Fiscal Year | Salary | Non-Equity Incentive Plan Compensation | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2011 | $375,192 | $272,610 | $500,692 | $6,736 | $1,155,230 |
| 2010 | $328,365 | $154,770 | $321,948 | $7,348 | $812,431 |
| 2009 | $305,815 | $180,963 | $255,552 | $7,145 | $749,475 |
| 2008 | $290,177 | $150,761 | $222,000 | $8,952 | $671,890 |
| 2007 | $256,154 | $92,400 | $174,943 | $115,399 | $638,896 |

(e)     Rathke is named as a defendant in the *Horowitz* class action, where she is alleged to have violated sections 10(b) and 20(a) of the Exchange Act in connection with the Company's Restatement.  She is also a defendant in the pending *LAMPERS* class action, where she is alleged to have violated sections 10(b) and 20(a) of the Exchange Act and sections 11, 12(a)(2), and 15 of the Securities Act by filing false financial statements in connection with the MBlock scheme.  Finally, Rathke is a defendant in the pending *Fifield* class action, where she is alleged to have violated sections 10(b) and 20(a) of the Exchange Act by making improper statements in connection with the Company's fiscal 2012 earnings guidance.

(f)     Defendant Rathke is a citizen of Vermont.

43.     Defendant R. Scott McCreary ("McCreary") is Green Mountain's President, Specialty Coffee Business Unit and has been since December 2009.  McCreary was also Green Mountain's Chief Operating Officer ("COO") from September 2004 to at least December 2009.

(a)     As Green Mountain's COO, defendant McCreary reported directly to the Company's CEO and had direct responsibility for the oversight of the Company's operations and sales and marketing.  In his positions as COO and President, McCreary had broad responsibility for oversight of the Company's manufacturing practices and sales strategies.  He was charged with effectively managing the Company's inventory and remaining informed as to demand for the Company's products.  Further, as President of the Specialty Coffee Business Unit, McCreary maintains regular contact with the CEO to discuss operating activities, financial results, forecasts, and plans for the Specialty Coffee Business Unit.

(b)     As COO, defendant McCreary directed the Company to engage in, or at a minimum, knew or recklessly disregarded that the Company engaged in, numerous improper accounting practices, including the inventory manipulation scheme conducted through MBlock,

that were used to manage Green Mountain's reported revenues. McCreary failed to implement and maintain effective internal controls over demand forecasting and inventory management, which he was specifically responsible for overseeing.

(c)     While in possession of material, non-public information concerning Green Mountain's inadequate internal controls and improper business and accounting practices, defendant McCreary sold 300,000 shares of his Green Mountain stock for $17,292,060 in proceeds.

(d)     While defendant McCreary was systematically breaching his duties to Green Mountain, the Company paid him the following compensation as an executive:

| Fiscal Year | Salary | Non-Equity Incentive Plan Compensation | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2011 | $357,885 | $258,630 | $419,935 | $7,586 | $1,044,036 |
| 2010 | $318,365 | $150,150 | $312,192 | $8,859 | $789,566 |
| 2009 | $290,846 | $175,875 | $247,104 | $7,652 | $721,477 |
| 2008 | $262,269 | $123,126 | $200,000 | $8,251 | $593,646 |
| 2007 | $258,981 | $79,050 | $177,744 | $15,519 | $531,294 |

(e)     Defendant McCreary is a citizen of Vermont.

44.     Defendant Michelle Stacy ("Stacy") is Green Mountain's President, Keurig Business Unit and has been since November 2008.

(a)     As the President of Keurig, defendant Stacy reports directly to the CEO and is a part of the Company's Enterprise Leadership Team. In her position as President of Keurig, defendant Stacy had broad responsibility for Keurig's manufacturing practices and sales strategies. She was charged with effectively managing Keurig's inventory and remaining informed as to demand for Keurig's products. She maintains regular contact with the CEO to discuss operating activities, financial results, forecasts, and plans for the Keurig Business Unit.

(b)     As President of Keurig, defendant Stacy directed the Company to engage in, or at a minimum, knew or recklessly disregarded that the Company engaged in, numerous improper accounting practices, including the inventory manipulation scheme conducted through MBlock, that were used to manage Green Mountain's reported revenues. Stacy failed to implement and maintain effective internal controls over demand forecasting and inventory management in the Keurig Business Unit, which she was specifically responsible for overseeing. Stacy made misleading statements concerning the Company's inventory issues during investor conference calls on January 27, 2010 and May 3, 2011.

(c)     While in possession of material, non-public information concerning Green Mountain's inadequate internal controls and improper business and accounting practices, defendant Stacy sold 84,936 shares of her Green Mountain stock for $3,235,085.38 in proceeds.

(d)     While defendant Stacy was systematically breaching her duties to Green Mountain, the Company paid her the following compensation as an executive:

| Fiscal Year | Salary | Non-Equity Incentive Plan Compensation | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2011 | $364,616 | $258,630 | $419,935 | $7,350 | $1,050,531 |
| 2010 | $346,019 | $161,700 | $336,582 | $8,509 | $852,811 |
| 2009 | $302,788 | $173,139 | $594,435 | $7,350 | $1,077,712 |

(e)     Defendant Stacy is a citizen of Massachusetts.

45.     Defendant Michael J. Mardy ("Mardy") is Green Mountain's Interim Chairman of the Board and has been since May 2012 and a director and has been since April 2007. Mardy was appointed Interim Chairman after the Board found that defendant Stiller had made margin-call related stock sales which were "inconsistent with the Company's internal trading policies" and removed Stiller from his position as Chairman. Mardy is also Chairman of Green Mountain's Audit Committee and has been since April 2007 and has been designated as a

- 25 -

"financial expert" by the Board since at least 2008. Mardy was a member of Green Mountain's Governance and Nominating Committee ("Governance Committee") from a least October 2007 to at least September 2009.

(a)    As a director of Green Mountain, defendant Mardy was responsible for overseeing the management of Green Mountain's business and was charged with staying informed about the operations of the Company. As a member of Green Mountain's Audit Committee and the designated "financial expert," Mardy was responsible for overseeing the Company's financial reporting processes and reviewing the Company's financial statements that were included in the Forms 10-K and 10-Q. Further, Mardy was specifically charged with evaluating and responding to deficiencies in the Company's internal controls. Mardy also was a member of the Audit Committee when it reviewed the Einhorn Presentation allegations and learned the details of Green Mountain's fraudulent scheme with MBlock. Mardy knew or recklessly disregarded that the Company engaged in numerous improper accounting practices, including the inventory manipulation scheme conducted through MBlock, that were used to manage Green Mountain's reported revenues. As a member of Green Mountain's Governance Committee, Mardy was responsible for evaluating the Company's corporate governance principles, including the Company's policies concerning insider pledges of Company stock.

(b)    Defendant Mardy failed to ensure that the Company maintained adequate internal controls over financial reporting, and also failed to ensure that the Company's financial statements complied with GAAP. Mardy signed, reviewed, and/or approved the Company's materially inaccurate financial statements for fiscal years 2007, 2008, and 2009, which were required to be restated. Mardy also signed the Forms 10-K for these years which improperly stated that the Company's internal controls over financial reporting "were effective." Mardy

- 26 -

issued, reviewed, and/or approved the Company's improper earnings guidance for fiscal year 2012, which he knew or recklessly disregarded lacked any reasonable foundation and were unreliable because the Company did not maintain internal controls sufficient to permit the Company to construct accurate forecasting models.   Mardy also failed to ensure that the Company maintained effective internal controls over demand forecasting, inventory management, and accounting.   Mardy was a member of the Governance Committee when it failed to implement policies preventing insiders from pledging material amounts of Company stock as collateral for margin loans, which created conflicts of interest on the part of key members of the Board and unjustifiably exposed Green Mountain and its shareholders to losses when margin calls forced defendants Stiller and Davis to sell $137.2 million of stock to meet margin calls.

(c)     While in possession of material, non-public information concerning Green Mountain's inadequate internal controls and improper business and accounting practices, defendant Mardy sold 20,000 shares of his Green Mountain stock for $1,949,606 in proceeds.

(d)     While defendant Mardy was systematically breaching his duties to Green Mountain, the Company paid him the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2011 | $81,000 | $74,296 | $155,296 |
| 2010 | $71,500 | $78,048 | $149,548 |
| 2009 | $58,500 | $47,688 | $106,188 |
| 2008 | $37,000 | $32,000 | $69,000 |
| 2007 | $3,000 | $7,440 | $10,440 |

(e)     Mardy is named as a defendant in the pending *LAMPERS* class action where he is alleged to have violated sections 11, 12(a)(2), and 15 of the Securities Act by signing the Company's 2011 offering documents which incorporated the Company's false financial statements.

- 27 -

(f)     Defendant Mardy is a citizen of New Jersey.

46.     Defendant Barbara D. Carlini ("Carlini") is a Green Mountain director and has been since 2002. Carlini is also a member of Green Mountain's Audit Committee and has been since at least January 2006 and a member of the Governance Committee and has been since May 2012. Carlini was also a member of Green Mountain's Governance Committee from at least October 2005 to at least September 2008.

(a)     As a director of Green Mountain, defendant Carlini was responsible for overseeing the management of Green Mountain's business and was charged with staying informed about the operations of the Company. As a member of Green Mountain's Audit Committee, Carlini was responsible for overseeing the Company's financial reporting processes and reviewing the Company's financial statements that were included in the Forms 10-K and 10-Q. Further, Carlini was specifically charged with evaluating and responding to deficiencies in the Company's internal controls. Carlini also was a member of the Audit Committee when it reviewed the Einhorn Presentation allegations and learned the details of Green Mountain's fraudulent scheme with MBlock. Carlini knew or recklessly disregarded that the Company engaged in numerous improper accounting practices, including the inventory manipulation scheme conducted through MBlock, that were used to manage Green Mountain's reported revenues. As a member of Green Mountain's Governance Committee, Carlini was responsible for evaluating the Company's corporate governance principles, including the Company's policies concerning insider pledges of Company stock.

(b)     Defendant Carlini failed to ensure that the Company maintained adequate internal controls over financial reporting, and also failed to ensure that the Company's financial statements complied with GAAP. Carlini signed, reviewed, and/or approved the Company's

- 28 -

materially inaccurate financial statements for fiscal years 2006, 2007, 2008, and 2009, which were required to be restated. Carlini also signed the Forms 10-K for these years which improperly stated that the Company's internal controls over financial reporting "were effective." Carlini issued, reviewed, and/or approved the Company's improper earnings guidance for fiscal year 2012, which she knew or recklessly disregarded, lacked any reasonable foundation and were unreliable because the Company did not maintain internal controls sufficient to permit the Company to construct accurate forecasting models. Carlini also failed to ensure that the Company maintained effective internal controls over demand forecasting, inventory management, and accounting. Carlini was a member of the Governance Committee when it failed to implement policies preventing insiders from pledging material amounts of Company stock as collateral for margin loans, and when it "grandfathered in" defendants Stiller's and Davis' existing stock pledges in 2011 when it created such a policy, both of which created conflicts of interest on the part of key members of the Board and unjustifiably exposed Green Mountain and its shareholders to losses when margin calls forced Stiller and Davis to sell $137.2 million of stock to meet margin calls.

(c)     While in possession of material, non-public information concerning Green Mountain's inadequate internal controls and improper business and accounting practices, defendant Carlini sold 108,000 shares of her Green Mountain stock for $11,493,252 in proceeds.

(d)     While defendant Carlini was systematically breaching her duties to Green Mountain, the Company paid her the following compensation as a director:

| Fiscal Year | Stock Awards | Option Awards | Total |
|---|---|---|---|
| 2011 | $63,000 | $74,296 | $137,296 |
| 2010 | $55,500 | $78,048 | $133,548 |
| 2009 | $51,000 | $58,915 | $109,915 |
| 2008 | $34,000 | $51,000 | $85,000 |
| 2007 | $18,000 | $36,487 | $54,487 |

(e)     Carlini is named as a defendant in the pending *LAMPERS* class action where she is alleged to have violated sections 11, 12(a)(2), and 15 of the Securities Act by signing the Company's 2011 offering documents which incorporated the Company's false financial statements.

(f)     Defendant Carlini is a citizen of Illinois.

47.     Defendant Jules A. del Vecchio ("del Vecchio") is a Green Mountain director and has been since 1993. Del Vecchio is also a member of Green Mountain's Audit Committee and a member of the Governance Committee and has been since at least October 2009.

(a)     As a director of Green Mountain, defendant del Vecchio was responsible for overseeing the management of Green Mountain's business and was charged with staying informed about the operations of the Company. As a member of Green Mountain's Audit Committee, del Vecchio was responsible for overseeing the Company's financial reporting processes and reviewing the Company's financial statements that were included in the Forms 10-K and 10-Q. Further, del Vecchio was specifically charged with evaluating and responding to deficiencies in the Company's internal controls. Del Vecchio knew or recklessly disregarded that the Company engaged in numerous improper accounting practices,  including the inventory manipulation scheme conducted through MBlock, that were used to manage Green Mountain's reported revenues. As a member of Green Mountain's Governance Committee, del Vecchio was responsible for evaluating the Company's corporate governance principles, including the Company's policies concerning insider pledges of Company stock.

(b)     Defendant del Vecchio failed to ensure that the Company maintained adequate internal controls over financial reporting, and also failed to ensure that the Company's financial statements complied with GAAP. Del Vecchio signed, reviewed, or approved the

Company's materially inaccurate financial statements for fiscal years 2006, 2007, 2008, and 2009, which were required to be restated. Del Vecchio also signed the Forms 10-K for these years which improperly stated that the Company's internal controls over financial reporting "were effective." Del Vecchio issued, reviewed, and/or approved the Company's improper earnings guidance for fiscal year 2012, which he knew or recklessly disregarded lacked any reasonable foundation and were unreliable because the Company did not maintain internal controls sufficient to permit the Company to construct accurate forecasting models. Del Vecchio also failed to ensure that the Company maintained effective internal controls over demand forecasting, inventory management, and accounting. Del Vecchio also was a member of the Audit Committee when it reviewed the Einhorn Presentation allegations and learned the details of Green Mountain's fraudulent scheme with MBlock. Del Vecchio was a member of the Governance Committee when it failed to implement policies preventing insiders from pledging material amounts of Company stock as collateral for margin loans, and when it "grandfathered in" defendants Stiller's and Davis' existing stock pledges in 2011 when it created such a policy, both of which created conflicts of interest on the part of key members of the Board and unjustifiably exposed Green Mountain and its shareholders to losses when margin calls forced Stiller and Davis to sell $137.2 million of stock to meet margin calls.

(c)     While in possession of material, non-public information concerning Green Mountain's inadequate internal controls and improper business and accounting practices, defendant del Vecchio sold 65,250 shares of his Green Mountain stock for $5,904,695.76 in proceeds.

(d)     While defendant del Vecchio was systematically breaching his duties to Green Mountain, the Company paid him the following compensation as a director:

- 31 -

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2011 | $66,000 | $74,296 | $140,296 |
| 2010 | $58,500 | $78,048 | $136,548 |
| 2009 | $44,000 | $58,915 | $102,915 |
| 2008 | $29,000 | $51,000 | $80,000 |
| 2007 | $16,000 | $36,487 | $52,487 |

(e)     Del Vecchio is named as a defendant in the pending *LAMPERS* class action where he is alleged to have violated sections 11, 12(a)(2), and 15 of the Securities Act by signing the Company's 2011 offering documents which incorporated the Company's false financial statements.

(f)     Defendant Del Vecchio is a citizen of New York.

48.     Defendant David E. Moran ("Moran") is a Green Mountain director and has been since 1995.  Moran was also a member of Green Mountain's Governance Committee from at least October 2005 to at least September 2009.

(a)     As a director of Green Mountain, defendant Moran was responsible for overseeing the management of Green Mountain's business and was charged with staying informed about the operations of the Company.  Moran knew or recklessly disregarded that the Company engaged in numerous improper accounting practices,  including the inventory manipulation scheme conducted through MBlock, that were used to manage Green Mountain's reported revenues.  As a member of Green Mountain's Governance Committee, Moran was responsible for evaluating the Company's corporate governance principles, including the Company's policies concerning insider pledges of Company stock.

(b)     Defendant Moran failed to ensure that the Company maintained effective internal controls over demand forecasting, inventory management, and accounting.  Moran signed, reviewed, or approved the Company's materially inaccurate financial statements for fiscal years 2006, 2007, 2008, and 2009, which were required to be restated.  Moran also signed the

- 32 -

Forms 10-K for these years which improperly stated that the Company's internal controls over financial reporting "were effective."  Moran also issued, reviewed, or approved the Company's improper earnings guidance for fiscal year 2012, which he knew or recklessly disregarded lacked any reasonable foundation and were unreliable because the Company did not maintain internal controls sufficient to permit the Company to construct accurate forecasting models.  Moran was a member of the Governance Committee when it failed to implement policies preventing insiders from pledging material amounts of Company stock as collateral for margin loans, which created conflicts of interest on the part of key members of the Board and unjustifiably exposed Green Mountain and its shareholders to losses when margin calls forced defendants Stiller and Davis to sell $137.2 million of stock to meet margin calls.

        (c)     While in possession of material, non-public information concerning Green Mountain's inadequate internal controls and improper business and accounting practices, defendant Moran sold 18,883 shares of his Green Mountain stock for $1,592,042.01 in proceeds.

        (d)     While defendant Moran was systematically breaching his duties to Green Mountain, the Company paid him the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2011 | $53,000 | $74,296 | $127,296 |
| 2010 | $50,500 | $78,048 | $128,548 |
| 2009 | $43,000 | $58,915 | $101,915 |
| 2008 | $29,000 | $51,000 | $80,000 |
| 2007 | $16,000 | $36,487 | $52,487 |

        (e)     Moran is named as a defendant in the pending *LAMPERS* class action where he is alleged to have violated sections 11, 12(a)(2), and 15 of the Securities Act by signing the Company's 2011 offering documents which incorporated the Company's false financial statements.

        (f)     Defendant Moran is a citizen of Connecticut.

49.     Defendant Hinda Miller ("Miller") is a Green Mountain director and has been since 1999. Miller was appointed Chairman of Green Mountain's Governance Committee in May 2012. She has been a member of the Governance Committee since at least October 2005, and chaired the Committee from October 2005 to September 2009. Miller was a member of the Audit Committee from at least January 2006 through December 2008.

(a)     As a director of Green Mountain, defendant Miller was responsible for overseeing the management of Green Mountain's business and was charged with staying informed about the operations of the Company. As a member of Green Mountain's Audit Committee, Miller was responsible for overseeing the Company's financial reporting processes and reviewing the Company's financial statements that were included in the Forms 10-K and 10-Q. Further, Miller was specifically charged with evaluating and responding to deficiencies in the Company's internal controls. Miller knew or recklessly disregarded that the Company engaged in numerous improper accounting practices,  including the inventory manipulation scheme conducted through MBlock, that were used to manage Green Mountain's reported revenues. As a member of Green Mountain's Governance Committee, Miller was responsible for evaluating the Company's corporate governance principles, including the Company's policies concerning insider pledges of Company stock.

(b)     Defendant Miller failed to ensure that the Company maintained adequate internal controls over financial reporting, and also failed to ensure that the Company's financial statements complied with GAAP. Miller signed, reviewed, and/or approved the Company's materially inaccurate financial statements for fiscal years 2006, 2007, 2008, and 2009, which were required to be restated. Miller also signed the Forms 10-K for these years which improperly stated that the Company's internal controls over financial reporting "were effective."

Miller issued, reviewed, and/or approved the Company's improper earnings guidance for fiscal year 2012, which she knew or recklessly disregarded, lacked any reasonable foundation and were unreliable because the Company did not maintain internal controls sufficient to permit the Company to construct accurate forecasting models. Miller also failed to ensure that the Company maintained effective internal controls over demand forecasting, inventory management, and accounting. Miller was a member of the Governance Committee when it failed to implement policies preventing insiders from pledging material amounts of Company stock as collateral for margin loans, and when it "grandfathered in" defendants Stiller's and Davis' existing stock pledges in 2011 when it created such a policy, both of which created conflicts of interest on the part of key members of the Board and unjustifiably exposed Green Mountain and its shareholders to losses when margin calls forced Stiller and Davis to sell $137.2 million of stock to meet margin calls.

(c)     While in possession of material, non-public information concerning Green Mountain's inadequate internal controls and improper business and accounting practices, defendant Miller sold 121,500 shares of her Green Mountain stock for $10,959,784.50 in proceeds.

(d)     While defendant Miller was systematically breaching her duties to Green Mountain, the Company paid her the following compensation as a director:

| Fiscal Year | Stock Awards | Option Awards | Total |
|---|---|---|---|
| 2011 | $59,000 | $74,296 | $133,296 |
| 2010 | $65,500 | $78,048 | $143,548 |
| 2009 | $53,500 | $58,915 | $112,415 |
| 2008 | $37,000 | $51,000 | $88,000 |
| 2007 | $20,000 | $36,487 | $56,487 |

(e)     Miller is named as a defendant in the pending *LAMPERS* class action and is alleged to have violated sections 11, 12(a)(2), and 15 of the Securities Act by signing the

Company's 2011 offering documents which incorporated the Company's false financial statements.

      (f)    Defendant Miller is a citizen of Vermont.

    50.    Defendant Davis was a Green Mountain director from 1993 until his "resignation" from the Board in August 2012. According the Company's 2011 Proxy Statement, Davis was appointed as Green Mountain's Lead Director in January 2009 due to his "wealth of knowledge about [the] Company [and] strong relationship with [the Company's] Chairman...." He remained Lead Director until May 2012, when his Lead Director position and Board committee memberships were revoked by the Board after finding that Davis made margin-call related stock sales which were "inconsistent with the Company's internal trading policies." Davis was a member of Green Mountain's Audit Committee from at least January 2006 to May 2012, and was designated as a "financial expert" by the Board throughout that time; was Chairman of the Governance Committee from at least October 2009 to May 2012; and Chairman of the Audit Committee from at least January 2006 to April 2007.

      (a)    As Green Mountain's Lead Director, defendant Davis was required to chair all meetings of the independent directors and to serve as liaison between defendant Stiller, the non-independent Board Chairman, and the independent directors and the CEO and all of the directors. As a director of Green Mountain, Davis was responsible for overseeing the management of Green Mountain's business and was charged with staying informed about the operations of the Company. As a member of Green Mountain's Audit Committee and designated as a "financial expert," Davis was responsible for overseeing the Company's financial reporting processes and reviewing the Company's financial statements that were included in the Forms 10-K and 10-Q. Further, Davis was specifically charged with evaluating and responding to

- 36 -

deficiencies in the Company's internal controls over financial reporting. Davis also was a member of the Audit Committee when it reviewed the Einhorn Presentation allegations and learned the details of Green Mountain's fraudulent scheme with MBlock. Davis knew or recklessly disregarded that the Company engaged in numerous improper accounting practices, including the inventory manipulation scheme conducted through MBlock, that were used to manage Green Mountain's reported revenues. As a member of Green Mountain's Governance Committee, Davis was responsible for evaluating the Company's corporate governance principles, including the Company's policies concerning insider pledges of Company stock. Davis not only failed to police executive officer and director compliance with these policies, but fought for special treatment under them and then blatantly violated them, heedless of the consequences for Green Mountain and its shareholders. Davis was particularly motivated to ensure that Green Mountain's stock price remained above a certain level because he had pledged substantial amounts of his Green Mountain stock as collateral to secure large margin loans.

(b)     Defendant Davis failed to ensure that the Company maintained adequate internal controls over financial reporting, and also failed to ensure that the Company's financial statements complied with GAAP. Defendant Davis signed, reviewed, and/or approved the Company's materially inaccurate financial statements for fiscal years 2006, 2007, 2008, and 2009, which were required to be restated. Davis also signed the Forms 10-K for these years which improperly stated that the Company's internal controls over financial reporting "were effective." Davis issued, reviewed, and/or approved the Company's improper earnings guidance for fiscal year 2012, which he knew or recklessly disregarded, lacked any reasonable foundation and were unreliable because the Company did not maintain internal controls sufficient to permit the Company to construct accurate forecasting models. Davis also failed to ensure that the

Company maintained effective internal controls over financial reporting, demand forecasting, inventory management, and accounting. Davis was a member of the Governance Committee when it failed to implement policies preventing insiders from pledging material amounts of Company stock as collateral for margin loans, and when it "grandfathered in" his own and defendant Stiller's existing stock pledges in 2011 when it created such a policy, both of which created conflicts of interest on the part of key members of the Board – including himself – and unjustifiably exposed Green Mountain and its shareholders to losses when margin calls forced him and Stiller to sell $137.2 million of stock to meet margin calls.

(c)     While in possession of material, non-public information concerning Green Mountain's inadequate internal controls and improper business and accounting practices, defendant Davis sold 100,000 shares of his Green Mountain stock for $6,785,723 in proceeds.

(d)     While defendant Davis was systematically breaching his duties to Green Mountain, the Company paid him the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2011 | $52,750 | $37,250 | $74,296 | $164,296 |
| 2010 | $83,000 | - | $78,048 | $161,048 |
| 2009 | $52,750 | $17,000 | $58,915 | $128,665 |
| 2008 | $3,000 | $36,000 | $51,000 | $90,000 |
| 2007 | $11,000 | $14,000 | $36,487 | $61,487 |

(e)     Davis is named as a defendant in the pending *LAMPERS* class action where he is alleged to have violated sections 11, 12(a)(2), and 15 of the Securities Act by signing the Company's 2011 offering documents which incorporated the Company's false financial statements.

(f)     Defendant Davis is a citizen of Michigan.

51.     Defendant Douglas N. Daft ("Daft") was a Green Mountain director from December 2009 to May 2012. Daft was also a member of Green Mountain's Governance Committee from at least 2010 to May 2012.

(a)     As a director of Green Mountain, defendant Daft was responsible for overseeing the management of Green Mountain's business and was charged with staying informed about the operations of the Company. Daft knew or recklessly disregarded that the Company engaged in numerous improper accounting practices, including the inventory manipulation scheme conducted through MBlock, that were used to manage Green Mountain's reported revenues. As a member of Green Mountain's Governance Committee, Daft was responsible for evaluating the Company's corporate governance principles, including the Company's policies concerning insider pledges of Company stock.

(b)     Defendant Daft failed to ensure that the Company maintained effective internal controls over demand forecasting, inventory management, and accounting. Daft issued, reviewed, and/or approved the Company's improper earnings guidance for fiscal year 2012, which he knew or recklessly disregarded, lacked any reasonable foundation and were unreliable because the Company did not maintain internal controls sufficient to permit the Company to construct accurate forecasting models. Daft was a member of the Governance Committee when it failed to implement policies preventing insiders from pledging material amounts of Company stock as collateral for margin loans, and when it "grandfathered in" defendants Stiller's and Davis' existing stock pledges in 2011 when it created such a policy, both of which created conflicts of interest on the part of key members of the Board and unjustifiably exposed Green Mountain and its shareholders to losses when margin calls forced Stiller and Davis to sell $137.2 million of stock to meet margin calls.

- 39 -

(c)     While defendant Daft was systematically breaching his duties to Green Mountain, the Company paid him the following compensation as a director:

| Fiscal Year | Stock Awards | Option Awards | Total |
|---|---|---|---|
| 2011 | $54,500 | $74,296 | $128,796 |
| 2010 | $39,775 | $78,048 | $117,823 |

(d)     Daft is a citizen of Massachusetts.

52.     The defendants identified in ¶¶45-47, 49-50 are referred to as the "Audit Committee Defendants."     The defendants identified in ¶¶45-51 are referred to as the "Governance Committee Defendants." The defendants identified in ¶¶40-41, 45-51 are referred to as the "Director Defendants."  Collectively, the defendants identified in ¶¶40-51 are referred to as the "Individual Defendants."

## V.    DUTIES OF GREEN MOUNTAIN'S DIRECTORS AND OFFICERS

### A.    Fiduciary Duties

53.     By reason of their positions as officers, directors, and/or fiduciaries of Green Mountain and because of their ability to control the business and corporate affairs of Green Mountain, the Individual Defendants owed and owe Green Mountain and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Green Mountain in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Green Mountain and its shareholders so to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

54.     Each director and officer of the Company owes to Green Mountain and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company,

the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

55.    Each director and officer of Green Mountain had the duty to exercise well-informed business judgment, which required each of the Individual Defendants to ensure that they availed themselves of all reasonably available information concerning the Company's financial reporting processes, inventory practices, relationship with MBlock, and demand forecasting models. Moreover, the Individual Defendants had the responsibility to conduct a reasonable inquiry and investigation upon learning of potential accounting manipulations and of significant or material deficiencies in the Company's internal controls over financial reporting.

**B.    Company Code of Ethics**

56.    Green Mountain maintains a Code of Ethics, applicable to all Company employees and directors, which provides that "integrity and honesty provide the backbone of our business dealings and success in the marketplace."

57.    The Code of Ethics includes the following principles:

**Accurate Reporting**
*Maintain accurate records and report any unethical behavior.*

It is the responsibility of each of us to ***ensure the accurate reporting of GMCR's business and operations***. We must all cooperate daily to make sure that correct records are maintained, that financial disclosures comply with the rules that govern us, and that any official proceedings are not impeded.

* * *

**Legal Compliance**
*Comply with all laws, rules, and regulatory requirements.*

All GMCR employees must ***be aware of the laws and regulations that govern our business***, as well as how these policies affect us in respect to our specific

- 41 -

jobs. It is up to each of us to *adhere to these laws as well as to prevent, detect, and report instances of illegal behavior that do not support the interests and well-being of the company*.

Beyond compliance with the law, GMCR employees should act in good faith during interactions with local, state, and federal organizations. All communication with government officials and all lobbying activities must be direct, honest, and in accordance with the rights and responsibilities relevant to our company and operations. Finally, GMCR operates in the global marketplace with diverse customs; we must each be aware of the relevant laws of the countries with which GMCR trades and otherwise conducts business.

### Conflicts of Interest

*Avoid conflicts of interest and refrain from any appearance of impropriety.*

A "conflict of interest" occurs whenever private or personal interests interfere with performance of duties or the best interests of the company as a whole. *We should avoid conflicts of personal interests with GMCR interests and even situations that may appear to constitute a conflict of interest. Each of us is responsible for avoiding relationships that might impair loyalty to GMCR or affect personal judgment regarding what is in the company's best interests*.

Examples of conflicting arrangements include: loans or guarantees to employees, officers or directors; gifts to or from employees, officers or directors; and relationships with competitors or suppliers. Things to consider in evaluating whether a situation presents a conflict of interest: interference of one's job; *adverse or beneficial impact on business* or GMCR relationships; enhancement of a competitor's positioning; and the extent to which the action or relationship appears improper to an observer. Conflicts of interest are prohibited unless the Board of Directors gives specific authorization to a particular situation.

\* \* \*

### Corporate Assets & Opportunities

*Be responsible stewards in the use, protection, and management of GMCR's assets and resources.*

We are each responsible for the protection and efficient use of GMCR's assets and resources, which include intellectual and physical property, manpower, supplies, consumables, products and equipment. *We all share the duty of seeing that GMCR funds are spent in a fiscally responsible manner and that our resources are used for legitimate business purposes*. Employees should be aware that GMCR maintains the right to access, review, and monitor any information transmitted, received or stored using our electronic equipment, with or without a employee's or third party's knowledge, consent or approval (Please refer to our E-mail policy).

Business gifts and entertainment are meant to create goodwill and sound working relationships. GMCR does not offer or solicit gifts, entertainment, or favors of any value unless it is consistent with our principles and in the best interest of the company. All of us should avoid situations where our customers, suppliers or other stakeholders are in a position to feel obligated to make a gift, provide entertainment, or do personal favors in the course of conducting business with GMCR. No one should accept gifts, cash, or entertainment that may be construed as a bribe, kickback or violation of any law. Please use discretion, moderation, and good judgment when gift-giving and entertainment are options.

Further, *no employee should use GMCR's property, information, or his/her position in the company for personal gain*, or to compete or to prepare to compete with the company. *No one should take personal advantage of opportunities or potential opportunities that properly belong to GMCR, or are discovered in the course of employment or directorship*, without first obtaining consent from a direct supervisor, Human Resources or in the case of executive officers and directors, the Board.

### C.    Duties of Members of the Board

58.    Green Mountain's Corporate Governance Principles, in effect since at least March

2010, state that the role of the Board is:

[A]s manager of the affairs of the Company, [to] act[] as overseer of the Company's operations and management, who are charged, under the direction of the Chief Executive Officer, to conduct the Company's day-to-day business in a manner that is consistent with the agreed strategic direction which is designed to protect and enhance the interests of, and assure the Company's long-term vitality for, all its stakeholders, including its shareholders, employees, consumers, customers and communities.

59.    The Corporate Governance Principles specifically charge the Board with overseeing the Company's: (i) corporate strategy; (ii) senior management succession and management structure; (iii) risk management; (iv) talent management; (v) capital structure; (vi) corporate reputation and culture; (vii) executive compensation; (viii) significant transactions; (ix) stakeholder return; and (x) Board effectiveness.

60.    The Corporate Governance Principles also contain the following Governance Policies and provisions regarding conflicts of interest:

* All major corporate decisions shall be considered and taken by the full Board.

- Each member of the Board will covenant to assist in the creation of an environment that fosters open, honest and transparent participation and deliberation of all issues and matters before the Board and to appropriately challenge both management and other Board members in candid debate on the issues, all with a goal to arrive at a single, unified position at the conclusion of any discussion or upon taking a decision.

                              *   *   *

- Each Director is expected at all times to adhere to the Company's Principles and its Ethics Policy.

- If an actual or potential conflict of interest arises, including any related party transaction, the Director shall promptly inform the Chairman of the Board, if any, the Lead Director, if any, the Chief Executive Officer or the Secretary. If a significant conflict of interest cannot be resolved, the Director must resign.

- The Board will resolve any conflict of interest involving any member of the Board, and the following officers at the Enterprise level: Chief Executive Officer, Chief Operating Officer, President, any Executive Vice President or Senior Vice President, the Chief Financial Officer, Vice President – Finance, Treasurer, Controller or General Counsel, including the Presidents of the Company's business units.

### D.    Duties of Members of the Audit Committee

61.    The Charter of Green Mountain's Audit Committee has stated since at least

October 2006 that the Audit Committee's purpose is to

> [O]versee the accounting and financial reporting processes and the audits of the financial statements of [the Company], including monitoring the integrity of the financial reports and other financial information of the Company; compliance by the Company with legal and regulatory requirements; the Company's systems of internal controls regarding finance, accounting, legal compliance and ethics that management and the Board have established; and the independence and performance of the Company's registered public accounting firm (the "Auditors") and the Company's auditing, accounting and financial reporting processes generally.

Until its amendment in December 2009, the members of the Audit Committee were further

charged with "encourag[ing] continuous improvement of, and [fostering] adherence to, the

Company's policies, procedures and practices at all levels."

- 44 -

62.     Since at least October 2006, the Audit Committee's Charter has obligated the

Audit Committee Defendants, del Vecchio, Mardy, Carlini, and former members Davis and

Miller, to fulfill the following specific responsibilities:

- Be directly and solely responsible for the appointment, oversight, evaluation, compensation, and replacement of any registered public accounting firm employed by the Company (the "Auditors");

- Review with management and the Auditors the financial statements to be included in the Company's Annual Report on Form 10-K and, the Annual Report to Stockholders, and review and consider with such accounting firm the matters required to be discussed by Statement of Auditing Standards ("SAS") No. 61, as amended from time to time;

- Review significant financial reporting issues and judgments made by management and the Auditors in connection with the preparation of the Company's financial statements, including an analysis of the effect of alternative GAAP methods on the Company's financial statements and a description of any transactions as to which management obtained SAS No.50 letters;

- Review with management and the Auditors the financial statements to be included in the Company's Quarterly Report on Form 10-Q and review and consider with such accounting firm the matters required to be discussed by Statement of Auditing Standards ("SAS") No. 61, as amended from time to time;

- Establish and, from time to time, review and reassess, procedures for (i) the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and (ii) the confidential, anonymous submission by employees of the issuer of concerns regarding questionable accounting or auditing matters;

- Review major changes to the Company's auditing and accounting principles and practices as suggested by the Auditors, management or internal auditors;

* * *

- Receive periodic reports from the Auditors which show all critical accounting policies and practices used in connection with the Company's audit; all alternative treatments of financial information with GAAP that have been discussed with management, ramifications of the use of such

alternative disclosures and treatments, and the treatment preferred by the Auditor; and other material written communications between the Auditor and management, such as any management letter or schedule of unadjusted differences;

* * *

- Evaluate whether management is properly and adequately emphasizing the importance of internal control measures throughout the organization;

- Respond to and oversee corrective action in connection with reports by executive officers of deficiencies in the design or operation of internal controls or fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls; [and]

- Resolve disagreements between management and the Auditors regarding financial reporting;

### E. Duties of Members of the Governance Committee

63. The Charter of Green Mountain's Governance Committee, in effect since at least December 2009, states that the committee's purposes are to: "(1) identify, review and recommend qualified candidates to the Board for nomination as members of the Board and its Committees and (2) review, evaluate and report to the Board on the corporate governance principles applicable to the Company." The Governance Committee Defendants, Carlini, del Vecchio, Miller, and former members Daft, Davis, Mardy, and Moran, therefore were required to review and evaluate the Company's policies with regard to insider pledges of Company stock as collateral for margin and other type of loans. For years, however, the Governance Committee failed to adopt policies restricting executive officer and director pledges of material amounts of Company stock to secure margin debt, despite corporate governance principles calling for such restrictions to prevent conflicts of interest and damage to Company and shareholder interests, and the sizable margin loans held by defendants Stiller and Davis. The Governance Committee did not recommend and the Board did not make amendments to the Company's trading policy to

- 46 -

prohibit new pledges of Company stock to secure personal debt until December 2011. The policy did not take effect until after January 1, 2012. Even after the Governance Committee determined that Company policy should prohibit pledges of Company stock to secure personal debt, the Governance Committee inexplicably recommended that the Board grandfather in defendant Stiller's and Davis' pledged positions as of January 1, 2012, fostering continued conflicts of interest on the part of Stiller and Davis and despite the clear and present danger that margins calls could trigger a liquidity event damaging to Company and shareholder interests.

**F.  Control, Access, and Authority**

64.  The Individual Defendants, because of their positions of control and authority as directors and/or officers of Green Mountain, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

65.  Because of their advisory, executive, managerial, and directorial positions with Green Mountain, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and growth prospects of Green Mountain. While in possession of this material, non-public information, the Individual Defendants signed/and or certified materially inaccurate financial statements that were required to be restated, and made other improper representations regarding the Company, including concerning the effectiveness of the Company's internal controls, accuracy of the Company's earnings guidance, and demand for the Company's products, among other things.

66.  At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Green Mountain, and was at all times acting within the course and scope of such agency.

### G.    Reasonable and Prudent Supervision

67.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)    properly and accurately guide investors and securities analysts to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health;

(b)    exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(c)    exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

(d)    remain informed how Green Mountain conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws.

### H.    Breaches of Duties

68.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duty of loyalty, good faith, and diligence in the management and administration of the affairs of the Company, as well as in

the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Green Mountain, the absence of good faith on their part, and a knowing or willful disregard for their duties to the Company and its shareholders that the Individual Defendants were aware posed a risk of serious injury to the Company.

69.     The Individual Defendants breached their duty of loyalty by allowing Individual Defendants to cause, or by themselves causing, the Company to misrepresent its financial condition, future prospects, and adequacy of the Company's internal controls, among other things. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. Because of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject to investigations by the SEC, and three class action lawsuits alleging violations of the securities laws. Green Mountain has expended, and continues to expend, significant sums of money and management resources responding to these investigations, defending against these lawsuits, and attempting to remediate on an emergency basis Green Mountain's disastrous internal controls environment.

## VI.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

70.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

71.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) conceal the fact that

the Company was engaging in a scheme to manipulate its financial statements, which allowed certain defendants to sell their Company stock at artificially inflated levels; (ii) conceal the fact that the Company conducted numerous improper business practices via its relationship with MBlock; (iii) conceal the fact that the Director Defendants did not maintain adequate internal controls; (iv) enhance the Individual Defendants' executive and directorial positions at Green Mountain and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions; and (v) deceive the investing public, including shareholders of Green Mountain, regarding the Individual Defendants' management of Green Mountain's operations, the Company's financial health and stability, and its future business prospects that had been misrepresented by Individual Defendants. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

72.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue materially inaccurate financial statements.

73.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, illicit insider trading, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

74.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the

Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

75.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VII.   SUBSTANTIVE ALLEGATIONS

### A.     The Individual Defendants Consciously Disregard Their Duty to Build an Accounting and Financial Reporting Infrastructure Sufficient to Keep Pace with the Growth of Green Mountain's Operations

#### 1.     Background of the Company and Its Management

76.     Green Mountain was founded in 1981 by defendant Stiller as a small café in rural Vermont that roasted and served coffee.  The Company later began distributing coffee to restaurants, supermarkets, convenience stores, and specialty food stores. In 1993, Green Mountain completed its initial public offering.

77.     Defendant Stiller had no previous experience leading a publicly traded company. Prior to founding Green Mountain, he had co-founded a cigarette-rolling paper business called E-Z Wider in 1972 with Burton Rubin ("Rubin").  Rubin has been quoted in the media saying that Stiller was not the most professional manager or business partner.  A *Bloomberg* article published July 30, 2012 entitled "Green Mountain CEO Faces Percolating Issue of Who's Boss," which reported Rubin's observations, noted that "[p]eople who have known Stiller since the 1970s and 1980s say they aren't surprised Green Mountain sometimes seems more like a startup

than a company with a market capitalization of about $2.8 billion." According to Rubin, Stiller "was very ambitious and that sometimes led him astray," Rubin commented.

78.    In 1998, Green Mountain partnered with Keurig, which had developed a single-cup brewing machine and patented "K-Cups," single-serving portion packs used with the Company's brewers. The partnership enabled Green Mountain to manufacture and sell Keurig's K-Cups and compatible brewers – the products that would drive Green Mountain's extraordinary growth in operations over the next decade. In 2002, Green Mountain acquired 42% of Keurig. In June 2006, Green Mountain acquired the remainder of Keurig.

79.    Following the acquisition of Keurig, Green Mountain hired defendant Blanford, who, unlike defendant Stiller, had experience leading publicly-traded companies, to take over as CEO. Stiller remained the Chairman of the Board, and the Company's Form 8-K filed May 3, 2007, promised that Stiller would "work in partnership with Blanford to ensure [Green Mountain's] continued success." Blanford's appointment as CEO, however, did not change the reality of how – and who – ran Green Mountain. Stiller continued to call the shots at the Company while the Individual Defendants claimed in the Company's 2008 Proxy Statement that Stiller was "act[ing] as an advisor" to Blanford. In fact, well after Blanford was appointed CEO, securities analysts, business reporters, and major investors continued to call Stiller for information following the Company's quarterly earnings reports. According to Paul Hodgson, senior research associate at GMI Ratings, "[i]f they're still doing that, then there's a perception he's still running the company," Hodgson said in an interview. "That's not healthy when you have a CEO."

### 2. The Individual Defendants' Aggressive Growth Strategy Substantially Increases the Size and Complexity of Green Mountain's Operations and the Volume of Its Transactions

80.     Following the Company's acquisition of Keurig, the Board approved a multi-pronged strategy to leverage the Company's Keurig K-Cup and brewer business.

81.     **Expand Manufacturing Capacity:** The Company materially increased capital expenditures to expand its own manufacturing capacity to support growth in direct sales of K-Cups and single-cup brewers.   In fiscal 2006, the Company produced all of its coffee in Vermont, and capital expenditures were just $13.6 million.  In fiscal 2007, this number grew to $21.8 million, and then increased by 123% in fiscal 2008 to $48.7 million.  The Company spent a similar amount in fiscal 2009 - $48.3 million.   The Company now has production and distribution facilities in eight cities in North America.

82.     **License Third-Party Roasters:** Green Mountain grew its business through patent licensing agreements with third-party coffee roasting companies.  These licensing arrangements granted the third-party roasters the right to manufacture, distribute, and sell K-Cups on an exclusive or non-exclusive basis in exchange for royalty payments, which Green Mountain earned once the licensee shipped K-Cups to its customers.  In fiscal 2007, Green Mountain earned $15.1 million in royalty income from licensing agreements with third-party brewers.  By fiscal 2009, Green Mountain reported earnings of $39.5 million in royalty income from its licensing agreements.

83.     **Acquire the Third-Party Licensees:** As the September 2012 expiration of the two principal patents associated with the Company's current generation K-Cup portion packs used in Keurig brewers approached, Green Mountain acquired many of these third-party coffee roasters to prevent them from becoming competitors. Green Mountain closed its first acquisition in fiscal 2009, spending $40.3 million to acquire Tully's Coffee Corporation ("Tully's"), and

acquired three more companies during the following two fiscal years at a total cost of more than $1.368 billion to the Company.

84. **Outsource Inventory Functions to MBlock:** Defendants caused Green Mountain to outsource its warehousing, inventory maintenance, order processing, and shipping functions to fulfillment vendor MBlock. As a result of these initiatives, Green Mountain's reported net sales in 2006 more than doubled by 2008, and more than tripled by 2009.

85. Each element of Green Mountain's growth strategy substantially increased the size and complexity of the Company's operations and enormously increased the volume and complexity of transactions that had to be properly controlled, accounted for, and reported in Green Mountain's consolidated financial statements. These demands quickly overwhelmed Green Mountain's rudimentary and already over-taxed accounting and finance departments, information technology, and related reporting and internal controls infrastructure. Taken together, these core strategic initiatives required nothing less than a complete overhaul and reconstruction of Green Mountain's internal controls infrastructure.

86. As alleged in greater detail below, however, the Director Defendants consciously disregarded their duty to make the investments necessary to build out and maintain the accounting, financial, and information systems infrastructure necessary to keep pace with this growth and to ensure the effectiveness of Green Mountain's internal controls and the accuracy and integrity of the Company's accounting and financial reporting. At a time when Green Mountain's break-neck growth strategy demanded more and more of the Company's internal control infrastructure, Board inattention and management's drive to control costs and report ever larger margins ensured that these critical functions languished. Green Mountain lacked documented accounting policies and standardized methods of applying those policies across

- 54 -

business units; its accounting and finance personnel were under-trained and under-staffed; its information systems were outmoded and under-resourced; it lacked key management, financial reporting, and control and policy positions; and as a result, it was unable to identify and remedy even the most obvious and persistent violations of GAAP and basic accounting and reporting rules.  Soon after Green Mountain acquired Keurig and lauded its growth strategy, material deficiencies in internal controls began to undermine the accuracy of Green Mountain's accounting and financial reporting resulting in the publication of years of false financial results.

87.    The Individual Defendants' failure to develop an adequate accounting and financial infrastructure to maintain appropriate accounting, financial, and disclosure controls allowed managers at various levels of the Company to employ multiple improper financial and accounting practices over several years.  These practices, in turn, permitted the Individual Defendants to portray Green Mountain as an unremittingly successful growth story to securities analysts and investors.  The material deficiencies in internal controls led directly to Green Mountain's publication of materially inaccurate and misleading quarterly and annual financial statements from 2006 through at least 2010.  Many of the problems flowed directly from the key components of Green Mountain's growth strategy.

88.    **Licensing**: From 2007 to 2010, Green Mountain materially increased its revenues through royalty fees it received from licensing arrangements entered into with third-party coffee roasters – which accounted for over 44% of the Company's total pretax income for fiscal 2007 through the third quarter of fiscal 2010.  The Individual Defendants disclosed in the Company's Form 10-K for fiscal year 2009 filed with the SEC on November 25, 2009 ("2009 Form 10-K") that "[a] significant and increasing percentage of our total revenue has been attributable to royalties and other revenue from sales of K-Cups for use with our Keurig single-cup brewing

systems." These licensing arrangements granted the third-party roasters the right to manufacture, distribute, and sell K-Cups in exchange for royalty payments. Green Mountain earned royalty income whenever the licensed third-party roasters shipped K-Cups to their customers. Defendants Stiller, Rathke, Carlini, Davis, del Vecchio, Miller, and Moran described this controlled competition strategy in the Company's 2006 Form 10-K, filed with the SEC December 14, 2006 ("2006 Form 10-K"). Although "to some extent these brands compet[ed]" against Green Mountain's own brands, the royalty fees the licensees paid to Green Mountain for each K-Cup they shipped more than offset the impact on Green Mountain's own sales.

89.     The Individual Defendants were well-aware of the importance of license royalties to Green Mountain's earnings. Green Mountain's royalty income was a material element in the Company's profitability, representing $109.7 million, or 44.4% of total pretax income, for fiscal year 2007 through the third quarter of fiscal 2010. In the Company's 2009 Form 10-K, the Individual Defendants disclosed that "[a] significant and increasing percentage of our total revenue has been attributable to royalties and other revenue from sales of K-Cups for use with our Keurig single-cup brewing systems[,]" and reported that 44%, or $39.5 million, of Green Mountain's 2009 pre-tax income of $90.4 million was derived from third-party royalty income.

90.     Green Mountain purchased much of its own product from third-party roasters in transactions that required these roasters to pay Green Mountain a royalty fee. But each time Green Mountain ordered their products to be shipped from the third-party roasters they would record royalty revenue received from the third-party roaster, in violation of GAAP. GAAP – specifically FASB Accounting Standards Codification ("ASC") 605-50 – required Green Mountain to reduce its revenues, cost of sales and inventory by the applicable amount of royalty fees, since such fees are considered a discount to the purchase price.

91.     By ignoring this basic premise of GAAP, Green Mountain was able to manage its earnings on an as need basis by continuing to purchase its own product from third-party roasters and falsely recording the applicable royalty fees as revenues. This revenue recognition scheme (described in further detail in ¶¶138-47 below) inflated the Company's reported net sales, cost of goods sold, and pre-tax income by approximately $39.7 million, $38.6 million, and $1 million, respectively, throughout the Restatement Period.

92.     **Acquisitions**: Keurig's patents on K-Cups are set to expire this year (2012), a critical fact the Individual Defendants have publicly acknowledged since at least 2008. In the Company's 2008 Form 10-K, filed with the SEC on December 11, 2008 ("2008 Form 10-K"), defendants Blanford, Rathke, Stiller, Carlini, Davis, del Vecchio, Mardy, Miller, and Moran disclosed that "[t]he two principal patents associated with our current generation K-Cup portion packs will expire in 2012 pending patent applications associated with this technology which, if ultimately issued as patents, would have expiration dates in 2023." These defendants, therefore, knew that the license agreements entered into by the Company had limited value because once the patents expired, third-party roasters would be able to manufacture their own K-Cups without entering into license agreements and paying royalty income to Green Mountain – one of the Company's key profit drivers. Knowing that patents responsible for nearly 50% of Green Mountain's pre-tax income and for stymying market entry by potential rivals would soon expire, the Individual Defendants caused Green Mountain to acquire many of its licensees.

93.     Green Mountain acquired Tully's in March 2009 for $40.3 million. In November 2009, Green Mountain acquired Timothy's Coffees of the World Inc. ("Timothy's") for $155.7 million. And in May 2010, Green Mountain completed its acquisition of Diedrich Coffee, Inc. ("Diedrich") for $305.3 million. This acquisition strategy was intended to avoid near-term

competition, and to alleviate some of the competition to come when Green Mountain's K-Cup related patents expire in 2012.   It also materially increased the challenge of properly consolidating and accounting for a huge increase in the volume of transactions.  The Individual Defendants consciously disregarded these facts and failed to make the necessary investments in Green Mountain's accounting, finance, and internal controls infrastructure to maintain effective controls over accounting and financial reporting.  The immediate consequence was a breakdown in controls over accounting for transactions with Green Mountain's former licensees.

94.     Once Green Mountain acquired these companies, GAAP (specifically ASC 810) required Green Mountain to consolidate the acquired companies' financial statements with Green Mountain's financial statements, which would require Green Mountain to eliminate any inter-company transactions between Green Mountain and the acquired companies to prevent Green Mountain from recognizing these revenues.  Most importantly, Green Mountain had to take steps to ensure that the revenues associated with royalty fees paid by these subsidiaries to Green Mountain were eliminated to avoid counting intercompany revenue.  Green Mountain, however, improperly continued to recognize royalty revenues from these acquired companies.   This resulted in the improper recognition of revenue among the consolidated entities and artificially inflated Green Mountain's revenues and net income.  Green Mountain's failure to follow one of the most basic principles of accounting and financial reporting for consolidated entities and eliminate these and other inter-company transactions improperly inflated Green Mountain's reported pretax and after-tax earnings by $8 million and $4.9 million, respectively, during the Restatement Period.

95.     **Inventory Outsourcing**: As Green Mountain rapidly increased its manufacturing and production capacity, the Company's inventory, warehousing, order processing, and shipping

functions grew well beyond the Company's capacities absent major investments in facilities, personnel, management, and controls infrastructure. Rather than make those investments, defendants caused Green Mountain to outsource its K-Cup inventory management, warehousing, order processing, and fulfillment functions to MBlock. By 2007, the majority of Green Mountain's product was shipped to MBlock, which warehoused, processed orders for, and distributed Green Mountain's products to retail outlets. Defendants utterly failed to ensure that Green Mountain developed sufficient controls to address the unique problems this outsourcing strategy created for proper oversight and controls. Lax oversight of MBlock and Green Mountain personnel responsible for inventory management permitted Green Mountain managers to manipulate accounting for inventory and sales, to inflate reported revenue, and to avoid detection by Green Mountain's outside auditors. Cross-shipping schemes were used to "ship" excess, expired, or otherwise unsold K-Cups between MBlock and Green Mountain's facilities and book false sales associated with these shipments. The Company would then recognize revenues on these sham sales as if the product had actually been sold to MBlock or another reseller.

96. As illustrated by the following chart, Green Mountain's relationship with MBlock was material, *accounting for approximately $2 billion or at least 37% of net sales* since the beginning of fiscal year 2008 through fiscal year 2011, when the Company began disclosing such information. Receivables due from MBlock accounted for 41.3% of total receivables as of the most recent fiscal year end 2011 close:

| MBlock Materiality | | | | | | |
|---|---|---|---|---|---|---|
| (Dollars in millions) | Fiscal 2007 | Fiscal 2008 | Fiscal 2009 | Fiscal 2010 | Fiscal 2011 | Total |
| MBlock Sales | N/A | $88.60 | $282.50 | $588.00 | $997.00 | $1,956.10 |
| Net Sales | - | $492.52 | $786.14 | $1,356.78 | $2,650.90 | $5,286.34 |
| Percentage Represented by MBlock | - | 18.0% | 35.9% | 43.3% | 37.6% | 37.0% |
| | | | | | | |
| Accounts Receivable Due from MBlock | $7.00 | $19.60 | $46.30 | $81.60 | $128.10 | $282.60 |
| Total Accounts Receivable | $39.37 | $54.78 | $91.56 | $172.20 | $310.32 | $668.23 |
| Percentage Represented by MBlock | 17.8% | 35.8% | 50.6% | 47.4% | 41.3% | 42.3% |

97.    The sheer volume of the increase in transactions that ran through MBlock raised a red flag about Green Mountain's continued reliance on its outmoded technology infrastructure, as well as its under-staffed and undertrained accounting and finance departments.  The Individual Defendants knew that it was imperative that the Company maintain adequate systems to track and account for the Company's inventory at MBlock facilities, and its shipments and sales to MBlock, in order to ensure that Green Mountain accurately accounted for its transactions with MBlock in its financial statements.  The Individual Defendants also knew that these metrics formed the basis for the sales and earnings guidance they issued, and that ensuring their accuracy was critical to issue reliable guidance.

98.    Even as Green Mountain's basic accounting and financial reporting functions fell into dysfunction and disrepair, the Individual Defendants repeatedly signed off on false and misleading public statements assuring investors that the Company was developing sufficient infrastructure that was commensurate with that growth.  Defendants Stiller and Rathke certified the effectiveness of the Company's internal control structure and procedures for financial reporting pursuant to section 404 of the Sarbanes-Oxley Act of 2002 ("SOX") in Green Mountain's 2006 Form 10-K, and in its Form 10-Q for the first quarter of 2007, filed with the SEC on February 8, 2007.  Defendants Blanford and Rathke certified the effectiveness of the

Company's internal control structure and procedures for financial reporting pursuant to SOX section 404 in each of the Company's financial statements from the second quarter of 2007 through the third quarter of 2010.

99.     Defendants also provided false assurances during quarterly earnings teleconferences with securities analysts.  For example, on Green Mountain's January 27, 2010 teleconference held to discuss the Company's earnings results from the first fiscal quarter of 2010, CFO Rathke told shareholders that *management was "ensuring that we have appropriate infrastructure to manage this growth*."

100.    The Board's utter failure to ensure that the Company's internal controls infrastructure, accounting policies, and personnel kept pace with the monumental growth in the scope and complexity of the transactions processed by its accounting and finance departments permitted these and other improper accounting practices to become firmly entrenched in the Company's practices and corporate culture, and resulted in Green Mountain's serial publication of false and misleading financial statements and internal control certifications.

**B.     The Individual Defendants' Failure to Implement and Maintain an Effective Internal Control Environment Leads to Publication of Nearly Five Years of False Financial Statements**

101.    The Individual Defendants – and particularly defendants Stiller, Blanford, Rathke, McCreary, Stacy, and Audit Committee members del Vecchio, Mardy, Carlini, Davis, and Miller – were duty-bound to implement and maintain effective internal controls over the Company's accounting and financial reporting.  The Individual Defendants knew that it was critical for the Company's internal control infrastructure to keep pace with the growth in the scope and complexity of Green Mountain's operations and transaction volume generated by the core elements of their business strategy, and they repeatedly assured investors that they were doing so.

- 61 -

102.    As alleged in further detail below (¶¶154, 156), the Individual Defendants consciously disregarded this duty, failing, among other things, to ensure that: (i) Green Mountain's accounting and finance departments were staffed with sufficient numbers of knowledgeable and experienced accounting professionals; (ii) training of Green Mountain's accounting and finance staff kept pace with the Company's rapid growth and the accounting complexities and demands associated with this growth; (iii) Green Mountain's enterprise management systems were sufficient to keep up with the increasing organizational complexity and transaction volume, including oversight of the Company's outsourcing of its major inventory function; and (iv) formal standardized practices were implemented and supervised at Green Mountain, including the processes and procedures used in the Company's intercompany accounting, and the method for review, approval, and tracking of retail customer marketing and incentive programs, pricing, and other key terms and conditions.  The foreseeable and entirely avoidable result of the Individual Defendants' complete disregard for their fiduciary duties was that the Company issued false financial statements that did not accurately reflect the Company's financial condition for nearly five years.

> **1.    The Individual Defendants Were Required to Implement and Maintain Effective Internal Controls over Accounting and Financial Reporting, and to Certify that Green Mountain's Financial Statements Were the Product of an Effective Internal Control Environment**

103.    SOX requires annual reports on Form 10-K that are filed with the SEC must "state the responsibility of management for establishing and maintaining an adequate internal control structure and procedures for financial reporting" and must "contain an assessment, as of the end of the most recent fiscal year of the issuer, of the effectiveness of the internal control structure and procedures of the issuer for financial reporting." 15 U.S.C. §7262. SOX also requires that the CEO and CFO must certify in each annual or quarterly report filed or submitted under section

13(a) or 15(d) of the Exchange Act that: (i) "the report does not contain any untrue statement of a material fact or omit to state a material fact"; and (ii) the financial statements "fairly present, in all material respects, the financial condition and results of operations." The CEO and CFO must also certify that: (i) they "are responsible for establishing and maintaining internal controls"; and (ii) they have evaluated the effectiveness of the company's internal controls within ninety days prior to the report, and "have presented in the report their conclusions about the effectiveness of the internal controls based on their evaluation as of that date." 15 U.S.C. §7241. Further, SOX requires that the CEO and CFO certify that they have disclosed to the Company's auditors "all significant deficiencies in the design or operation of the internal controls" and identify for the auditors "any material weaknesses in internal controls." *Id.*

104. SOX also requires that any outside auditing firm attesting that prepares or issues a company's audit report "shall attest to, and report on, the assessment [of the effectiveness of the internal control structure and procedures of the company for financial reporting] made by the management of the issuer." 15 U.S.C. §7262. Generally Accepted Accounting Standards ("GAAS") require auditors to undertake a variety of tests of control to assess their effectiveness in particular settings, an assessment that in turn drives the plan and scope of the financial audit. The Public Company Accounting Oversight Board ("PCAOB") promulgates the standards for independent auditors' evaluation of a company's internal controls over financial reporting. The PCAOB recognizes that outside auditors rely to a great extent on the reliability of information provided to them by management and they cannot and are not expected to discover every instance of significant or material control deficiencies. The PCAOB interim standard AU section 110.02 specifically provides:

> Because of the nature of audit evidence and the characteristics of fraud, the auditor is able to obtain reasonable, but not absolute, assurance that material

misstatements are detected. *The auditor has no responsibility to plan and perform to the audit to obtain reasonable assurance that misstatements, whether caused by errors or fraud, that are not material to the financial statements are detected.*

105.    The PCAOB interim standard AU Section 110.03 further provides that "*[m]anagement is responsible* for adopting sound accounting policies and *for establishing and maintaining internal control* that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements."

106.    The Individual Defendants were required by SOX and SEC regulations to implement and maintain an effective system of internal controls over financial reporting at Green Mountain, and defendants Blanford, Stiller, and Rathke were required to certify that they had evaluated the Company's internal controls over financial reporting and to present an accurate assessment of their effectiveness.    More, Audit Committee members del Vecchio, Mardy, Carlini, Davis, and Miller were specifically required by the terms of their Charter to "oversee the accounting and financial reporting processes and the audits of the financial statements of [the Company], including ... the Company's systems of internal controls regarding finance [and] accounting...."    The Individual Defendants' failure to fulfill these duties resulted in Green Mountain's publication of financial statements that materially misstated the Company's financial results and position for the fiscal years 2006, 2007, 2008, and 2009 and the first three quarters of fiscal year 2010.

**2.      Green Mountain Overstates Net Sales, Cost of Sales, and Net Income in Nearly Five Years of Financial Statements, and the Individual Defendants Falsely Certify that the Company's Internal Controls over Financial Reporting Were "Effective" Throughout These Periods**

107.    Green Mountain's sales of K-Cups and brewers are the Company's primary source of revenues, accounting for "a significant percentage of [the Company's] total revenue" since fiscal 2006, according to the Company's 2007 Form 10-K filed with the SEC on December 13, 2007 ("2007 Form 10-K"). Specifically, in fiscal 2009 (the first year in which this information is broken out), K-Cup and brewer and accessory sales accounted for 77% of the Company's total net sales, 86% of total net sales in fiscal 2010, and 84% of total net sales in fiscal 2011. The Company's reported net sales are material to investors because they represent the Company's profitability. The Individual Defendants' earnings guidance is based on the Company's historical and projected net sales.

108.    As the Individual Defendants now admit, for fiscal years 2006 through 2009 and the first two quarters of fiscal 2010, the lack of internal controls at Green Mountain allowed the Company to publish financial statements that overstated the Company's net sales, net income, and EPS, falsely portraying the strength of the Company's financial health. For certain of these periods, the Company also understated its cost of sales, which artificially inflated the Company's revenues and earnings.

109.    In its 2006 Form 10-K, Green Mountain reported net sales of $225,323,000, net income before taxes of $14,408,000 and after taxes of $8,443,000.

110.    In its 2007 Form 10-K, Green Mountain reported net sales of $341,651,000, net income before taxes of $21,585,000 and after taxes of $12,483,000.

111.    In its 2008 Form 10-K, Green Mountain reported net sales of $500,277,000, net income before taxes of $36,496,000 and after taxes of $22,299,000.

112.    In its 2009 Form 10-K, Green Mountain reported net sales of $803,045,000, net income before taxes of $36,496,000 and after taxes of $55,882,000.

113.    In its Form 10-Q for the first fiscal quarter of 2010 filed with the SEC on February 4, 2010, Green Mountain reported net sales of $349,363,000, cost of sales of $247,538,000, and net income before taxes of $20,928,000 and after taxes of $12,494,000. In its Form 10-Q for the second fiscal quarter of 2010 filed with the SEC on May 6, 2010, Green Mountain reported net sales of $324,915,000 and net income before taxes of $41,377,000 and after taxes of $24,702,000. In its Form 10-Q for the third fiscal quarter of 2010 filed with the SEC on August 5, 2010, Green Mountain reported net sales of $311,514,000, cost of sales of $201,783,000, and net income before taxes of $31,079,000 and after taxes of $18,554,000.

114.    Defendants Stiller, Blanford, and/or Rathke signed and certified each of these Forms 10-K and 10-Q and, pursuant to SOX, certified that the accompanying financial statements "fully compl[ied]" with sections 13(a) or 15(d) of the Exchange Act and that the reports "fairly presen[t], in all material respects, the financial condition and result[s] of operations of the company." These certifications also represented that they had "assessed the effectiveness of the Company's internal control over financial reporting ... and concluded that it is effective" during each of these periods. Defendants Davis, Mardy, Carlini, del Vecchio, Moran, Miller, and/or Daft also signed the Forms 10-K that contained these materially inaccurate financial statements. The following chart details the specific persons who signed and/or certified each of the improper financial statements that were required to be restated:

| Date | Filing | Person(s) Who Signed and Certified |
|---|---|---|
| 12/14/2006 | 10-K | Robert P. Stiller (Chairman of the Board of Directors, President and Chief Executive Officer); Frances G. Rathke (Chief Financial Officer, Treasurer, and Secretary); Barbara Carlini (Director); William D. Davis (Director); Jules A. Del Vecchio (Director); Hinda Miller (Director); David E. Moran (Director) **SOX CERTIFICATION:** Robert P. Stiller (CEO); Frances G. Rathke (CFO) |
| 2/8/2007 | 10-Q | Robert P. Stiller (President and Chief Executive Officer); Frances G. Rathke (Chief Financial Officer) **SOX CERTIFICATION:** Robert P. Stiller (CEO); Frances G. Rathke (CFO) |
| 5/10/2007 | 10-Q | Lawrence J. Blanford (Chief Executive Officer); Frances G. Rathke (Chief Financial Officer) **SOX CERTIFICATION:** Lawrence J. Blanford (CEO); Frances G. Rathke (CFO) |
| 8/9/2007 | 10-Q | Lawrence J. Blanford (Chief Executive Officer); Frances G. Rathke (Chief Financial Officer) **SOX CERTIFICATION:** Lawrence J. Blanford (CEO); Frances G. Rathke (CFO) |
| 12/13/2007 | 10-K | Lawrence J. Blanford (President, Chief Executive Officer and Director); Frances G. Rathke (Chief Financial Officer, Treasurer, and Secretary); Robert P. Stiller (Chairman of the Board of Directors and Founder); Barbara Carlini (Director); William D. Davis (Director); Jules A. Del Vecchio (Director); Michael Mardy (Director); Hinda Miller (Director); David E. Moran (Director) **SOX CERTIFICATION:** Lawrence J. Blanford (CEO); Frances G. Rathke (CFO) |
| 2/7/2008 | 10-Q | Lawrence J. Blanford (President and Chief Executive Officer); Frances G. Rathke (Chief Financial Officer) **SOX CERTIFICATION:** Lawrence J. Blanford (CEO); Frances G. Rathke (CFO) |
| 5/8/2008 | 10-Q | Lawrence J. Blanford (President and Chief Executive Officer); Frances G. Rathke (Chief Financial Officer) **SOX CERTIFICATION:** Lawrence J. Blanford (CEO); Frances G. Rathke (CFO) |
| 8/7/2008 | 10-Q | Lawrence J. Blanford (President and Chief Executive Officer); Frances G. Rathke (Chief Financial Officer) **SOX CERTIFICATION:** Lawrence J. Blanford (CEO); Frances G. Rathke (CFO) |
| 12/11/2008 | 10-K | Lawrence J. Blanford (President, Chief Executive Officer and Director); Frances G. Rathke (Chief Financial Officer, Treasurer, and Secretary); Robert P. Stiller (Chairman of the Board of Directors and Founder); Barbara Carlini (Director); William D. Davis (Director); Jules A. Del Vecchio (Director); Michael Mardy (Director); Hinda Miller (Director); David E. Moran (Director) **SOX CERTIFICATION:** Lawrence J. Blanford (CEO); Frances G. Rathke (CFO) |
| 2/5/2009 | 10-Q | Lawrence J. Blanford (President and Chief Executive Officer); Frances G. Rathke (Chief Financial Officer) **SOX CERTIFICATION:** Lawrence J. Blanford (CEO); Frances G. Rathke (CFO) |
| 5/7/2009 | 10-Q | Lawrence J. Blanford (President and Chief Executive Officer); Frances G. Rathke (Chief Financial Officer) **SOX CERTIFICATION:** Lawrence J. Blanford (CEO); Frances G. Rathke (CFO) |

| | | |
|---|---|---|
| 8/3/2009 | 10-Q | Lawrence J. Blanford (President and Chief Executive Officer); Frances G. Rathke (Chief Financial Officer) **SOX CERTIFICATION:** Lawrence J. Blanford (CEO); Frances G. Rathke (CFO) |
| 11/25/2009 | 10-K | Lawrence J. Blanford (President, Chief Executive Officer and Director); Frances G. Rathke (Chief Financial Officer, Treasurer, and Secretary); Robert P. Stiller (Chairman of the Board of Directors and Founder); Barbara Carlini (Director); William D. Davis (Director); Jules A. Del Vecchio (Director); Michael Mardy (Director); Hinda Miller (Director); David E. Moran (Director) **SOX CERTIFICATION:** Lawrence J. Blanford (CEO); Frances G. Rathke (CFO) |
| 2/4/2010 | 10-Q | Lawrence J. Blanford (President and Chief Executive Officer); Frances G. Rathke (Chief Financial Officer) **SOX CERTIFICATION:** Lawrence J. Blanford (CEO); Frances G. Rathke (CFO) |
| 3/11/2010 | 10-K/A | Frances G. Rathke (Chief Financial Officer) **SOX CERTIFICATION:** Lawrence J. Blanford (CEO); Frances G. Rathke (CFO) |
| 3/11/2010 | 10-Q/A | Frances G. Rathke (Chief Financial Officer) **SOX CERTIFICATION:** Lawrence J. Blanford (CEO); Frances G. Rathke (CFO) |
| 5/6/2010 | 10-Q | Lawrence J. Blanford (President and Chief Executive Officer); Frances G. Rathke (Chief Financial Officer) **SOX CERTIFICATION:** Lawrence J. Blanford (CEO); Frances G. Rathke (CFO) |
| 8/5/2010 | 10-Q | Lawrence J. Blanford (President and Chief Executive Officer); Frances G. Rathke (Chief Financial Officer) **SOX CERTIFICATION:** Lawrence J. Blanford (CEO); Frances G. Rathke (CFO) |

115.    The Individual Defendants knew or consciously disregarded the substantial likelihood that these financial statements contained material misstatements because they were the product of a materially deficient internal controls environment. The Individual Defendants also knew or consciously disregarded the fact that their certifications that the Company's internal controls were effective were false and misleading when they were made. The Individual Defendants knew that they had failed to make investments in maintaining internal controls over the Company's financial reporting and accounting processes commensurate with the enormous growth in the scope and complexity of Green Mountain's operations and transaction volumes.

116.    The Company's reported net sales nearly doubled just two years after the growth strategy was implemented, increasing from $225.3 million in fiscal 2006 to over $500 million by

fiscal 2008.   In March 2009, the Company completed the acquisition of Tully's, which contributed to further increases in the Company's reported net sales – up to $803 million in fiscal 2009.   Green Mountain's substantial sales and revenue increases continued throughout fiscal 2010 as it acquired two more companies – Timothy's and Diedrich – reporting net sales that totaled $985 million by the third quarter of fiscal 2010.

117.   As described in further detail below at ¶¶134-54, the lack of internal controls allowed the Company to employ improper accounting practices that led to inflated reported net sales and misstated net income during these periods.   Specifically, Green Mountain: (i) failed to eliminate certain intercompany transactions, which inflated reported net sales and misstated the Company's net income; (ii) improperly recognized royalty income, which also inflated net sales and misstated the Company's net income; and (iii) failed to properly account for certain marketing and customer incentives and accruals, which understated the cost of goods sold and inflated revenues, and misstated the Company's net income.   These accounting manipulations were the proximate result of the Board's conscious disregard for Green Mountain's failure to build an adequate internal controls environment commensurate with Green Mountain's growth. Ultimately, Green Mountain was forced to restate its financial statements for these periods and tell shareholders that its published financial statements for fiscal years 2006, 2007, 2008, and 2009, and for the first three quarters of fiscal 2010 could not be relied upon.

   **3.** **Defendants Are Forced to Announce that Nearly Five Years of Financial Statements Materially Misstated the Results of Operations Due to Material Weaknesses in Internal Controls**

118.   After nearly five years of sustained lack of oversight and serial accounting errors and manipulations, the Company's outside auditors finally forced the Individual Defendants to re-evaluate the Company's financial statements, accounting practices, and internal controls over financial reporting.   The Individual Defendants' resistance to the disclosures that would

ultimately reveal the scope and pervasiveness of the accounting issues and the seriousness of the lapses in internal controls is evident in their initial effort to falsely characterize the accounting and reporting errors as "immaterial." After finally deciding to disclose that material errors would require restatement of financial results, the total disarray in the control environment led defendants to exclude the financial disclosures published in 2006 from the Restatement. Ultimately, nearly five years of financials were restated. Defendants finally admitted that the Company's internal controls had been materially deficient for half a decade or more. These controls continue to suffer material deficiencies today. It is now apparent that it will take years to hire and train staff and to build out the accounting policies and information systems necessary to ensure adequate controls in just those areas in which the Individual Defendants have acknowledged material deficiencies.

### a. Defendants Misleadingly Disclose "Immaterial" Accounting Errors

119.    On September 28, 2010, the Individual Defendants approved the disclosure in a Form 8-K that the Company's management had discovered an "immaterial accounting error" relating to the way the Company had accounted for royalty income it received from inter-company transactions with Keurig, which resulted in the overstatement of consolidated inventory and understatement of the cost of sales between fiscal 2007 and the third quarter of fiscal 2010. As was later disclosed in the Restatement, these errors also impacted certain financial information reported for periods before fiscal 2007. The Form 8-K also disclosed that the SEC's Division of Enforcement had commenced an inquiry into the Company's relationship with order fulfillment vendor, MBlock, focused on revenue recognition.

120.    With regard to the accounting error, the September 28, 2010 Form 8-K stated:

Intercompany Adjustment Correction

In connection with the preparation of its financial results for its fourth fiscal quarter, the Company's management discovered an *immaterial accounting error relating to the margin percentage it had been using to eliminate the inter-company markup in its K-Cup inventory balance residing at its Keurig business unit*. Management discovered that the *gross margin percentage used to eliminate the inter-company markup resulted in a lower margin applied to the Keurig ending inventory balance effectively overstating consolidated inventory and understating cost of sales*. Management determined that the accounting error arose during fiscal 2007 and analyzed the quantitative impact from that point forward to June 26, 2010.

As of June 26, 2010, there is a cumulative $7.6 million overstatement of pre-tax income. Net of tax, the cumulative error resulted in a $4.4 million overstatement of net income or a $0.03 cumulative impact on earnings per share.

121.    Further, the Form 8-K represented that the Audit Committee had participated in

the Company's review of the accounting error, and contributed to the Company's concealment of

what were, in fact, material errors in reporting.  They caused Green Mountain to report that the

errors were "not material" for fiscal years 2007, 2008, and 2009, and would not be material to

fiscal 2010. Specifically, the Form 8-K stated:

After evaluating the quantitative and qualitative aspects of the error in accordance with applicable accounting literature, including Staff Accounting Bulletins published by the SEC, the Company, *with the participation of the audit committee of the Board of Directors*, has determined that the correction in the margin calculation represents a correction of an error in accordance with Accounting Standards Codification 250 *Accounting Changes and Error Corrections*, that *the correction was not material to the fiscal years and the respective quarters ended 2007, 2008 and 2009 and that the Company anticipates that the correction will not be material to fiscal year 2010 and the respective quarters of fiscal 2010*. As a result, the Company anticipates the cumulative amount of the accounting correction will be made in the quarter ended September 25, 2010.

### b.    Green Mountain Announces the Need to Restate Nearly Four Years of Results Due to Material Accounting Errors

122.    Just over seven weeks after misleadingly characterizing Green Mountain's

accounting error as "immaterial," under pressure from its outside auditor, Green Mountain

announced that it would have to restate its financial statements for fiscal years 2007, 2008, 2009,

and the first three quarters of 2010. On November 19, 2010, the Company filed with the SEC a

Form 8-K, signed by defendant Rathke, announcing that investors "should no longer rely upon"

the Company's previously issued financial statements for fiscal years 2007, 2008, 2009, and the

first three quarters of 2010, and announced that the Company would restate its financial

statements for these periods. The press release attached to the Form 8-K identified the following

material accounting errors and misstatements:

- A $7.6 million overstatement of pre-tax income, cumulative over the restated periods, due to the K-Cup inventory adjustment error previously reported in the Company's Form 8-K filed on September 28, 2010. *This error is the result of applying an incorrect standard cost* to intercompany K-Cup inventory balances in consolidation. *This error resulted in an overstatement of the consolidated inventory and an understatement of the cost of sales.* Rather than correcting the cumulative amount of the error in the quarter ended September 25, 2010, as disclosed in the September 28, 2010 Form 8-K, the effect of this error will be recorded in the applicable restated periods.

- A $1.4 million overstatement of pre-tax income, cumulative over the restated periods, due to the under-accrual of certain marketing and customer incentive program expenses. The Company also has corrected the classification of certain of these amounts as reductions to net sales instead of selling and operating expenses. These programs include, but are not limited to, brewer mark-down support and funds for promotional and marketing activities.  Management has determined that *miscommunication between the sales and accounting departments* resulted in expenses for certain of these programs being recorded in the *wrong fiscal periods.*

- A $1.0 million overstatement of pre-tax income, cumulative over the restated periods, due to changes in the timing and classification of the Company's historical revenue recognition of royalties from third party licensed roasters. Because royalties were recognized upon shipment of K-Cups by roasters pursuant to the terms and conditions of the licensing agreements with these roasters, Keurig historically recognized these royalties at the time Keurig purchased the K-Cups from the licensed roasters and classified this royalty in net sales.  Management has determined to recognize this royalty as a reduction to the carrying cost of the related inventory. The gross margin benefit of the royalty will then be realized upon the ultimate sale of the product to a third party customer.

- 72 -

> Due to the Company's complete and, when consummated, pending acquisitions of third party licensed roasters, these purchases and the associated royalties have become less of a factor, since the post-acquisition royalties from these wholly-owned roasters are not included in the Company's consolidated financial statements.

- An $800,000 overstatement of pre-tax income, cumulative over the restated periods, due to *applying an incorrect standard cost* to intercompany brewer inventory balances in consolidation. *This error was identified during the preparation of the fiscal year 2010 financial statements and resulted in an overstatement of the consolidated inventory and an understatement of the cost of sales.*

- A $700,000 understatement of pre-tax income for the Specialty Coffee business unit, due primarily to a *failure to reverse an accrual* related to certain customer incentive programs in the second fiscal quarter of 2010. The over-accrual was not identified and corrected until the fourth fiscal quarter of 2010.

- In addition to the errors described above, the Company also will include in the restated financial statements certain other immaterial errors, including previously unrecorded immaterial adjustments identified in audits of prior years' financial statements.

123.   Defendants made clear that their previous certifications of the Company's financial statements for fiscal years 2007, 2008, 2009 (and for each fiscal quarter during these years), and the first three fiscal quarters of 2010 were false because the Company suffered material deficiencies in its internal controls throughout the Restatement Period.  Contrary to defendants Stiller's, Blanford's, and Rathke's certifications, the Company's internal controls over financial reporting had *not* been effective and were not effective:

> In accordance with Section 404 of the Sarbanes-Oxley Act of 2002, the Company's management has been assessing the effectiveness of the Company's internal controls over financial reporting and disclosure controls.  Based on this assessment, the Company expects to report a material weakness in the Company's internal controls over financial reporting, and, therefore, conclude that *internal controls over financial reporting as of September 25, 2010 are not effective.*

####    c.    Defendants Are Forced to Admit that Green Mountain Actually Published Nearly Five Years of Materially Inaccurate Financial Results

124.    On December 9, 2010, the Individual Defendants issued a press release announcing Green Mountain's financial results for the fiscal fourth quarter and year ended September 25, 2010, and filed with the SEC the 2010 Form 10-K for the year ended September 25, 2010 ("2010 Form 10-K"). The 2010 Form 10-K included Green Mountain's Restatement, which revealed that material controls deficiencies led to the publication of false financial statements *beginning in fiscal 2006 – not fiscal 2007, as previously disclosed*. The Restatement also revealed for the first time that *net income for the most recently affected reporting periods – the first three quarters of fiscal 2010 – had been overstated by over 6% and accrued expenses at June 26, 2010 were understated by more than 5%*.

125.    In the 2010 Form 10-K, the Individual Defendants attributed the Restatement to errors in the Company's accounting for and reporting of the following, which are discussed in further detail below at ¶¶134-54: (i) intercompany eliminations; (ii) recognition and classification of royalty income; and (iii) recognition and classification of certain marketing and customer incentive programs, among other things; and (iv) other adjustments that defendants had identified but which went unrecorded because they had been deemed immaterial.

126.    Defendants Blanford, Rathke, Stiller, Carlini, Daft, Davis, del Vecchio, Mardy, Miller, and Moran admitted in the 2010 Form 10-K that throughout the Restatement Period, the Company had "material weaknesses" in its "internal control over financial reporting principally related to the Company's period-end financial reporting and consolidation processes," which had permitted these accounting manipulations to go on for years. The Individual Defendants admitted that the *material weaknesses* in Green Mountain's internal controls over financial

reporting were *caused by "the Company's rapid growth, both organically and through acquisitions, outpacing the development of the Company's accounting infrastructure."*

127.    The 2010 Form 10-K further disclosed that "the Company's internal control over financial reporting was not effective as of September 25, 2010," confirming the falsity of defendants Blanford's, Stiller's, and Rathke's certifications in the 2006-2009 Forms 10-K that the Company's internal controls over financial reporting "were effective." Specifically, the 2010 Form 10-K stated:

1.    *Financial statement consolidation process.* The Company *did not have effective controls to ensure the completeness and accuracy of the accounting for intercompany transactions* in its financial statement consolidation process. *The method used to identify all intercompany transactions between the business segments for purposes of performing required eliminations, and to process and to document the eliminations, was not accurately designed and adequately performed* during each reporting period.

2.    *Accruals related to marketing and customer incentive programs.* The Company *did not have effective controls to ensure the completeness, accuracy and proper classification of certain marketing and customer incentive programs and related accrued liabilities.* There was a *lack of adequate communication between the accounting function to gather the appropriate information from the sales and marketing functions to accurately classify these liabilities* and *an insufficient number of personnel with an appropriate level of GAAP knowledge and experience evaluating the transactions* related to these programs.

128.    The Company's independent auditors, PricewaterhouseCoopers LLP ("PWC"), also opined in the 2010 Form 10-K that the Company's internal controls over financial reporting were not effective as of September 25, 2010. PWC took pains to distinguish their role from that of Green Mountain management, noting that "[t]he Company's management is responsible for these financial statements and financial statement schedule, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in management's report referred to above."

129.    PWC's opinion accompanying the financial statements published with Green Mountain's 20120 Form 10-K stated:

> *[T]he Company did not maintain, in all material respects, effective internal control over financial reporting as of September 25, 2010,* based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) *because material weaknesses in internal control over financial reporting related to the financial statement consolidation process and marketing and customer incentive program accruals existed as of that date.* A material weakness is a deficiency, or *a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected* on a timely basis. The material weaknesses referred to above are described in *Management's Report on Internal Control Over Financial Reporting* appearing under Item 9A. We considered these material weaknesses in determining the nature, timing, and extent of audit tests applied in our audit of the September 25, 2010 consolidated financial statements, and our opinion regarding the effectiveness of the Company's internal control over financial reporting does not affect our opinion on those consolidated financial statements. *The Company's management is responsible for these financial statements and financial statement schedule, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in management's report referred to above.*

130.    During the Restatement Period, the lack of internal controls at Green Mountain permitted the Company's reported revenues and net income to be systematically inflated in at least three ways:

(a)    First,   Green Mountain improperly accounted for intercompany transactions conducted within Green Mountain, i.e., between the Company and its own subsidiaries.   One of the most basic premises of GAAP is the requirement to eliminate intercompany transactions in consolidated financial statements.  Once Green Mountain acquired a company, GAAP required Green Mountain to consolidate the acquired company's financial statements with its own, and to eliminate any intercompany transactions, including recognition of revenues related to the payment of royalty fees.  The systematic failure to eliminate revenues associated with these transactions led to serial overstatements of earnings.

(b)  Second, the lack of effective internal controls permitted management to recognize revenue on an as-needed basis by creating and recognizing bogus royalty revenue through circular transactions among Green Mountain and third-party licensees in violation of GAAP. The Individual Defendants revealed in the Restatement that the Company had purchased K-Cups from licensed third-party roasters for resale by Keurig, stating: "Roasters licensed by Keurig to manufacture and sell K-Cup portion packs, *both to Keurig for resale* and to their other coffee customers, are obligated to pay a royalty to Keurig upon shipment to their customer." In the Restatement, the Individual Defendants noted that the Company had changed its policy for accounting for royalty income on these purchases. Previously, the Company's policy permitted Green Mountain to recognize revenues from royalty fees upon shipment of K-Cups by third-party licensees *back to Green Mountain*, despite the fact that this was merely a circular flow of funds from Green Mountain to the third party and back to Green Mountain. This improper revenue recognition policy permitted the Company to manage earnings and revenues by purchasing K-Cups from third-party licensees and recognizing revenues from the royalty fees paid by these licensees once they were shipped back to Green Mountain for resale.

(c)  Third, Green Mountain failed to reduce reported revenues and costs on products for which the Company provided marketing and customer incentives. The Company failed to accrue liabilities and adjust the cost and selling price of inventory that was sold in connection with marketing and customer incentives, as required by GAAP. This had the effect of artificially inflating the Company's reported revenues by accounting for inventory that was effectively sold at a discount (net of the incentives) as though it were sold at full price.

131.  The following chart illustrates Green Mountain's reported versus actual financial results for the Restatement Period:

| | | | | | In thousands, except per share data | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | FY 2006 | FY 2007 | FY 2008 | FY 2009 | Q1 2010 | Q2 2010 | Q3 2010 | YTD 2010 | Total |
| **Net Sales** | | | | | | | | | |
| As Reported | $225,322 | $341,651 | $500,277 | $803,045 | $349,363 | $324,915 | $311,514 | $985,792 | $2,856,088 |
| As Restated | $224,305 | $336,112 | $492,517 | $786,135 | $345,152 | $321,953 | $316,583 | $983,688 | $2,822,757 |
| Overstatement | | | | | | | | | |
| Amount | $1,018 | $5,539 | $7,760 | $16,910 | $4,211 | $2,962 | ($5,069) | $2,104 | $33,331 |
| Percentage | 0.45% | 1.65% | 1.58% | 2.15% | 1.22% | 0.92% | -1.60% | 0.21% | 1.18% |
| | | | | | | | | | |
| **Cost of Sales** | | | | | | | | | |
| As Reported | $143,289 | $210,530 | $323,372 | $553,281 | $247,538 | $216,263 | $201,783 | $665,584 | $1,896,056 |
| As Restated | $143,034 | $205,956 | $318,477 | $540,744 | $249,575 | $214,103 | $207,698 | $671,376 | $1,879,587 |
| Overstatement | | | | | | | | | |
| Amount | $255 | $4,574 | $4,895 | $12,537 | ($2,037) | $2,160 | ($5,915) | ($5,792) | $16,469 |
| Percentage | 0.18% | 2.22% | 1.54% | 2.32% | -0.82% | 1.01% | -2.85% | -0.86% | 0.88% |
| | | | | | | | | | |
| **Net Income (Before Taxes)** | | | | | | | | | |
| As Reported | $14,408 | $21,585 | $36,472 | $90,358 | $21,915 | $40,243 | $36,719 | $93,384 | $261,700 |
| As Restated | $13,614 | $21,104 | $35,459 | $88,031 | $17,871 | $39,169 | $36,463 | $87,965 | $251,712 |
| Overstatement | | | | | | | | | |
| Amount | $794 | $481 | $1,013 | $2,327 | $4,044 | $1,074 | $256 | $5,374 | $9,988 |
| Percentage | 5.83% | 2.28% | 2.86% | 2.64% | 22.63% | 2.74% | 0.70% | 6.11% | 3.97% |

132.   The cumulative impact of the Restatement (by type) on reported pretax net income was material, as depicted by the chart below[4]:

| Adjustment Effects on Pretax Net Income | | | | | |
|---|---|---|---|---|---|
| *(Dollars in Thousands)* | | | | | |
| Fiscal Year | Inter-Company Elimination Adjustments | Third Party Royalty Adjustments | Marketing and Customer Incentive Expense Adjustments | Other Adjustments | Total Decrease to Pretax Net Income |
| 2006 | $474 | $319 | - | - | $794 |
| 2007 | $292 | $188 | - | - | $481 |
| 2008 | $1,252 | $488 | ($179) | ($548) | $1,013 |
| 2009 | $943 | $1,198 | ($621) | $807 | $2,327 |
| 2010 | $5,102 | ($1,133) | $1,537 | ($132) | $5,374 |
| **Total** | **$8,064** | **$1,060** | **$737** | **$127** | **$9,988** |

> **4.   The Improper Accounting Practices that Required Restatement Were Obvious, Systematic, and Sustained Violations of Basic Accounting and GAAP Principles**

133.   GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a

---

[4] Plaintiffs have calculated pretax impact of the Restatement for fiscal years 2006 and 2007 by applying tax rates of 41.4% and 40.5%, respectively, as disclosed in the corresponding Company Forms 10-K for fiscal years 2006 and 2007.

particular time.[5]  ***SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate***, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures, which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

### a.  Failure to Eliminate Intercompany Transactions

134.   The requirement that a company eliminate intercompany transactions in consolidated financial statements is one of the most basic principles of GAAP.[6]  ASC 810 states that when a company prepares its consolidated financial statements, the full amounts of a subsidiary's assets, liabilities, revenues, and expenses – irrespective of the percentage of ownership – should be combined with those of the parent company, and ***intercompany items and***

---

[5] On June 30, 2009, the FASB issued SFAS No. 168, *The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles* – a replacement of FASB Statement No. 162. *FASB* ASC became the source of authoritative U.S. accounting and reporting standards for nongovernmental entities, in addition to guidance issued by the SEC, effective for financial statements issued for reporting periods that ended after September 15, 2009. The Codification did not change existing U.S. GAAP. These allegations use the current references to U.S. GAAP, unless otherwise indicated there are no applicable changes within the relevant period.

[6] The guiding principle of consolidated financial statements is that of the "single economic entity" principle. ASC 810, Consolidation, Accounting Research Bulletin No. 51, Consolidated Financial Statements.  The aim of consolidated financial statements is to show the performance of the group as if it were a single entity.  Consolidated financial statements are financial statements that factor the parent company and subsidiaries into an aggregated accounting figure. It is a representation of how the parent company is doing as a group.  The consolidated accounts should provide a true and fair view of the financial and operating conditions of the group. Doing so typically requires a set of eliminating and consolidating entries to work back from individual financial statements to a group financial statement that is an ***accurate representation of operations***.  By failing to eliminate intercompany transactions on the consolidated balance sheet, Green Mountain's financial statements were falsely representing that the Company had earned the same money twice: once by Green Mountain, and again by its subsidiary.

***transactions should be eliminated***.   Accordingly, any intercompany profit or loss on assets remaining within the group are required to be eliminated.

135.    Once Green Mountain acquired the third-party roasters in 2009 and 2010, Green Mountain was required to eliminate all "intercompany" transactions between it and these third party roasters.   During the Restatement Period, the Company violated GAAP by failing to eliminate certain intercompany transactions from the date of acquisition.   The failure to eliminate these intercompany transactions had the effect of overstating the Company's net sales and understating cost of sales.   The impact of this failure to eliminate intercompany transactions was material and enabled the Company to inflate cumulative Restatement Period pretax and after tax earnings by $8.1 million and $4.9 million, respectively.

136.    In the Restatement, the Individual Defendants admitted that *"[t]he Company did not have effective controls to ensure the completeness and accuracy of the accounting for intercompany transactions in its financial statement consolidation process" because "the method used to identify all intercompany transactions between the business segments for purposes of performing required eliminations, and to process and to document the eliminations, was not accurately designed and adequately performed during each reporting period."*

137.    As part of the quarterly close, defendant Blanford, the Company's CEO, defendant Rathke, the Company's CFO, and the members of the Audit Committee, defendants Davis, Mardy, Carlini, del Vecchio, and Miller, were required to review the consolidated financial statements of Green Mountain and its subsidiaries, and therefore knew or consciously disregarded the fact that they did not include the requisite entries eliminating these intercompany transactions.   Blanford, Rathke, and the Audit Committee Defendants also knew or consciously

- 80 -

disregarded the fact that the complexities of integrating the financial statements of the companies Green Mountain acquired into Green Mountain's financial statements required that they apply a higher level of scrutiny to the consolidated financial statements of Green Mountain and its subsidiaries. They knew that the companies Green Mountain had acquired were third-party roasters that paid Green Mountain royalty fees, and that these royalty fees were a material part of Green Mountain's revenue. They also knew that any revenues Green Mountain generated from the royalty fees paid by these companies were required to be eliminated after Green Mountain acquired these companies. This is because once Green Mountain acquired a company, any payment by that company to Green Mountain was now an intercompany transaction and was thus, required to be eliminated from Green Mountain's financial statements in order to avoid inflating reported revenues. Blanford, Rathke, and the Audit Committee Defendants had the necessary information that would enable them to easily determine that Green Mountain had failed to eliminate the revenues associated with these transactions from the Company's financial statements. A review of the acquired companies' financial statements prior to their acquisition (which these defendants had reviewed in connection with their approval of Green Mountain's acquisition of these companies), review of Green Mountain's financial statements from the periods before it had acquired these companies, and comparison to the consolidated financial statements of Green Mountain would reveal that the revenue flow between the acquired entities and Green Mountain continued to include transactions among both Green Mountain and the acquired subsidiaries – a red flag that these revenues were not being eliminated.

### b. Improper Recognition of Revenues from Royalty Income Acquired Through Circular Inventory Transactions

138. Green Mountain granted third-party roasters the right to manufacture, distribute, and sell K-Cups on an exclusive or non-exclusive basis in exchange for royalty payments.

Manufacturing and production entities like Green Mountain enter into such outsourcing arrangements to streamline their production process and to provide their customers greater access to their products. In these arrangements there is no need for the manufacturer to acquire its own finished product as it is readily available to its consumers by its licensed producers, in Green Mountain's case – the third-party roasters.

139.    Leading up to the Restatement, Green Mountain earned royalty income whenever licensed third-party roasters shipped K-Cups to their customers.[7]  Green Mountain's accounting policy (improperly) allowed the Company to recognize royalty income at the time third-party roasters shipped K-Cups to Green Mountain.  This policy combined with the failure to maintain effective internal controls over the revenue recognition process permitted Green Mountain managers to manage the Company's reported earnings by recognizing royalty income on an as-needed basis through orders of K-Cups from licensed third-party roasters.  The Individual Defendants consciously disregarded red flags that should have prompted an in-depth inquiry that would have revealed this misconduct including: (i) the Company's revenue recognition policy specifically permitted it to recognize royalty income upon shipment by third-party licensees to Green Mountain; (ii) the Company's revenues were an important indicator of its business health and were closely watched by securities analysts, thus providing motive for management to employ this scheme; (iii) the Company's net income – a material portion of which was derived from its royalty income – was overstated during the periods the improper revenue recognition policy was in place; and (iv) the Company's inventory was also increasing during these periods.

---

[7]  According to the Company's 2009 Form 10-K, Green Mountain's "[r]oyalty revenue is recognized upon shipment of K-Cups by roasters as set forth under the terms and conditions of various licensing agreements."   While the 2007 Form 10-K stated that revenue was only recognized upon product delivery, the 2008 Form 10-K added that revenue is also recognized "in some cases upon product shipment."

Following material acquisitions of former licensees at a cumulative cost of over $347 million

during the Restatement Period, the Board, and especially the Audit Committee Defendants,

should have immediately recognized that the Company's inventory and royalty income were both

increasing through purchases of Green Mountain's own product from third-party vendors

throughout the Restatement Period.  These strongly suggested the possibility of round-tripping

transactions – a well-understood method of manipulating accounting to inflate revenues that all

knowledgeable audit committee members should be on the lookout for.

140.    Round-tripping is a common scheme used to improperly inflate revenues.  The

American Institute of Certified Public Accountants ("AICPA") has highlighted the importance of

identifying and eliminating round-trip transactions, describing them as follows:

> "Round-trip" or "linked" transactions occur when a company enters into a
> seemingly valid sales transaction with a customer but sends all or some of the
> sales proceeds back to the customer in another seemingly valid purchase
> transaction often affecting a different accounting period.   These types of
> transactions frequently occur in industries where analysts have focused on the
> revenue that companies display on financial statements instead of on income.
> Practice Alert 2003-01, AICPA, June 2007.

141.    Recording revenues in a round-trip transaction violates GAAP because it elevates

form over substance.  In a round-trip transaction, the economic substance of the transaction is a

circular flow of cash (or other assets of value), rather than an arm's-length transaction.   No

legitimate earnings ever occur in such transactions because the company initiating the circular

transaction is using its own cash or other assets to "buy" or "create" revenues, and the cash

inflows are not produced as a result of the company's ongoing major or central operations.

142.    During the Restatement Period, Green Mountain improperly recorded the royalty

fees the Company received pursuant to its licensing agreements with third parties as revenues in

violation of GAAP – specifically ASC 605-50 – and SEC guidance regarding revenue

recognition provided in SEC Staff Accounting Bulletin ("SAB") Topic 13.   ASC 605-50

provides that cash consideration given by a vendor to a customer is presumed to be a reduction of the selling prices of the vendor's products or services and, therefore, shall be characterized as a reduction of revenue when recognized in the vendor's income statement. ASC 605-50 further states that cash consideration received by a customer from a vendor is presumed to be a reduction of the prices of the vendor's products or services and is required to be characterized as a reduction of cost of sales when recognized in the customer's income statement. ASC 605-50 required Green Mountain to reduce the value of its purchased inventory and related cost of goods sold in connection with these purchases of its own product from third-party roasters rather than record such royalty payments as income. The Company failed to do so, and instead improperly recorded $39.7 million in additional net sales in connection with these purchases during the Restatement Period.

143.     This had a material effect on Green Mountain's financial statements because it inflated the Company's reported royalty income, which was a significant element of the Company's profitability during the Restatement Period. As indicated in the chart below, the Company's reported royalty income represented $109.7 million, or 44.4% of total pretax income for fiscal 2007 through the third quarter of fiscal 2010.

| Royalty Income Materiality (As reported Pre-Restatement) | | | | | |
|---|---|---|---|---|---|
| (Dollars in millions) | Fiscal 2007 | Fiscal 2008 | Fiscal 2009 | 2010 YTD (Q1 – Q3) | Total |
| Royalty Income[1] | $15.10 | $24.40 | $39.50 | $30.70 | $109.70 |
| Income Before Taxes | $21.58 | $36.47 | $90.36 | $98.88 | $247.28 |
| Royalty Income as % of Income | 70.0% | 66.9% | 43.7% | 31.0% | 44.4% |

[1] As reported for the Keurig segment.

144.     The Individual Defendants repeatedly emphasized throughout the Restatement Period that the royalty income Green Mountain received from the sales of K-Cups was a

"significant" element of the Company's total revenue and profitability, as well as one of the Company's main sources of growth. For example, during a conference call held on August 2, 2007, to discuss the Company's third fiscal quarter 2007 results, defendant Rathke attributed the net sales increase of 91% compared to the prior same year period "primarily... to higher brewer and K-Cup sales and royalty income from the sales of K-Cups." She further explained that in the future, "[t]he royalty income ... will be increasing our gross margin as that installed base continues to increase at the rates we're seeing." On a conference call held on January 1, 2008, to discuss the Company's first fiscal quarter 2008 results, Rathke stated that "a little over half of the increase in Keurig sales this past quarter was due to higher brewer sales ... [and] [t]he other half of the increase was due to higher K-Cup sales and royalty income from the sales of K-Cups." During a conference call held July 31, 2008, to discuss the Company's third fiscal quarter 2008 results, Rathke again asserted that "we're going to continue to see the improvement, especially as we're building such a strong base of brewers and the K-Cup royalty stream coming in. That's one thing that's going to improve our gross margin." Defendant Blanford also touted the royalty income as a source of growth during that call, stating that "[u]ltimately, our growth potential here is driven by the number of installed brewers, the number of K-Cup portion packs consumed per day per brewer, and the royalty rate per K-Cup." By the second fiscal quarter of 2009, a Company press release issued April 29, 2009, indicated that "royalty income from the sale of K-Cups from all licensed roasters increased approximately $12 million or 85% over last year's second fiscal quarter." The Individual Defendants also acknowledged in the Company's 2009 Form 10-K that "[a] significant and increasing percentage of our total revenue has been attributable to royalties and other revenue from sales of K-Cups for use with our Keurig single-cup brewing systems."

145.   By repeatedly touting the Company's royalty income as a primary driver of revenues and growth, the Individual Defendants – and especially Audit Committee Defendants Davis, Mardy, Carlini, del Vecchio, and Miller – were required to investigate the underlying metrics which supported these statements.   They knew that as a matter of Company practice, Green Mountain purchased K-Cups from third-party licensees for resale, and that the Company's revenue recognition policy permitted it to recognize royalty income upon shipment by these third parties.   They also knew (or recklessly disregarded) that Green Mountain's inventory was increasing as compared to prior periods – a red flag indicating (among other things) that the Company may be increasing the amount of K-Cups it was purchasing from third parties for resale.   Finally, the Individual Defendants knew that analysts focused on the Company's revenues, and therefore knew or recklessly disregarded that it was possible that Green Mountain was using "round-trip" transactions as a method to increase revenues, a common industry practice, and improperly recognizing revenues from royalty income associated with these "round-trip" transactions.   The Individual Defendants therefore knew or recklessly disregarded that Green Mountain was improperly engaging in a round-tripping scheme designed to fabricate additional revenues from royalty income payments.

146.   The impact of this scheme to fabricate additional revenues by purchasing its inventory from licensed vendors enabled the Company to inflate net sales, cost of goods sold, and net income by approximately $39.7 million, $38.6 million, and $1 million ($0.7 million after taxes), respectively, during the Restatement Period.

147.   In the 2010 Form 10-K containing the Restatement, the Individual Defendants admitted that the Company's financial statements during the Restatement Period "should be restated in order to correct certain identified errors" and that the Company had "identified certain

material weaknesses in its internal control over financial reporting." Green Mountain announced that it had substantially tightened its policy governing accounting for royalty income on the Company's purchases from third-party roasters:

> Roasters licensed by Keurig to manufacture and sell K-Cup portion packs, **both to Keurig for resale and to their other coffee customers**, are obligated to pay a royalty to Keurig upon shipment to their customer. Keurig records royalty revenue upon shipment of K-Cup portion packs by licensed roasters to third-party customers as set forth under the terms and conditions of various licensing agreements. **For shipments of K-Cup portion packs to Keurig for resale, this royalty payment is recorded as a reduction to the carrying value of the related K-Cup portion packs in inventory.**

* * *

> Keurig earns royalty income from K-Cup portion packs when shipped by its licensed roasters, **except for shipments of K-Cup portion packs by third party roasters to Keurig, for which the royalty is recognized as a reduction to the carrying cost of the inventory and as a reduction to cost of sales when sold through to third parties by Keurig.**

### c. Improper Accounting for Marketing and Customer Incentives

148.   Green Mountain further manipulated its earnings and financial position by failing to properly account for certain marketing and customer incentive programs in violation of GAAP.

149.   ASC 605-50-25-3 required Green Mountain to recognize the cost of sales incentives at the later of the date upon which the related revenue is recognized by Green Mountain or the date at which the sales incentive is offered. Upon the later of these two triggering events, Green Mountain was required to accrue a liability for the marketing and customer incentives that the Company could "reasonably" and "reliably" estimate. If the Company could not reasonably and reliably estimate the liability for the marketing and customer incentives, it was required to accrue a liability for the "maximum" amount of the potential amount of incentive exposure. ASC 605-50-25-4.

150. During the Restatement Period, Green Mountain failed to record these obligations on its balance sheet and offset the applicable revenue stream and the corresponding accrual in a timely manner, which had the effect of misstating the Company's net income and financial position during the Restatement Period.

151. GAAP also requires that an adjustment to the selling price of the Company's product or services in which they provide marketing and customer incentives be recorded as a reduction in revenue. ASC 605-50-45-1. GAAP further requires that consideration provided by a company to its customers is presumed to be a reduction of the selling prices of the company's products or services. ASC 605-50-45-2. The incentives paid to Green Mountain's customers therefore should have been recorded as a reduction of revenue in Green Mountain's income statement. They were not, resulting in the systematic artificial inflated of reported revenues on those sales that included marketing and customer incentives.

152. As sophisticated businesspeople, all of the Individual Defendants knew that in the sales industry, it is customary to provide customers with discounts and incentives. They therefore knew or recklessly disregarded that, consistent with industry practice, Green Mountain provided its customers with certain incentives and that these incentives had to be reflected in the cost of goods sold. The Audit Committee Defendants – especially "financial experts" Mardy and Davis – knew that these incentives were required to be treated as a reduction in sales price. Because they were specifically required to oversee and monitor Green Mountain's accounting processes, including accounting for these customer and marketing incentives, Audit Committee Defendants Carlini, del Vecchio, Miller, Mardy, and Davis knew or recklessly disregarded that the Company was incorrectly accounting for these incentives.

153.    The impact of the scheme to misapply marketing and customer incentives was material and enabled the Company to misstate pretax net income by approximately $.7 million ($0.4 million after taxes) through the Restatement Period.

154.    In the Restatement, the Individual Defendants admitted that Green Mountain "did not have effective controls to ensure the completeness, accuracy and proper classification of certain marketing and customer incentive programs and related accrued liabilities." "There was a lack of adequate communication between the accounting function to gather the appropriate information from the sales and marketing functions to accurately classify these liabilities and an insufficient number of personnel with an appropriate level of GAAP knowledge and experience evaluating the transactions related to these programs." The lack of personnel with appropriate GAAP knowledge and experience evaluating these types of transactions was a necessary and entirely foreseeable outgrowth of the Company's break-neck rate of growth and core strategies, and should have been remedied before material reporting errors required restatement of financial results.

## VIII.  THE INDIVIDUAL DEFENDANTS' REMEDIATION PLAN FAILS TO ADDRESS MATERIAL WEAKNESSES IN ACCOUNTING AND FINANCIAL REPORTING CONTROLS

155.    Along with the Restatement, the Individual Defendants disclosed a plan purportedly designed to remediate the "material weaknesses" they admitted had arisen "due to the Company's rapid growth, both organically and through acquisitions, outpacing the development of the Company's accounting infrastructure" ("Remediation Plan").  But their Remediation Plan stopped far short of the wholesale top-to-bottom reconstruction of Green Mountain's internal control infrastructure, policies and practices that was required to make up for years of inattention, under-investment and lack of oversight, and ignored entire areas of material reporting risks, despite obvious red flags that should have prompted serious and thorough Board

scrutiny and immediate and effective remedial measures. Even as additional red flags came to

light during the implementation of the Remediation Plan, the Individual Defendants still failed to

modify the Remediation Plan to address them, or to implement necessary internal controls to

prevent them from recurring – breaches of fiduciary duty that would have disastrous

consequences for Green Mountain's credibility in financial markets.

### A. The Individual Defendants Misleadingly Report that the Remediation Plan Will Address Both the Identified Material Weaknesses in Internal Controls and Other Risk Areas

156.    The 2010 Form 10-K, that reported the Restatement also disclosed the Individual

Defendants' Remediation Plan for remediating the material deficiencies in internal controls and

accounting and finance infrastructure that had led to the Restatement. The Individual Defendants

acknowledged that *these material weaknesses arose due to the Company's rapid growth, both*

*organically and through acquisitions, outpacing the development of the Company's*

*accounting infrastructure*, and promised the Remediation Plan would "address the material

weaknesses, *as well as other identified areas of risk*." According to the Individual Defendants,

"[t]hese remediation efforts ... are *intended both to address the identified material weaknesses*

*and to enhance the Company's overall financial control environment*." The elements of the

Remediation Plan were described as follows:

> **Plan for Remediation of the Material Weaknesses in Internal Control Over Financial Reporting**
>
> Management has been actively engaged in the planning for, and implementation of, remediation efforts to address the material weaknesses, as well as other identified areas of risk. These remediation efforts, outlined below, are intended both to address the identified material weaknesses and to enhance the Company's overall financial control environment. Management believes that these material weaknesses arose due to the Company's rapid growth, both organically and through acquisitions, outpacing the development of the Company's accounting infrastructure.

Management's planned actions to further address these issues in fiscal 2011 include:

- the addition of more experienced accounting staff at the Company's enterprise and business segment levels;

- a formal training program for all accounting and finance personnel, so that they remain current with accounting rules, regulations and trends as well as a formal training program for sales and marketing personnel;

- a thorough review of the finance and accounting departments to ensure that the areas of responsibilities are properly matched to the staff competencies and that the lines of communication and processes are as effective as possible;

- a thorough review of the processes and procedures used in the Company's intercompany accounting, including an evaluation of possible methods to simplify and automate certain aspects of the intercompany accounting;

- development of a standardized method for the review, approval, and tracking of retail customer marketing and incentive programs, pricing and other key terms and conditions; and

- an evaluation of the Company's key accounting policies to ensure that they are documented and standardized across business units, circulated within the appropriate Company constituencies, and reviewed and updated on a periodic basis with an view towards the interrelations of the policies across the enterprise.

*The audit committee has directed management to develop a detailed plan and timetable for the implementation of the foregoing remedial measures* (to the extent not already completed) *and will monitor their implementation*. In addition, *under the direction of the audit committee, management will continue to review and make necessary changes to the overall design of the Company's internal control environment*, as well as *policies and procedures* to improve the overall effectiveness of internal control over financial reporting.

Management believes the measures described above and others that will be implemented will remediate the control deficiencies the Company has identified and strengthen its internal control over financial reporting. Management is committed to continuous improvement of the Company's internal control processes and will continue to diligently review the Company's financial reporting controls and procedures. As management continues to evaluate and work to improve internal control over financial reporting, the Company may determine to

take additional measures to address control deficiencies or determine to modify,
or in appropriate circumstances not to complete, certain of the remediation
measures described above.

157.    PWC has proved unwilling to opine as to the sufficiency of the Remediation Plan.

PWC's opinion attached to Green Mountain's 2010 Form 10-K stated: "We do not express an

opinion or offer any other form of assurance on management's statement referring to the

Company's plan for remediation of the material weaknesses in internal control over financial

reporting."

**B.      The Individual Defendants' Remediation Plan Fails to Address Internal
         Control Deficiencies in Inventory Accounting and Revenue Recognition in
         Connection with Operations Outsourced to MBlock**

158.    Concurrent with its September 28, 2010 disclosure of the accounting errors that

ultimately led to the restatement of nearly five years of financial results, Green Mountain

reported that, on September 20, 2010, the SEC's Division of Enforcement had commenced and

inquiry into the Company's relationship with order fulfillment vendor MBlock that appeared to

be focused on revenue recognition practices.  The Individual Defendants ignored their duty to

conduct a full-scale inquiry and comprehensive remediation plan for the Company's accounting,

inventory management, and revenue recognition practices and related internal controls in its

relationship with MBlock, and even attempted to conceal the identity and materiality of Green

Mountain's relationship with MBlock from investors.

159.    After receiving notice of the SEC's inquiry, the Individual Defendants disclosed

only that the SEC inquiry involved "the Company's relationship with one of its fulfillment

vendors." Green Mountain's September 28, 2010 Form 8-K stated:

SEC inquiry

On September 20, 2010, the staff of the *SEC's Division of Enforcement
informed the Company that it was conducting an inquiry* and made a request for
a voluntary production of documents and information. Based on the request, *the*

*Company believes the focus of the inquiry concerns certain revenue recognition practices and the Company's relationship with one of its fulfillment vendors.* The Company, at the direction of the audit committee of the Company's board of directors, is cooperating fully with the SEC staff's inquiry.

160.    Notwithstanding the Individual Defendants' vague disclosure, securities analysts' investigations revealed that the SEC was inquiring into Green Mountain's relationship with MBlock – the order processing and fulfillment vendor responsible for more than 50% of Green Mountain's total accounts receivable at the end of fiscal 2009, according to the Company's 2009 Form 10-K.  Dougherty reported on September 29, 2010 that "in regard to [Green Mountain's] comment that the SEC inquiry concerns its relationship with a fulfillment vendor, we believe: [t]he fulfillment vendor is *M.Block & Sons, which processes the majority of orders for [Green Mountain's] at home business sold through retailers*."  Piper Jaffray & Co.'s report of the same date clarified that "the fulfillment vendor is M.block & Sons – *the company's sole vendor*."

161.    Rather than fulfill their fiduciary duties and undertake a complete overhaul of the Company's internal controls for MBlock-related operations and related inventory and revenue recognition policies and practices, the Individual Defendants opted instead to deny categorically that the reported deficiencies and errors that led to the Restatement arose out of the MBlock relationship – and implicitly gave the Company's MBlock-related accounting a clean bill of health.  In Green Mountain's November 19, 2010 Form 8-K, the Individual Defendants claimed that the Audit Committee had commenced an internal investigation in response to the SEC's inquiry and was able to determine less than a month later that there were no financial reporting errors arising from the Company's relationship with MBlock:

[T]hese errors were discovered by management during the course of its preparation of the year-end financial statements and audit, as well as during the course of an *internal investigation initiated by the audit committee* of the Company's board of directors in light of the previously disclosed inquiry by the staff of the Securities and Exchange Commission's ("SEC") Division of Enforcement. The internal investigation *is nearly complete*, and the Company

continues to cooperate fully with the SEC.... *In addition, none of the financial statement errors are related to the Company's relationship with M.Block & Sons*, the fulfillment vendor through which the Company makes a majority of the at-home orders for the Keurig business unit's single-cup business sold to retailers.

162.    In Green Mountain's 2010 Form 10-K, the Individual Defendants claimed that the Audit Committee had completed its investigation and concluded that "[n]one of the financial statement errors implicate misconduct with respect to the Company or its management or employees," and that "none of the financial statement errors are related to the Company's relationship with M.Block & Sons Inc."

163.    The Individual Defendants' decision not to expand the Remediation Plan to include reforms that would address the material risks to the integrity of accounting and financial reporting that flowed from Green Mountain's relationship with MBlock was an egregious breach of their fiduciary duties given the material risks intrinsic to that relationship and the SEC's inquiry. The Individual Defendants disregarded at least four sets of red flags that should have triggered a full-scale investigation and remediation of Green Mountain's relationship with MBlock.

(a)    First, the Individual Defendants knew that the outsourcing of the warehousing, inventory maintenance, order processing, and shipping functions to MBlock was a major part of Green Mountain's strategy for growing sales without investing in a massive build-out of Green Mountain's facilities and administrative infrastructure, and they could not have overlooked the fact that MBlock sales amounted to over *$2 billion at least 37% of Green Mountain's net sales by fiscal 2011.* The financial significance and the importance of these functions of a timely and accurate accounting and financial reporting for Green Mountain as a whole should have prompted the Audit Committee and the whole Board to review and confirm how, following outsourcing, these functions would be subject to sufficient controls to ensure the

integrity of Green Mountain's financial reporting and that its sales and earnings guidance rested on a sound foundation, as well as periodic scrutiny to confirm that the controls were actually effective.

(b)     Second, upon concluding that Green Mountain suffered material internal controls deficiencies attributable to the Company's growth far outpacing its investment in administrative infrastructure and resulting in inconsistently applied accounting practices at the Company, an insufficiently trained and staffed accounting department, and a lack of sufficient enterprise management systems, the Audit Committee and the whole Board should have conducted a thorough inquiry to determine the extent to which these problems affected the aspect of the Company's operations that, due to its outsourcing, were the most difficult to monitor and control: MBlock's warehousing, inventory maintenance, order processing, and shipping functions. The Board not only failed to do so, but rejected without adequate basis the inclusion of the MBlock functions in the Company's internal control Remediation Plan.

(c)     Third, the Individual Defendants disregarded the fact that, concurrent with the Company's announcement that it had discovered an "accounting error" that ultimately required it to restate nearly five years of quarterly and annual financial statements, the SEC was scrutinizing the Company's revenue recognition practices and its relationship with MBlock. Even in the absence of the SEC's inquiry, the Audit Committee and the rest of the Board knew or through the exercise of reasonable diligence would have known that material distributor relationships are common targets of SEC and Self-Regulatory Organization inquiries because of the well-understood pattern of manufacturers using such relationships to boost or manage reported revenues through strategically timed and improperly recorded shipments to or from distributor warehouses, and recognizing revenue upon shipment to the warehouse, rather than

when product is actually sold. Green Mountain's increasing dependence on MBlock combined with the SEC's scrutiny of that relationship in the context of a restatement necessitated by the failure of Green Mountain's internal control environment should have prompted immediate Board-level scrutiny and sustained remedial action. That did not happen.

(d)     Fourth, the Individual Defendants consciously disregarded MBlock's well-publicized involvement in accounting frauds uncovered by the SEC. In May of 2001, for example, the SEC charged former Sunbeam Corp. Chairman Albert J. Dunlap with overseeing a massive accounting fraud involving channel stuffing practices designed to enable the company to meet promised sales and earnings numbers, and deposed MBlock's then-president regarding the company's procedures for warehousing and delivering goods for its customers in connection with that litigation. In March of 2005, the SEC charged various executives of iGo, Inc. with prematurely and fraudulently recording revenue on transactions with MBlock. The Board's decision not to subject MBlock to heightened scrutiny and include it in the Restatement-prompted Remediation Plan was an inexcusable breach of duty under these circumstances.

**C.     Even Faced with Ongoing SEC Scrutiny, the Individual Defendants Fail to Investigate and Remediate Material Weaknesses in Controls and Supervision of Green Mountain's MBlock Operations**

164.     Despite the ongoing SEC inquiry into the MBlock relationship, the Individual Defendants failed to adequately investigate and remediate the internal controls applicable to the order fulfillment, shipping, invoicing, and inventory management operations that Green Mountain had outsourced to MBlock.

165.     In Green Mountain's Form 10-Q for the first quarter of 2011 filed with the SEC on February 3, 2011, the Individual Defendants asserted that the Company's management had "been actively engaged in the implementation of remediation efforts to address the material weaknesses" in accordance with the previously-announced Remediation Plan. Five years of

controls deficiencies could not be remedied overnight. The Individual Defendants acknowledged that "the Company's disclosure controls and procedures were not effective as of December 25, 2010." The Form 10-Q stated that during the first quarter of fiscal 2011, the Company had made the following progress:

- Management has performed an initial review of the processes and procedures used in the Company's intercompany accounting, and has begun to implement changes to the intercompany sales and profit elimination processes, including:

    - introducing a systemic tracking of intercompany sales in the general ledger using specific department codes to identify intercompany sales; and

    - implementing a consistent process for the calculation of intercompany profit margin on brewers and K-Cup® portion packs, which includes reconciliation to the general ledger to ensure completeness of the margin elimination and consistent valuation of brewers and K-Cup portion packs in ending inventories.

- Management has hired a new accounting manager at the Keurig business unit. Responsibilities for this new position include *establishing and implementing accounting best practices*; reviewing and ensuring the timely reconciliation of general ledger accounts; *developing and ensuring adherence to accounting policies; and providing training and support and knowledge of generally accepted accounting principles to technical accounting situations and the Keurig finance team*.

166. Although these changes purported to address Keurig's accounting practices, they did not increase Green Mountain's oversight of the warehousing, inventory maintenance, order processing, and shipping functions the Company had outsourced. As a result, the inventory, demand, sales, and revenue data derived from these operations was inaccurate due to an accumulation of accounting errors and manipulation.

167. On March 2, 2011, the SEC sent a comment letter to Green Mountain (the "March 2 Comment Letter") that should have prompted the Individual Defendants to conduct a more comprehensive investigation of the Company's relationship with MBlock and to amend the

Remediation Plan to include comprehensive evaluation and remediation of the controls applicable to the functions outsourced to MBlock. The March 2 Comment Letter sought more specific information concerning Green Mountain's revenue recognition policies and practices for sales transactions conducted through MBlock and provided the Individual Defendants with a partial roadmap of the types of issues that concerned the SEC:

> We note that you rely on a single order fulfillment entity, M.Block & Sons, Inc. ("MBLock") in the U.S. to proves the majority of the sales orders for your AH single-cup business. *You also indicate that MBLock "generally" accepts all credit risk on sales to these retailers. Tell us the circumstances under which MBLock would not assume the credit risk, quantify the amount of sales channeled through MBLock where you retained the risk of collection* for each of the years presented, and *describe your revenue recognition policy for these sales transactions.*

> *Tell us your sales return policy for all types of transactions* reflected in your financial statements *and explain why this policy is not apparent in your disclosure.* Please also *quantify the amount of sales returns that occurred in each period.*

> \* \* \*

> We note your disclosure regarding *the importance of your relationship with M.Block & Sons, Inc.,* the order fulfillment entity through which the company makes a majority of the at-home orders for the Keurig business unit's single-cup business sold to retailers. *Please tell us how you concluded that filing your contract documentation would not be required to comply with Item 601(b)(10) of Regulation S-K....*

168. As set forth below, reasonable investigation of these matters would have revealed material weaknesses in controls over inventory, sales, and demand data, as well as affirmative efforts to manipulate accounting to inflate reported sales and revenues.

169. Rather than conduct a reasonably thorough investigation, the Individual Defendants immediately assumed a defensive posture dismissive of the areas of concern to the SEC. On March 29, 2011, defendant Rathke responded to the March 2 Comment Letter on behalf of the Company, denying that the Company's disclosures regarding its relationship with MBlock were inadequate. Rathke said Green Mountain did not recognize revenue upon

shipments to MBlock because MBlock was not a customer. Rathke emphasized that MBlock performed "administrative function[s]," including receiving and fulfilling sales orders from retailers, invoicing retailers on those sales, and maintaining the Company's inventory, and that MBlock was "not ... a purchaser or consumer of the Company's products." She said Green Mountain's disclosures were adequate because its relationship MBlock was material only to the extent the Company faced credit risk with respect to accounts receivable from MBlock, and that this risk had been disclosed.[8] Rathke omitted to mention the material risk of accounting errors and manipulation attendant to the MBlock relationship, especially following the Company's acknowledgment that its internal controls and accounting and finance infrastructure had not kept pace with its growth and the special risks entailed in outsourcing these critical functions. Rathke wrote:

> Historically, *MBlock accepted all credit risk on sales to retailers through MBlock, with the exception of one retailer, QVC*. QVC sales processed through MBlock accounted for approximately $16.1 million in, or approximately 1.2% of, sales for fiscal 2010 ....
>
> \* \* \*
>
> With respect to non-TSV event sales to QVC, the Company has historically recognized revenue upon shipment, although there may be a right of return. The Company recognized revenue upon shipment because the amount of these sales is smaller than for the TSV events and, based on historical rates of return being very low, the risk for return is minimal. As disclosed in Note 2, Restatement of Previously Issued Financial Statements, of the Notes to Consolidated Financial Statements under the heading Other Adjustments, the Company recently determined, based upon review of its contract with QVC that the risk of loss does not transfer under the contract until the product is sold through to the end

---

[8] Green Mountain's 2010 Form 10-K stated that Green Mountain was "subject to significant credit risk regarding the creditworthiness of MBlock and the creditworthiness of its customers," although "MBlock generally accepts all credit risk on sales to these retailers." As of September 25, 2010, receivables from MBlock were approximately 47% of Green Mountain's consolidated accounts receivable balance. The 2010 Form 10-K further disclosed that the Company recognized revenue only after title had passed from Green Mountain to MBlock, which occurred once MBlock had processed *and* shipped the product order to the retailer.

customer. The Company does not have visibility into QVC's shipment status, but based on the historical timing of payments from QVC, management has estimated that products shipped from the Company to QVC are sold and shipped by QVC within 60 days. Therefore, as part of the restatement, the Company has deferred the recognition of revenue on non-TSV sales by 60 days since inception of selling products to this customer.

In addition to QVC, starting in the second quarter of fiscal 2011, the Company began assuming the credit risk for the retailer BJ's Wholesale Club. BJ's Wholesale Club continues to send its sales orders to MBlock to be fulfilled, however, the invoices and associated accounts receivable are now directly between the Company and BJ's Wholesale Club (not MBlock). Title to the product is with the Company and only passes to BJ's Wholesale Club upon shipment from MBlock's warehouses based on the contractual shipping terms.

\* \* \*

As disclosed in the Fiscal 2010 Form 10-K, *MBlock performs an administrative function in processing the majority of sales orders for the Company's at-home single-cup business with retailers in the United States.* Similarly, the Company relies on a single order fulfillment entity similar to MBlock to process the majority of sales orders for its at-home single-cup business with retailers in Canada, which accounted for less than 3% of the Company's consolidated net sales in fiscal 2010. *These fulfillment entities do not sell the Company's products but rather receive and fulfill sales orders and invoice retailers and maintain the Company's inventory.* The Company notes that even though *approximately 43% of its consolidated net sales were processed by MBlock in fiscal 2010, the substance of MBlock's relationship with the Company is administrative and procedural and not as a purchaser or consumer of the Company's products.* Instead, *retailers, and the consumers purchasing brewers and K-Cup portion packs from those retailers, initiate demand for at-home brewers* and are the Company's primary customers.

Because these functions are primarily administrative and *these vendors do not constitute a customer relationship or drive purchases of the Company's products*, the Company has concluded that it is not substantially dependent on these contractual relationships and could either perform these functions internally or find a suitable replacement vendor if the need arises. Instead, the Company believes that *these vendor relationships may be material to investors only to the extent that it faces potential credit risk with respect to its accounts receivable from these vendors, and it has disclosed this risk in its periodic reports*, including in the risk factors found in its Fiscal 2010 Form 10-K.

170.    Green Mountain's Form 10-Q for the second quarter of 2011 again discussed

Remediation Plan progress, and, apart from general resource initiatives, mentioned no changes in

internal controls governing the warehousing, inventory maintenance, order processing, and shipping functions that were outsourced to MBlock. The Individual Defendants acknowledged that the Company's "disclosure controls and procedures were not effective as of March 26, 2011," and described the following measures implemented during the second quarter of fiscal 2011, stating:

> In the second quarter of fiscal 2011 the Company implemented a mandatory training program for all accounting and finance personnel that requires an established number of training hours annually so they remain current with accounting rules, regulations and trends.

> In the second quarter of fiscal 2011 management began a thorough review of the Company's finance and accounting departments to ensure that the areas of responsibilities are properly matched to the staff competencies. Management has identified the need for 5 key management, financial reporting and control and policy positions for which they are now actively recruiting.

171.    On August 3, 2011, the Company filed its Form 10-Q for the third quarter of 2011. Again, the Form 10-Q disclosed the Company's progress with the Remediation Plan and, apart from actions taken to address issues identified in the Restatement regarding intercompany selling prices and recognition of intercompany royalty income, mentioned no remedial steps to address controls over the functions outsourced to MBlock.    Specifically, the Form 10-Q disclosed that the Company had done the following during the third quarter of fiscal 2011:

> [I]n the third quarter of fiscal 2011 management implemented uniform inventory standard costs across its segments and updated the intercompany selling prices to equal the standard cost of the item to simplify the elimination of intercompany profit. In addition, the Keurig business unit discontinued the practice of recording intercompany royalty income.

> * * *

> In the third quarter of 2011 the Enterprise sales teams attended a training session at their national sales meeting to review revenue recognition and trade promotion policy and regulation.

172.    The Individual Defendants again acknowledged in the Form 10-Q that the Company's "disclosure controls and procedures were not effective as of June 25, 2011."

173.    In the Company's Form 10-K for fiscal 2011, filed with the SEC on November 14, 2011 ("2011 Form 10-K"), the Individual Defendants disclosed that, during the fourth quarter of 2011, the Company established a new position of Chief Accounting Officer "to strengthen [Green Mountain's] accounting function and overall financial control environment," and created "policies and procedures manuals, where such items were missing or lacking in some manner, including documentation of our accounting policies and methods of applying those policies." Once again, the changes did not address controls over warehousing, inventory maintenance, order processing, and shipping functions which had been outsourced to MBlock.  Nonetheless, the Individual Defendants misleadingly assured investors that as of September 24, 2011, Green Mountain "*had remediated the previously reported material weaknesses in our internal control over financial reporting.*"

## IX.    THE INDIVIDUAL DEFENDANTS' CONSCIOUS DISREGARD FOR THE CONTROL RISKS ARISING FROM THE OUTSOURCING OF INVENTORY FUNCTIONS TO MBLOCK FACILITATES ACCOUNTING MANIPULATION AND FRAUD

174.    Contrary to their representation to shareholders that Green Mountain's internal controls deficiencies had been effectively remediated, the Individual Defendants consciously disregarded an obvious and critical source of material risk: the functions outsourced to MBlock. The Individual Defendants' failure to address the accounting and financial reporting risks presented by the MBlock relationship allowed Green Mountain managers to continue using MBlock in a fraudulent "cross-shipping" scheme designed to conceal massive over-production and growing inventories of obsolete goods, and to enable the Company, quarter after quarter, to appear to beat aggressive demand forecasts and report inflated sales and revenues.    The

mechanics and magnitude of the cross-shipping scheme underscore the obvious inadequacy of the Company's internal controls and the reckless inattention of Green Mountain's officers and directors.

### A. The Einhorn Investigation Uncovers Credible Evidence of Accounting Fraud Conducted Through MBlock

175.   On October 17, 2011, during the seventh annual Value Investing Congress, noted hedge fund manager Einhorn gave a presentation regarding Green Mountain that revealed the details of an elaborate "cross-shipping scheme" conducted through MBlock.   Einhorn's presentation cited the results of "[f]ield [i]nterviews" his team had conducted of "several former [Green Mountain] and MBlock workers" who told "consistent stories and paint[ed] an unflattering picture of the companies."

176.   **Deliberate Over-Production and Hiding Expired Inventory:**  Einhorn cited multiple sources who described a "cross-shipping scheme" in which Green Mountain would "[d]eliberate[ly]" overproduce inventory not supported by consumer demand and then transfer the excess inventory to MBlock facilities, where it was moved from warehouse to warehouse as necessary to conceal the excess inventory.  The purpose of the scheme was to meet and beat unrealistic and unsustainable demand and sales growth projections.  One source noted that *Green Mountain's manager of demand planning "consistently" sent e-mails "talk[ing] about how far over the demand forecast actual production was*."  As inventory continued to build, it also began to expire, unreported.[9]  Einhorn's sources indicated that, "*MBlock received truckloads of*

---

[9] The Company has not disclosed the total product life of the K-Cups, but disclosed in its March 29, 2011 response to the SEC's March 2 Comment Letter, the shelf life guaranteed to the consumer:

[T]he Company guarantees shipment of K-Cup portion packs to retailers at least six months prior to the "Best Used By" date printed on the packaging.  If K-Cup portion packs are shipped to a retailer less than six months prior to the Best Used

*expired coffee directly from Green Mountain*." MBlock simply stockpiled this expired product. One source stated that, "*[t]hese plant managers just kept on saying they have space taken up by the inordinate amount of expired coffee.*" "*[A]t least one third of [MBlock's] warehouse is more than likely expired coffee in all the warehouses.*" Einhorn's channel check confirmed that even coffee that shipped to retailers included "*significant amounts of retail product with short shelf-life, and at times even expired product.*"

177.   **Shell Game Played Across All Facilities:** One of Einhorn's sources specifically described these practices as a deliberate "'shell game'" encompassing all of Green Mountain's facilities. According to the source, "*[d]eliberate overproduction of K-cups and refusal to ship from multiple locations gave cover for a 'shell game that Green Mountain was playing across all its facilities.'*" Indeed, the facts revealed in the Einhorn Presentation show there was little if any effort to conceal the cross-shipping scheme – any reasonable investigation would have discovered the controls weaknesses and the accounting manipulations. For example, a "*Kenco trucker allegedly reported delivering merchandise to Kenco, picking it up later on, sealing the truck, and delivering it 10 bay doors down at the same warehouse.*" The shipment of product within the same warehouse could not have gone unnoticed by Green Mountain's employees – and, as noted below, the instruction to do it almost certainly came from Green Mountain, since MBlock employees took their direction from Green Mountain.   This was no aberration. Einhorn's sources noted that the practice of simply transferring product between MBlock's and Green Mountain's facilities was even more common than shipping product to actual customers: "*We would do more transferring of inventory than we physically did shipping... Keurig would*

By date, retailers may deem such K-Cup portion packs as non-saleable product and be eligible for credit for the non-saleable product. The Company does not allow return of K-Cup portion packs that are shipped at least six months prior to the "Best Used By date or allow retailers to classify such items as non saleable.

*ship stuff to themselves, I mean truckloads of stuff they'd ship [from MBlock] to themselves.*'" Another source indicated that the same inventory was actually being shipped back and forth multiple times: *"There is a lot of cross-shipping.  Product is transferred from one facility to another, often multiple times."*

178.   **Inflating Financial Results and Misleading Auditors:**  Einhorn's sources also noted the suspect timing of product shipments.  The pattern they observed was that bogus product shipments and cross-shipments occurred just before quarter-end inventory audits.  One source explained that *"[p]rior to the inventory audit, 'We would remove product and preload trailer trucks to ship to retailers because we didn't have room on the floor.  Then we'd load more product on trailer trucks to nowhere to move it off the floor.*'"  Another source noted deliberate efforts to hire excess inventory from auditors: *"The warehouse was partially cleared prior to an audit, leaving a skeleton inventory of ~50%.  Inventory was loaded onto trucks, which sat in the docks and was never counted.  Sometimes after the audit, the product would simply be moved back into the warehouse."*  Another source said these tactics were applied to brewers, as well: *"Immediately prior to an audit, 500,000 brewers were inventoried and processed as an order for QVC.  The brewers were never shipped, and after the audit, the inventory was restocked."*  Strikingly, the brewer manipulation occurred during the second fiscal quarter of 2011, in which the Individual Defendants reported that sales of brewers exceeded market expectations by about 300,000 brewers.  Einhorn concluded that *"the research shows that Green Mountain and MBlock are potentially engaged in a variety of shenanigans that appear designed to mislead auditors and to inflate financial results."*

179.   **Obvious and Pervasive Lack of Controls:**  Einhorn's sources reported that Green Mountain employees were able to effectuate this cross-shipping scheme due to the lax

controls applied to the operations outsourced to MBlock.  He specifically cited witnesses'
observations that Green Mountain's internal controls environment suffered from a weak
technology infrastructure and an under-staffed and inexperienced accounting department.  In
addition, lax inventory control practices, including comingling and failure to utilize automated
tracking systems, were rampant. A former MBlock employee was cited as stating that "'*Nobody
in that warehouse can tell you what is MBlock's, what is Keurig, what is Green Mountain's,
nobody can tell you that.  I honestly don't think the owner of MBlock can tell you that.*'"
Another employee said that the software-based "*PeopleSoft function to fulfill orders from
multiple locations was never implemented.*"  Einhorn summarized the reports of multiple
sources as indicating that: (i) the accounting department was not adequately staffed and that
Green Mountain "*uses many temporary workers and makes extensive use of college 'co-op'
students instead of hiring full time accountants*"; (ii) "*[b]oth [Green Mountain] and MBlock
use sub-standard IT systems.  Important functions including inventory management are
performed in Excel spreadsheets which are easy to change, provide non-standardized analysis,
and are prone to material error*"; (iii) "*[s]uggestions to improve operations through the use of
technology are met with resistance inside both organizations*"; and (iv) some "*[f]ormer* workers
believe that though no reason was given, they were *fired for asking too many questions.*"

180.    **Green Mountain Employees Direct the Scheme:**  The material weaknesses in
controls and inattention to obvious indicators of fraudulent activity were not due to a lack of
involvement by Green Mountain managers in the outsourced functions. To the contrary, Green
Mountain employees actually directed the scheme.  Sources cited in the Einhorn Presentation
said "*[i]t was clear that Keurig and Green Mountain control MBlock,*" and that, from the
perspective of the MBlock personnel charged with executing the outsourced order fulfillment,

invoicing and inventory management functions, the companies appeared to be one and the same. One former MBlock worker was cited as saying: "*It was more like I was working for Keurig than I was working for MBlock ... I really never even had a boss while I was at MBlock.*" The Einhorn Presentation specifically noted the "*[p]eculiar relationship between [Green Moutain] and its distributors.*" According to Einhorn's sources, when Keurig managers visited MBlock, "they were not treated like clients as the other customers were ... It was so weird." Another former MBlock warehouse worker said "*[t]hey treated all the other customers like clients. Not Keurig.*" According to Einhorn, Green Mountain actually incentivized the fraudulent activities: "*Bonuses were based on overall K-Cup production, rather than on total revenue/sales ... This has led to excess production and related inventory and spoilage problems.*"

### B. The Fraudulent Cross-Shipping Scheme Permitted Green Mountain to Inflate Revenues and Earnings in Violation of GAAP

181.    The cross-shipping scheme described in the Einhorn Presentation allowed Green Mountain to overstate its revenues, understate its cost of sales, and report inflated earnings. Green Mountain deliberately overproduced K-Cups in amounts that far exceeded actual consumer demand. The Company would ship excess, expired, or otherwise unsold K-Cups to MBlock and within MBlock, and book sales associated with these shipments. Green Mountain recognized revenues on these sham sales as if the product had actually been sold by MBlock. Massive quantities of expired inventory went unaccounted for. Steps were taken to hide excess inventory from Green Mountain's outside auditors.

182.    The "sales" to MBlock lacked economic substance because the sales did not pass title, risks and rewards, or ownership to an actual customer or re-seller of the product. By recognizing revenues on these sales, Green Mountain violated Statement of Financial Accounting Concepts ("SFAC") No. 2, ¶160, because this did not accurately reflect the economic

substance of these underlying transactions.[10]   Accounting entries that are contrary to the economic substance of what has transpired are not faithful representations of the event and are inherently unreliable.

183.   Recognizing revenue on these shipments violated basic GAAP principles. Specifically, it violated SFAC No. 5, which provides that revenues on sale of goods should not be recognized until they are realized or realizable and earned – usually when the product is delivered to customers.[11]   In recognizing revenue associated with sham "sales" to MBlock, the Company violated the basic premise of SFAC No. 5 requiring the delivery of merchandise or rendering services, and fraudulently recorded revenues on sales that did not pass title, risk, and rewards of ownership to their end customers and resellers.

184.   This practice also violated SEC criteria for revenue recognition.   ASC 605 and SEC SAB Topic 13A[12] permit revenue recognition only when all of the following criteria are

---

[10] SFAC No. 2, Qualitative Characteristics of Accounting Information, ¶160 provides that accounting entries that are contrary to the economic substance of what has transpired are not faithful representations of the event and are inherently unreliable. Accounting must reflect the basic nature of what has transpired to provide meaningful information to investors. The quality of reliability and, in particular, of representational faithfulness leaves no room for accounting representations that subordinate substance to form. The reliability of a measure rests on the faithfulness with which it represents what it purports to represent, coupled with an assurance for the user that it has that representational quality.

[11] SFAC No. 5, Recognition and Measurement in Financial Statements of Business Enterprises, ¶84(a) states in part that "two conditions (being realized or realizable and being earned) are usually met by the time product or merchandise is delivered or services are rendered to customers, and revenues from manufacturing and selling activities and gains and losses from sales of other assets are commonly recognized at time of sale (usually meaning delivery)." SFAC No. 5, ¶83(b) states that "[a]n entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues."

[12] SAB Topic 13 represents the codification of certain Staff Accounting Bulletins, including SAB No. 101 (and No. 104), Revenue Recognition in Financial Statements as of May 9, 2003. On

met: (i) persuasive evidence of an arrangement exists; (ii) delivery has occurred – which "generally is not considered to have occurred unless the customer has taken title and *assumed the risks and rewards of ownership* of the products specified in the customer's purchase order or sales agreement"; (iii) the seller's price to the buyer is fixed or determinable; and (iv) collectability is reasonably assured.  Because MBlock never took title and credit risk to the product that Green Mountain shipped to MBlock in the sham "sales" nor was this product ever sold or delivered to retailers who took title to and risks and rewards associated with ownership of the product and became true owners, Green Mountain was precluded from recognizing revenues associated with these sham sales.

185.    The Company's failure to write down impaired inventory – i.e., the expired K-Cups – in a timely manner also violated GAAP.[13]  ASC 330 requires impaired inventory to be written down as a charge against income in the period in which the inventory becomes impaired – i.e., when the K-Cups expired.[14]  Green Mountain also failed to properly account for this

---

December 17, 2003, SAB Topic 13 was revised by SAB No. 104, Revenue Recognition. Such revisions, have been incorporated in all references to SAB Topic 13.

[13] GAAP requires that inventories shall be valued at the lower of cost or market, with market generally defined as net realizable value (the estimated selling price in the ordinary course of business, less reasonably predictable costs of completion and disposal) for finished goods and replacement cost for raw materials and work-in-process.  An essential part of the application of the lower of cost or market value concept is the *reduction of the cost of obsolete, damaged, and excess inventories* to market.  Excess inventories are quantities of items that exceed anticipated sales or usage for a reasonable period.  Obsolete, damaged, and excess inventories shall be carried at net realizable value (which may be scrap value), with consideration being given to *obsolescence risks for excess stock*.

[14] ASC 330-10-35 specifically states: "Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference should be recognized as a loss of the current period. This is generally accomplished by stating such goods at a lower level commonly designated as market .... Thus, in accounting for inventories, a loss should be recognized whenever the utility of goods is impaired ...."

expired inventory by reducing its excess and obsolete inventory to its net realizable value as a charge to earnings or by increasing its reserves for excess and obsolete inventory in sufficient amounts to match the increase in inventory.[15]

186.    Although the Individual Defendants had not admitted that sales, revenues, and profits were overstated, the facts indicating that the manipulations observed by Einhorn's sources led to material reporting inaccuracies are striking.  Despite a 156% increase in inventory at the end of fiscal 2011 compared to the prior year, the Company actually decreased its reserves for excess and obsolete inventory (as a percentage of inventory) during fiscal 2011 by 25% as compared to fiscal 2010.  Green Mountain did not sell all of this inventory.  In fact, this massive increase in inventory was accompanied by a 28% decline in inventory turnover from the same period the previous year, indicating that it was taking the Company significantly longer to sell its inventory.  The Company's inventory at the end of fiscal 2011 was taking, on average, 108.31 days to sell – more than forty days longer than at the end of fiscal 2010, when it took 77.05 days to sell.  While it is impossible without discovery to quantify the net impact of these improper accounting practices, they plainly had the effect of overstating the Company's saleable inventory, understating the Company's cost of sales as obsolete, expired inventories went unaccounted for, and commensurately inflating revenues and earnings.  As alleged in further detail below (*see* ¶¶191-200; 240-52), these practices also rendered Green Mountain's inventory and demand data unreliable, making it impossible to forecast demand using any method other than equally unreliable bottom-up estimates derived from sales channels.

---

[15] Green Mountain violated GAAP and its own publicly stated policy of accounting for inventory (as noted in its 2011 Form 10-K) -- to state inventories "at the lower of cost or market" – by failing to write down (or reserve) the value of its excess and obsolete inventory to the lower of cost to market in its fiscal year 2006 through the third quarter of fiscal 2010 financial statements.

**C.** **The Individual Defendants Fail to Take Reasonable Corrective Action in Response to Einhorn's Allegations**

187. The October 17, 2011 Einhorn Presentation raised serious questions about the adequacy of the investigation purportedly overseen by Green Mountain's Audit Committee and the efficacy of the Remediation Plan in connection with material deficiencies in controls applicable to the functions outsourced to MBlock. Rather than take the time to thoroughly investigate the allegations made in the Einhorn Presentation and evaluate further improvements in internal controls to address them, the Individual Defendants brushed them aside. Little more than three weeks after the Einhorn Presentation, during the Company's regularly scheduled November 9, 2011 earnings teleconference, defendant Blanford noted that the Audit Committee had "reviewed the allegations" and determined there was no "misconduct":

> [W]e take the recent allegations of misconduct seriously. ***Our Audit Committee has reviewed the allegations and we are confident there is no misconduct. There is no wrongdoing***.

188. In prepared remarks published in connection with the November 9, 2011 earnings teleconference, management simply restated Green Mountain's revenue recognition policy, without addressing whether it was actually followed or whether sufficient controls were in place to alert executives and the Board when revenue recognition policies were violated:

> All inventories maintained at third party fulfillment locations are owned by the Company until the fulfillment entity processes the orders and ships the product to the retailer. The Company recognizes revenue when the fulfillment entities ship the product based on contractual shipping terms and when all other revenue criteria are met.

> Given that all inventories maintained at MBlock are owned by the Company until product is shipped to the retailer, movement of inventory within or between MBlock does not result in revenue recognition.

189.   No one at Green Mountain addressed the mechanics of the scheme uncovered by Einhorn or the allegations of systematic over-production and under-reporting of expired inventory.

190.   The Individual Defendants have since continued to dismiss rather than address the substance of Einhorn's allegations, failing to make any other statements in response to Einhorn's damning allegations until May 2012, when the Company again came under fire after failing to meet its earnings guidance.  During a CNBC interview, defendant Stiller was asked if he would ever discuss the allegations with Einhorn, Stiller said "I don't think I would, I'm not going to deal with people like himself."  Rather than give the serious allegations the weight they deserved and thoroughly investigate them, Stiller called Einhorn's revelations "a joke."  Stiller's dismissiveness and the publication of the conclusion of the Audit Committee's purported "investigation" just three weeks after Einhorn's presentation, make clear that the Individual Defendants never took the allegations seriously and certainly did not take the time to conduct the thorough investigation their importance demanded.

**D.     The Individual Defendants Consciously Disregarded Serious Inventory Anomalies Indicating a Lack of Effective Internal Controls in Green Mountain's MBlock-related Operations**

191.   Serious anomalies in the inventory numbers Green Mountain reported in its Forms 10-Q and 10-K show the Individual Defendants consciously disregarded material inconsistencies between the reported increases in Green Mountain's sales and revenues and the Company's reported inventory balances and inventory turnover rates.

192.   Through 2010 and 2011, the Individual Defendants repeatedly explained Green Mountain's fast rising inventory balance as a product of the Company's efforts to increase supply to meet rising demand for K-Cups and brewers.  The Individual Defendants repeatedly claimed that the inventory levels 'normalize' as increased sales brought them into balance with rising

demand.  *See* ¶¶203-07; 211; 213-16, *infra*.  But the rate of increase in Green Mountain's inventory balance significantly outpaced the rate at which sales and revenues reportedly rose.

193.    Even more striking, the Company's "days sales of inventory" – a metric commonly used to determine the amount of time it took to sell through inventory on hand – substantially increased during this same period.  In the second quarter of 2010, for example, it took Green Mountain about a month-and-a-half to sell through (or "turn") inventory on hand.  By the second quarter of 2012, it was taking Green Mountain more than three months to turn its inventory.  At a time when net sales were reportedly increasing at a rate of between 64% and 127% each quarter, and Green Mountain was purportedly struggling to increase production capacity to keep pace with increasing demand, inventory turnover rates (the number of times inventory on hand is sold or used in a reporting period) should have been rising, or at least remaining constant, as inventory was released to fulfill orders.  Instead, inventory turnover was falling – fast.

194.    Taken together, the faster than expected rate of increase in inventory and falling rates of inventory turnover raised a red flag that should have prompted immediate Board-level inquiry into the quality of the Company's demand, sales, and inventory data, particularly after the Individual Defendants had admitted that Green Mountain's internal controls infrastructure had not kept pace with their growth initiatives – including the outsourcing of inventory management functions to MBlock – and the concomitant increase in the volume of transactions and complexity of operations.  These anomalies also raised the specter of accounting manipulation and fraud.  Any reasonable investigation would have revealed fundamental deficiencies in the internal controls applied to the MBlock operations, as well as evidence of cross-shipping, sham sales, and stockpiling of expired inventory.

195.   **Inventory Growth Outpaces Sales**.  Green Mountain reported net sales increases over corresponding periods in prior years throughout fiscal 2010, 2011, and into 2012. Specifically, the Company reported increases in net sales of 75.2%, 66.5%, 66.1%, and 81.7% in the first, second, third, and fourth quarters of fiscal 2010,[16] respectively; increases in net sales of 66.3%, 101.1%, 126.55%, and 90.8% in the first, second, third, and fourth quarters of fiscal 2011, respectively; and increases in net sales of 101.7%, 36.6%, and 21.1% in the first, second, and third quarters of fiscal 2012, respectively.  As the Company's sales increased, Green Mountain's inventory balance should have risen in proportion to growth in demand, sales, and revenues.  As depicted in the graph below, however, the Company's inventory balances increased disproportionately relative to reported revenue growth.   Especially given the Individual Defendants' repeated assertions that the Company was struggling to keep pace with demand, and Green Mountain's policy of deeming K-Cup inventory obsolete if not shipped within six months of roasting,[17] the rate of increase in inventory balances should not have been materially outpacing the rate of growth in sales and revenues.  This anomaly, particularly against the backdrop of material controls deficiencies and the information reported by Einhorn, should have prompted an immediate and thorough inquiry by the Audit Committee and the entire Board.

---

[16] The figures for the first three quarters of fiscal 2010 are from the Company's restated financial statements.

[17] According to the Company's March 29, 2011 response to the SEC, "the Company guarantees shipment of K-Cup portion packs to retailers at least six months prior to the 'Best Used By' date printed on the packaging."



196.     As detailed in the chart below, beginning in the third quarter of fiscal 2010, and in

every fiscal quarter since then, the Company's average inventory balance[18] has increased at a

substantially higher rate than the Company's net sales and revenues in that period.[19]   For

example, in the second quarter of fiscal 2011, the Company's revenues increased by 101.17%

from the same period the previous year, while average inventory for the same period increased

---

[18] The average inventory balance figure is the estimated average dollar amount of inventory on
hand based on the beginning and ending inventory balances for each period.  As the Individual
Defendants admitted, even material variations in the cost of major inputs, such as the 60%
increase in coffee prices in the fourth quarter of fiscal 2011, accounted for only about a quarter
of the increase in Green Mountain's inventory balance.  Applying the average published price for
Arabica coffee to the Company's inventory values to measure average inventory in pounds shows
the same thing – rising input costs cannot account for the outsized increase in inventory.

[19] During fiscal years 2010 and 2011, Green Mountain derived 86% and 84%, respectively, of its
reported net sales from sales of K-Cup and brewers.

161.08% from the same period the previous year, indicating that the Company was growing its inventory at a rate that was 1.59 times higher than the rate at which it was growing revenue. From the second quarter of 2010 through the third quarter of fiscal 2012, revenues increased at an average rate of 12%, while inventory grew at an average rate of 20% each quarter.

| In Millions of dollars, except per share items. | Q1 2010 | Q2 2010 | Q3 2010 | Q4 2010 | Q1 2011 | Q2 2011 | Q3 2011 | Q4 2011 | Q1 2012 | Q2 2012 | Q3 2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | $345.15 | $321.95 | $316.58 | $373.09 | $574.15 | $647.66 | $717.21 | $711.88 | $1,158.22 | $885.05 | $869.19 |
| Year Over Year % Change | 75.22% | 66.51% | 66.18% | 81.73% | 66.35% | 101.17% | 126.55% | 90.81% | 101.73% | 36.65% | 21.19% |
| Cost Of Goods Sold | $249.58 | $214.10 | $207.70 | $259.64 | $430.55 | $404.80 | $453.13 | $457.79 | $821.61 | $572.01 | $565.88 |
| Year Over Year % Change | 73.76% | 62.96% | 64.26% | 86.37% | 72.51% | 89.07% | 118.17% | 76.32% | 90.83% | 41.31% | 24.86% |
| Gross Profit | $95.58 | $107.85 | $108.89 | $113.45 | $143.60 | $242.86 | $264.08 | $254.09 | $336.60 | $313.04 | $303.31 |
| Year Over Year % Change | 79.15% | 74.00% | 69.92% | 71.95% | 50.25% | 125.18% | 142.53% | 123.97% | 134.40% | 28.90% | 14.86% |
| | | | | | | | | | | | |
| Inventory at End of Period | $117.21 | $101.08 | $177.18 | $262.48 | $269.13 | $300.76 | $417.50 | $672.25 | $606.68 | $602.12 | $667.01 |
| Year Over Year % Change | 82.56% | -50.24% | 78.61% | 98.57% | 129.62% | 197.56% | 135.63% | 156.12% | -125.42% | 100.20% | 59.76% |
| Inventory at Beginning of Period | $132.18 | $117.21 | $101.08 | $177.18 | $262.48 | $269.13 | $300.76 | $417.50 | $672.25 | $606.68 | $602.12 |
| Year Over Year % Change | 54.94% | 82.56% | 50.24% | 78.61% | 98.57% | 129.62% | 197.56% | 135.63% | 156.12% | 125.42% | 100.20% |
| Average Inventory | $124.70 | $109.14 | $139.13 | $219.83 | $265.81 | $284.95 | $359.13 | $544.87 | $639.46 | $604.40 | $634.56 |
| Year Over Year % Change | 66.80% | 66.02% | 67.14% | 90.01% | 113.16% | 161.08% | 158.13% | 147.86% | 140.58% | 112.11% | 76.70% |
| | | | | | | | | | | | |
| Inventory Turnover* | 2.00 | 1.96 | 1.49 | 1.18 | 1.62 | 1.42 | 1.26 | 0.84 | 1.28 | 0.95 | 0.89 |
| Year Over Year % Change | 4.17% | -1.83% | -1.71% | -1.92% | -19.07% | -27.56% | -15.48% | -28.86% | -20.68% | -33.36% | -29.32% |
| Days Sales of Inventory** | 45.47 | 46.39 | 60.96 | 77.05 | 56.18 | 64.06 | 72.12 | 108.31 | 70.83 | 96.15 | 102.04 |
| Year Over Year % Change | -4.01% | 1.87% | 1.74% | 1.96% | 23.56% | 38.06% | 18.32% | 40.58% | 26.07% | 50.11% | 41.49% |

* Inventory turnover is calculated by dividing the cost of good sold by the average inventory for each quarter. Inventory turnover is the measure of how many times inventory on hand is released for sale or obsolescence in a given period. The turnover figures above are based on quarterly periods.

** Days sales of inventory is calculated by dividing the inventory turnover in the length of the reporting period (i.e. 91 days). Days sales of inventory is a commonly-used financial measure that gives an indication of how many days it takes a company to turn its inventory (including goods that are work in progress) into sales.

197.   **Inventory Turnover Falls**.   At the same time the Individual Defendants were claiming that inventory was rising to meet increasing demand, the rate of inventory turnover should have remained steady or increased to account for increases in inventory released to fulfill sales. Instead, the rate of inventory turnover was falling precipitously – indicating inventory stockpiling and slowing sales. As shown in the chart above, Green Mountain's inventory turnover fell consecutively in seven of ten quarters from the second quarter of fiscal 2010 through the third quarter of fiscal 2012, and fell at an accelerating rate in each of these quarters on a year-over-year basis. Simply put, it was taking Green Mountain significantly longer to release (i.e., sell or obsolete)[20] its inventory on hand as compared to the same quarter in the

---

[20] The inventory balances reported in the chart are net of reserves set by Green Mountain for obsolete or excess unsellable inventory (i.e., reserves have been deducted from the reported

previous year.  For example, the Company's inventory turnover fell to 0.95 times in the second quarter of fiscal 2012 compared to 1.42 and 1.96 in the second quarters of fiscal 2011 and 2010, respectively, reflecting the fact that it took Green Mountain on average 96.15 days to release its inventory in the second quarter of fiscal year 2012 compared to 64.06 days and 46.39 days for the same quarters in fiscal 2011 and fiscal 2010, respectively.  It took Green Mountain over 50% and 107% longer to sell its inventory in the second quarter of fiscal year 2012 than it did for the same period in fiscal year 2011 and fiscal year 2010, respectively.

198.    These inventory trends were strikingly inconsistent with the Individual Defendants' repeated statements that inventory was rising to meet increasing demand.  They suggested that inventory was not actually selling through, as inventory turnover rates were rapidly declining, raising serious questions about the integrity of the inventory, sales, and revenue data reported by Green Mountain and the effectiveness of its internal controls.

199.    The implications of these trends became even more serious upon Einhorn's presentation of the results of his investigation.  Taken together, the evidence suggested not just continuing material internal controls deficiencies, but affirmative efforts to manipulate Green Mountain's accounting and reported results.  Einhorn's description of the over-production, cross-shipping, and stockpiling of obsolete inventories at MBlock supplied a far more compelling explanation of the inventory anomalies than the Individual Defendants' claims that inventory was

---

amount).  The reserves were not growing proportionately with the increasing inventory balance during these periods, so the anomaly of declining inventory turns at a company claiming to be struggling to keep pace with demand cannot be explained by any increase in the rate at which inventory was released due to obsolescence.  In fact, during these periods, the Company held reserves for excess and obsolete inventory steady at amounts less than 1%, 2%, and 1% of the total inventory at the end of fiscal 2009, 2010, and 2011, respectively.  If Green Mountain's reserves were accurately reported, the increases in inventory and declining inventory turnover cannot be explained by greater amounts of increases in obsolete or expired product released from inventory.

increasing to meet higher demand. The anomalous inventory data strongly supported Einhorn's conclusions. Inventory was increasing due to over-production. Inventory turnover was declining because inventories were not actually selling through. Excess production and obsolete (expired) inventory was being stockpiled and unaccounted for. Sham sales were being booked to inflate sales and revenue figures.

200.    At a minimum, these facts should have prompted the Board to inquire further into the Company's relationship with MBlock and the adequacy of the Company's internal controls over its inventory function. These facts also called into question whether Green Mountain could reasonably forecast demand without reliable inventory and sales figures with which to build their demand and sales models. The inevitable result of the Individual Defendants' failure to establish and maintain an adequate system of internal controls over the Company's key inventory management function was the material distortion of Green Mountain's reported results. The impact of these distortions accumulated over time, undermining the Company's ability to reliably forecast demand and sales in support of the Individual Defendants' published guidance. The question became not *if* Green Mountain would experience a severe guidance miss, but *when*.

## X.    THE INDIVIDUAL DEFENDANTS ISSUE SALES, REVENUE, AND EARNINGS FORECASTS WITHOUT A REASONABLE BASIS AND MISLEAD ANALYSTS AND INVESTORS ABOUT THE REASONS FOR THE COMPANY'S INCREASING INVENTORY

201.    Throughout fiscal 2011, the Individual Defendants published aggressive sales and earnings guidance, touted "strong" demand for Green Mountain's products, and promised analysts and investors that the Company's inventory levels were rising to meet demand. These statements were misleading because the Individual Defendants knew that they had not remediated the material weakness in the Company's internal controls over financial reporting identified in the Restatement, and knew or, through the reasonable exercise of diligence, should

- 118 -

have known that other serious, un-remediated deficiencies plagued the Company's internal controls over the order fulfillment, invoicing, and inventory management functions outsourced to MBlock. The cumulative effect of the resulting inaccuracies and distortions was that no one at Green Mountain could explain: (i) why the Company's inventory growth was outpacing sales and revenues while inventory turnover slowed; (ii) how these facts could be consistent with their continued aggressive demand and sales growth projections; or (iii) how Green Mountain could forecast with any degree of reliability what demand would look like from quarter to quarter, let alone over the course of a year.

202.    Following their failure to invest in the internal control infrastructure necessary to keep pace with their growth initiatives, the Individual Defendants failed to thoroughly investigate the MBlock operations at greatest risk of control lapses, even after the SEC commenced its inquiry. They also disregarded the serious questions Einhorn's investigation raised about the thoroughness of the Audit Committee's purported internal investigation. And they ignored the fact that the increase in inventory was far outpacing the rate of increase in sales and the anomalous material decline in inventory turnover, even as reported sales increased quarter after quarter. These red flags all pointed to the same conclusion: Green Mountain's lack of effective internal controls, especially over the functions outsourced to MBlock, and the accounting manipulations later disclosed by Einhorn, left the Company with no reliable inventory and historical demand data with which to reliably model and predict demand and sales. These deficiencies had been masked by Green Mountain's high overall growth rate; but it was only a matter of time before a series of slower than expected quarters would force defendants to reveal that the Company's sales demand and sales estimates lacked any reasonable foundation.

A.    **The Individual Defendants Make Misleading Statements Touting "Strong" Demand for the Company's Products and Minimizing the Company's Apparent Lack of Control over Inventory**

203.    On December 9, 2010, Green Mountain filed a Form 8-K announcing the Company's fourth quarter and full fiscal year 2010 earnings results.  In the Form 8-K, the Individual Defendants represented that the Company was "experiencing some K-Cup shortages" "[d]espite ... efforts to ensure adequate capacity ahead of Holiday."  They reported that Green Mountain was making capital investments to increase its production lines and crews to "ramp [up] available capacity."  The Individual Defendants promised that they were "focused on achieving and maintaining *optimum inventory levels* across our business."

204.    The Company held a conference call that same day to discuss the earnings results. During the call, defendant Rathke touted the high demand for the Company's products, explaining that the Company was "continuing to invest in our packaging lines and infrastructure, *to ensure we can keep up with the ... the anticipated K-Cup demand*."  Defendant Blanford similarly stated: "*We are in fact dealing right now with very strong demand*, and are *struggling to support our customers* in a way we would want.  So we are working vigorously to increase our capacity."  Rathke further announced that the Company would "be building the inventory of K-Cups, especially into Q2, where we see *very strong demand for the K-Cups where a lot of folks just got a brewer for the holidays*."

205.    On a conference call held February 2, 2011, to discuss the Company's first quarter 2011 earnings results, defendant Blanford continued to tout the strong demand for the Company's products, stating: "We are definitely being stretched.... *[D]emand is definitely stretching our ability to supply.  And we've not quite caught up with that demand curve yet*."

206.    During a May 3, 2011 earnings conference call held to discuss the Company's second-quarter 2011 results, certain Company officers repeated that demand for the Company's

products remained high and denied that the Company was building excessive inventories. For

example, when questioned by Bryan Spillane, an analyst from Bank of America Merrill Lynch,

regarding how much, if any, in sales "actually might have been pulled forward," defendant Stacy

answered: "*We did not pull forward any sales at all. The general demand is what we see.* We

fill our customers' orders as they come in, and they were not building any excessive inventories

at all at retail." John Whoriskey, the Vice President and General Manager of Keurig's At Home

Division, also asserted, "*there is no pulling forward of shipments to do anything, other than*

*react to the demand and make sure we have adequate inventories in place.*" Defendant Stacy

also denied that the Company's massive inventory increases were problematic, promising that the

Company was "*not building any excessive inventories at all.*"

207.    Defendant Blanford continued to tout high demand for the Company's product

during an earnings conference call held on July 27, 2011, to discuss the Company's third quarter

2011 results, emphasizing that any increase in inventories would quickly sell though to satisfy

pent up customer demand: "As we have continued to add portion pack production capacity in

Q3, we were able to *fulfill customer demand that had pent-up in the system over the prior two*

*quarters.*"

208.    In the July 27, 2011 press release announcing the Company's third quarter 2011

results, the Individual Defendants provided estimates for the Company's fiscal year 2012 for the

first time, including:

- Total consolidated net sales growth of 60% to 65% from fiscal 2011.

- Fiscal 2012 non-GAAP earnings per diluted share in a range of $2.55 to
$2.65 per diluted share, excluding any acquisition-related transaction
expenses; legal and accounting expenses related to the SEC inquiry, the
Company's internal investigation and pending litigation; amortization of
identifiable intangibles related to the Company's acquisitions; and any

gain or loss form sale of the Filterfresh U.S.-based coffee services business.

- Capital expenditures for fiscal 2012 in the range of $650 million to $720 million. In addition, as the Company secures new production facilities for future growth it may incur additional capital expenditures in the range of $50 million to $60 million in fiscal 2012.

209.    Analysts responded favorably to the fiscal 2012 guidance.  Scott Van Winkle of Canaccord Genuity wrote in his July 28, 2011 report that the 2012 EPS guidance "was well ahead of consensus and higher than our most robust expectations."  Despite expressing surprise at the fact that the Company's revenues so far exceeded projections, however, analysts bought defendants' explanation that this was attributable to the ever-increasing demand for the Company's products.  As a result, analysts also raised their estimates for the fourth quarter of fiscal 2011 – by as much as 30%.  For example, Canaccord Genuity's July 28, 2011 report noted that, "*the upside [of third quarter fiscal 2011] was entirely driven by the stronger K-cup demand*," and raised its share price target to $120 from $97.  William Blair similarly stated that "*strong demand trends [were] driving upside relative to our estimate*."  Dougherty's report that same day noted that, "*[d]emand for [Green Mountain] products exploded*," and raised its price target to $130 from $100.

210.    Analysts also accepted at face value the Individual Defendants' explanation that the Company's increased capital expenditures were driven by increasing demand for the Company's products. A report from Janney Capital Markets dated July 28, 2011, noted that the increased capital expenditures "indicate[d] that K-Cup capacity expansion is well ahead of ... estimates and suggests that [Green Mountain's] internal projections remain robust."   Likewise, KeyBanc's report of that same day noted that the Company's capital spending plans for fiscal year 2012 "are the result of greater than expected brewer demand."

211.   At least one analyst, however, took notice of the Company's ever-increasing inventories and pressed for an explanation.  During the July 27, 2011 conference call, Longbow Research LLC analyst Alton Stump questioned whether "with the capacity that came online, was there any channel fill benefit there?" and asked defendant Rathke if she "thought the [inventory] growth would come down a bit in Q4 for K-Cups versus Q3."  Rathke repeated the Individual Defendants' standard explanation – inventory had grown to meet demand and would level off as product was sold through to customers:

> "I think coming off of Q2 we definitely had shortages or outages of certain products.  So I do know we had a backlog that we fulfilled in Q3 on – so that was a piece of it.  So I feel what we've been seeing and hearing from all of our accounts is that *during Q3 we got back into a place where we knew we had appropriate inventory levels*, and they felt comfortable they were getting appropriate inventory levels for the products.  So I think we're in good shape."

**B.   Green Mountain Significantly Misses Fourth Quarter 2011 Sales Estimates, but the Individual Defendants Refuse to Acknowledge the Anomalous Inventory Patterns and Re-Affirm Their Aggressive Sales Forecast for Fiscal 2012**

212.   On November 9, 2011, Green Mountain announced its fourth quarter and full fiscal year results for the fiscal year ending September 24, 2011.  For the first time in over eight quarters, the Company missed its sales estimates.  In the Company's Form 8-K filed with the SEC July 27, 2011, the Individual Defendants had projected fiscal fourth quarter consolidated net sales growth of 100% to 105%.  The November 9, 2011 press release, reported net sales growth of only 91% –14% off the high-end forecast.  Fourth quarter sales came in at $711.9 million, far below estimates of $767.7 million.  This miss, coming just three weeks after the Einhorn Presentation, gave additional weight to Einhorn's findings, and, when combined with the continuing unexplained anomalies in Green Mountain's inventory numbers, raised serious questions about the Company's capacity to reliably forecast demand.  Undaunted, the Individual

Defendants reaffirmed their previously-issued guidance for fiscal 2012 and reiterated the "strong" demand for the Company's products.

213.   The November 9, 2011 Form 8-K, disclosed huge increases in inventory. Inventory rose 156% from 2010 levels, increasing from $262.48 million at year-end 2010 to $672.25 million at year-end 2011 – an astounding $410 million increase year-over-year and far faster than the rate at which sales grew. The results contradicted defendant Rathke's suggestion a quarter earlier that inventory sell through in the third quarter of 2011 would restore inventories to "appropriate [] levels," and appeared to corroborate Einhorn's conclusion that the Company was over-producing product and cross-shipping excess inventory to MBlock to inflate reported sales and meet market expectations. Nevertheless, the Individual Defendants continued to claim that inventory was simply rising to meet increasing demand. They made no attempt to address the declining rate of inventory turnover. The press release stated, in relevant part:

### Performance Highlights

**Fiscal 2011**
- Net sales of $2,650.9 million, up 95% over fiscal 2010

- GAAP EPS of $1.31 increases 126% over fiscal 2010; non-GAAP EPS of $1.64 increases 113% over a year ago

- GAAP operating income of $368.9 million increases 166% over fiscal 2010; non-GAAP operating income of $428.7 million improves 148% over a year ago

- GAAP net income of $199.5 million increases 151% over 2010; non-GAAP net income of $248.9 million up 135% over 2010

**Fourth Quarter Fiscal 2011**
- Net sales of $711.9 million, up 91% over the same period in fiscal 2010

- GAAP EPS of $0.47 increases 135% over fourth quarter fiscal 2010; non-GAAP EPS of $0.47 increases 96% over the year ago quarter

- GAAP operating income of $106.7 million increases 156% over fourth quarter fiscal 2010; non-GAAP operating income of $119.1 million improves 128% over the year ago quarter

- GAAP net income of $75.4 million increases 179% over Q4'10; non-GAAP net income of $75.3 million increases 126% over Q4'10

"With 95% annual revenue growth over last year the business continues to demonstrate extraordinary momentum as a result of broad consumer adoption of the Keurig® Single Cup Brewing system," said Lawrence J. Blanford, president and CEO of GMCR. "*We are seeing continued evidence of strong consumer demand for both brewers and portion packs from our customers and from third party sources that track consumer purchases* such as NPD Group and SymphonyIRI Group, Inc. For instance, NPD reports Keurig® Single Cup Brewer unit sales increased 56% in our fiscal 2011 fourth quarter from the same period last year. *As an indication of what we believe will be strong holiday consumer demand, for the month of September alone, NPD reports Keurig brewer unit sales are up 73% from the same month in 2010.*"

"Our *fiscal fourth quarter revenue growth of 91% was strong.* This was off of our estimates as a result of a number of factors including changes in wholesale customer ordering patterns in our grocery and club channels despite steady consumer point-of-sale demand in those channels," continued Blanford.

Blanford concluded, "While like most consumer products companies we are watchful of broader consumer sentiment going into the holidays, *we remain confident in the Company's growth potential and comfortable reiterating our estimate for fiscal year 2012 non-GAAP earnings per diluted share in a range of $2.55 to $2.65.*"

214.    Defendants took pains to explain the unexpected increase in inventory during a conference call held to discuss earnings results that same day. During the November 9, 2011 call, securities analysts questioned Green Mountain's inventory buildup. The Individual Defendants struggled to explain the increase as yet another attempt to support increasing demand. They added that part of the increase was due to an increase in coffee prices, but admitted that the price increase accounted for only about a quarter of the increase in inventory. They made no attempt to explain the materially declining rate in inventory sell through and turnover rates. Mark Astrachan of Stifel Nicolaus & Company, Inc. asked:

*So, it was up 156% year-on-year, which was ahead of the sales growth, especially considering the previous commentary, you talked about it being capacity constrained. So I guess I'm trying to figure out why inventories are building when you've talked about running your equipment basically 24/7.*

Defendant Rathke responded:

> So on the first question about inventory, and it is highlighted in our press release and the balance sheet highlights, so *inventories were up significantly over September of last year at $672 million*. The increase this year, unlike other years, I think, for us, is we really saw a big increase in the raw material side on -- because of, most notably, the green coffee volume, and *the price of the coffee is up over 65%* year-over-year. So that drove a big piece, about *$136 million of the [$410 million] increase*.

215.     Greg McKinley, an analyst at Dougherty, also asked about the Company's inventory issues.  In response, T.J. Whalen, the Company's Vice President of Marketing – Specialty Coffee Business Unit re-emphasized defendants Blanford, Rathke, and McCreary's explanation that inventory was being built to "catch-up" with demand.  Whalen said that there was no concern "at all ... with underlying demand," outsized inventory was simply an "aberration in ... customer order patterns," and Green Mountain's inventory positions had "corrected" and "are appropriate":

> **McKinley**: Can you help us understand whatever information or perspective you have in terms of inventory levels within your distribution channel with your retail partners, relative to how that channel may have been positioned from inventories in the past? Do you think that that is linked at all to some of the buying pattern changes that you noticed in grocery and club channels? And how do those retailer positions give the Company an opportunity to continue supplying aggressively in the holiday period?
>
> **Whalen**: Hi, Greg, this is TJ. I'll probably start with part of the answer  related to grocery and club, and leave it to John to talk about specialty retail and department.
>
> So as I think Larry spoke about, we did see in Q3 and Q4, some factory out-sales fluctuations. *Scott and Fran and Larry also suggested part of that was related to catch-up*. Right? So *we had been chasing capacity to support our customers' needs for quite some time, and we finally caught up*. Part of it related to assortment build, so we're introducing a number of new products at the time and promoting them heavily. And in some channels like club, when you take in an individual incremental item, it can actually have a very significant effect.
>
> There probably was also *some impact in terms of anticipation of pricing action, which became apparent to a number of customers. What that drove was heavier than expected ordering in Q3. Subsequently, a related expansion of customer*

- 126 -

*inventories as they took in those heavier than expected orders. And then in Q4, they worked down through that inventory position to normalize it. And that's what caused a bit of a gap in terms of our order pattern.*

*Now as we analyze the situation and we look at consumer pull-through data, we're not at all concerned with underlying demand. We see that as a very steady and consistent growth.* If you look at IRI over the past 12 weeks, which equates to our fiscal Q4, you're talking about a net sales gain of 146% year-over-year. So we feel very confident that *the consumer is showing up, and there was just this aberration in terms of customer order patterns and related customer level inventories.*

**McKinley**: Yes. And *given the demand that you can see on the consumer side, and knowing what you do about what you provided to your retail partners, supposedly then you'd have enough data to assess where you think those channel inventories are. Do you think they're substantially corrected then at this point, from maybe getting a little extended previously?*

**Whalen**: *Yes, I think so, Greg. I think they're in a good position going into holiday.* I don't think it's, frankly, too much or too little, and we're all going to see how the consumer shows up. But *we have every confidence that we're delivering against our longer-term model and believe that inventory positions are appropriate*.

216.    Defendants Blanford's, Rathke's, and McCreary's statements attributing the Company's inventory levels to playing "catch-up" with demand, and Rathke's earlier statements that Green Mountain had been struggling to keep up with demand due to capacity constraints, were misleading because no one at the Company could say with any confidence what Green Mountain's actual inventory or sell through was, let alone predict future demand with any reasonable level of confidence. In fact, the substantial increase in Green Mountain's inventory had no precedent. At the end of fiscal 2011, Green Mountain's inventory balance was at its all-time high: $672.25 million, a *156.12% increase year-over-year*. The Individual Defendants knew that although inventory had continually increased, it was taking longer and longer for Green Mountain's inventory to turn over, or to be sold, to customers. At the end of fiscal 2011, year-over-year inventory turnover was down *28.86%* from the previous year, and the day sales of inventory was at the longest Green Mountain had ever reported – *108 days*. This meant that it

was taking *more than 40%* longer for Green Mountain to sell its inventory than it had the previous fiscal year.

217.    The inventory data and the facts revealed by Einhorn's investigation suggested a simple answer to the apparent conflicts in the inventory and sales trends apparent in Green Mountain's financial reports:  the Company's inventory far exceeded demand for its products. Green Mountain had incentivized over-production of inventory, which its managers covered up by cross-shipping to generate sham sales, and parking excess and expired inventory at MBlock. Without effective internal controls, no one at Green Mountain was in a position to dispute that conclusion, let alone supply accurate information about the actual rate of increase in sales and demand.    The Individual Defendants consciously disregarded these anomalies and the implications of the lack of effective controls over the operations outsourced to MBlock, and continued to report higher sales driven by purportedly rising demand.   Without accurate inventory and sell through numbers, however, no one at Green Mountain could reliably forecast demand or sales.

218.    Investors found the Individual Defendants' explanations inadequate and punished the stock.  Following the November 9, 2011 press release and accompanying financial reports, the price of Green Mountain common stock fell approximately 39%, from $67.02 to close at $40.89 a share on November 10, 2011, wiping out approximately $4 billion in market value from the previous day's close.

219.    Securities analysts disputed the reasons offered for the sales growth forecast miss, and expressed skepticism that the Individual Defendants had any idea what caused the miss. Stifel Nicolaus & Company, Inc.'s Mark Astrachan explicitly rejected defendants' denials that Green Mountain had shipped product ahead of demand, writing in his November 10, 2011 note:

"*The sales miss resulted from weakening end demand for brewers and K-Cups, [a problem Green Mountain] exacerbated by the company shipping ahead of demand*."   According to Astrachan, the reality was that "*[h]ousehold penetration of brewers has peaked*."

220.    In its November 16, 2011 note, Canaccord Genuity expressed similar skepticism: "*We don't gather that there is a complete understanding of the driver behind softer ordering patterns at the end of the quarter....*"   Dougherty's December 14, 2011 report, stated that, "*we lack* conviction and *confidence in how and why key areas of risk focus will abate* in the near-term" and "*we continue to struggle to understand and articulate certain areas of risk including how inventory positions align with demand planning within the company and by its retail partners*. In addition, *we are challenged to understand how price, volume, and partnered brands combine to support expected K-Cup revenues in 2012*."

221.    Despite the unexplained anomalies regarding inventory, certain analysts continued to give Green Mountain's management the benefit of the doubt.  KeyBanc's November 10, 2011 note, noted "concern[] about the 4Q miss and subsequent inventory build," but bought management's explanation that the *increased inventory was due to "the Company's attempt to prepare for holiday demand*."   Canaccord Genuity's November 10, 2011 note, stated that the fourth quarter "was a bad time for a miss vs. guidance given the controversy created by accusations of accounting fraud by David Einhorn," but said they remained "*confident in the holiday selling outlook*."   SunTrust Robinson Humphrey, Inc.'s ("SunTrust") report of the same day similarly noted that, "[w]ith all the controversy surrounding the company over the past month, this was the quarter that Green Mountain needed to beat," but stated that, "*we expect inventory levels at retail to be more normalized going into the holiday season*."

222.    Even these analysts would come to question the reliability of Green Mountain's explanations of the Company's inventory and demand patterns when, just two quarters later, Green Mountain again missed its sales estimates by a wide margin, reported continued increases in inventory and declining inventory turnover, and the Individual Defendants admitted they could not reliably forecast demand or sales.

### C.    Green Mountain Meets Its First Quarter 2012 Estimates, but Misses Badly in the Second Quarter, Forcing the Individual Defendants to Acknowledge Their Inability to Reliably Forecast Demand or Sales

223.    Even in the face of ongoing SEC scrutiny and mounting questions from securities analysts regarding Green Mountain's accounting and financial reporting practices and demand for the Company's products, the Individual Defendants continued to reaffirm the sales growth and earnings guidance they had previously issued for fiscal 2012. This aggressive guidance appeared to be supported when the Company exceeded sales estimates for the first quarter of fiscal 2012 due to a successful holiday season. The spike in holiday brewer demand, however, masked deeper problems in Green Mountain's internal controls environment, inventory accounting, and forecasting models. Once the Company's off-season arrived, sales fell far short of the Individual Defendants' projections and gave lie to the Individual Defendants' explanations regarding inventory and demand, damaging the Company's credibility in the capital markets and causing yet another sharp decline in Green Mountain's stock price. The second sales miss in three quarters led securities analysts to express doubt that the Company could reliably forecast demand – and the Individual Defendants were forced to acknowledge that the Company's demand forecasting models were inadequate and unreliable. The Individual Defendants continue, however, to deny the more fundamental problems with the integrity of the historical inventory and sales data Green Mountain used to construct its forecasts.

1.    **The Individual Defendants Issue Aggressive Guidance for the Second Quarter and Fiscal Year 2012 Based on the Spike in Holiday Sales, Heedless of Continuing Inventory Anomalies, and Data Integrity Issues in the MBlock Operations**

224.    On February 1, 2012, the Company issued a press release announcing Green Mountain's financial results for the first quarter of fiscal 2012.   In the press release, the Individual Defendants reaffirmed the Company's fiscal year 2012 guidance of year-over-year net sales growth of 60% to 65% and non-GAAP EPS in a range of $2.55 to $2.65 per diluted share, initially issued July 27, 2011.   The Individual Defendants also provided initial estimates for the second quarter of fiscal 2012 of sales growth of 45% to 50% and non-GAAP EPS in the range of $0.60 to $0.65 per share.   Despite knowing about the data integrity problems in the MBlock operations, the continuing weaknesses in internal controls, the continuing inventory anomalies, and weaknesses in demand forecasting models, the Individual Defendants re-assured shareholders that all direct rigor would be applied to confirm the Company's modeling assumptions and future demand:

> Our brewer sales in the first quarter of fiscal year 2012 were above our expectations, with approximately 4.2 million brewers sold by the combination of GMCR and our licensed partners.   That total is more than half of the 6.5 million brewers sold in all of our fiscal year 2011.... As these brewers come into use, we expect them to have a positive impact on future portion pack demand.   Given the challenge of estimating sales in such a dynamic environment, ***in the coming months we will be working to ensure we apply appropriate rigor and analyses to confirm and refine our modeling assumptions and estimates of forward demand.   In the meantime however, we are reaffirming our prior revenue and earnings estimates*** for fiscal year 2012.   The Company reaffirmed its prior estimates for its fiscal year 2012, including:

> • Total consolidated net sales growth of 60% to 65% from fiscal year 2011.

> • Fiscal year 2012 non-GAAP earnings per diluted share in a range of $2.55 to $2.65 per diluted share, excluding any acquisition-related transaction expenses; legal and accounting expenses related to the SEC inquiry and the Company's pending litigation; amortization of identifiable intangibles related to the Company's acquisitions; and any gain from the sale of the Filterfresh business.

- Capital expenditures in the range of $630.0 million to $700.0 million for fiscal year 2012.

* * *

The Company is providing initial estimates for the second quarter of fiscal year 2012:

- Net sales growth of 45% to 50%.

- Fully diluted non-GAAP earnings per share in the range of $0.60 to $0.65 per share excluding any acquisition-related transaction expenses; legal and accounting expenses related to the SEC inquiry and the Company's pending litigation; and amortization of identifiable intangibles related to the Company's acquisitions.

225. During the conference call to discuss the earnings results, securities analysts questioned the basis for the guidance the Individual Defendants had issued for the second quarter of fiscal 2012. The issues of concern to analysts included the impact of the warm winter season, the reliance on the strong 2011 holiday sales in forecasting 2012 demand, and the overall reliability of the Company's forecasting model. The Individual Defendants consciously disregarded the fundamental problems with their model and data, and repeatedly expressed confidence in their forecasting model.

226. For example, Canaccord Genuity analyst Scott Van Winkle asked if the guidance "assum[ed] any negative impact as a result of this crazy warm weather were seeing this year for winter" and questioned whether "it doesn't sound like we should think about coffee being softer in a warm winter?" Defendant Rathke specifically assured him that the guidance had accounted for the warm winter the country was experiencing, stating:

Well, that's -- we've been asking that ourselves, what has -- the warm weather we do believe may have some impact. *It's been exceptionally warm up in the northeast, but we factored that in. We obviously have our month of January results in, so we're just — that's factored into this guidance as well.*

227.    Defendant Blanford similarly affirmed that the Company's guidance accounted for the warm winter weather, and said it was somewhat "conservative" in light of this factor. When questioned by Akshay Jagdale of KeyBanc, Blanford expressed "confidence" in the Company's demand forecasting model as a basis for the guidance, and re-emphasized that the increased inventory ("stock position") would capitalize on increased consumer interest the following quarter:

And just to follow-up, in terms of your guidance, this was, in my opinion, really an amazing quarter for brewers, and *we don't know exactly how you model it, but your demand model I'm sure is predicated on that brewer number; and in the past, the holiday season has really determined your guidance for the year, if I just go back and look historically.* Can you give me some context here, Larry? It looks like you're being very conservative, so I'm trying to understand, *you went from making comments last quarter, saying you believe in your demand model, et cetera, et cetera, and now you had an absolute blow-out quarter on brewers, which we would think would translate into much higher sales growth for the year. So was there some growth from next quarter in K-Cups that's pulled forward? I don't understand* -- I'm a little bit confused. Maybe you're just being conservative, but if you can help us there, that would be great.

In response, defendant Blanford stated:

Well, Akshay, this is Larry, I will try to help you a little bit. First of all, obviously we're off to a great start this year, and we're very pleased that our revenue and earnings growth did outpace our own expectation in Q1. And of course, *[on the] basis [of] getting off to a great start, we're comfortable reiterating our revenue and earnings guidance for the year.* I think there's a couple of factors and you kind of touched on them here. One, *we do have confidence in our model as we back-check it in '10, '11.*

It's just that *the number of brewers sold here are*, as we mentioned, *very significant relative to the installed base* and relative to what we sold last year, and *I think we want to have the benefit of some time here over the next couple of months with our survey efforts to make sure that we confirm and or refine, if necessary, the assumptions in our model, just because of the incremental growth that we are seeing.* So that is part of it. And it does take us a little while for those brewers that were sold -- a lot of those brewers sold in October, November, and December are given as gifts, and so they don't really begin to enter the installed base until the holidays or shortly after. Generally they've got portion packs either in the brewer box or they also receive portion packs, and *it*

*takes us some time to really understand how those brewers work their way into the installed base and some time to confirm also consumption trends.*

*So we want to make sure that we are using good rigor and analysis in fully understanding that.* So that is one aspect. I think *also*, as we mentioned, *we were in very good stock position going into the quarter.* We did have the opportunity this year to promote more than we have previously in similar quarters because we were -- *last year and the year before we didn't have the same stock position.* And so I think we did potentially see some sales as a result of that with consumers when they're highly interested in the product, and *we may have seen some sales in Q1 that we may not have been able to get last year because of our in-stock position* and our ability to promote.

So we're certainly trying to be sensitive to that. *I think warm weather may, in fact, be a factor here. So we're just -- I wouldn't say overly conservative.* We're trying to do the very best we can taking into account the very dynamic business with a lot of moving parts and try to provide the best estimates that we can.

228.    Other analysts followed up on the inventory question.    Green Mountain's inventory remained high despite the spike in holiday sales – over 125% higher than the same period the previous year – while turnover continued to fall, declining 20% year-over-year. SunTrust analyst William Chappell asked whether Green Mountain's purported capacity constraints would limit the opportunity presented by the supposed holiday spike in brewer sales:

Just keep it fairly simple with one question, but *trying to understand inventory on the K-Cups* and especially capacity from Starbucks' comments of really capacity constrained, and *I think you had in the past said, by the time we get into spring, there was a chance that you could be capacity constrained. Will you have the CapEx done in time, and, I mean, from that standpoint with the huge brewer shipment, should we expect the K-Cups to match that or be able to match that over the next couple of quarters?*

Defendant Blanford repeated the theme that Green Mountain had been capacity constrained and assured shareholders that the Company's inventory would match anticipated demand:

I think overall, certainly *we have been adding capacity, adding floor space.* I think we mentioned in our remarks, *we've been adding space at all of our plants, and in two very significant floor additions,* one here in Vermont, at our Essex plant, and then our new plant near Norfolk. So -- and *we've been ordering packaging lines* and trying to leave ourselves in the process, as we've talked before, a bit of upside machine capacity because this market is so dynamic. With respect specifically -- sorry, I think we're feeling, *even with the brewer numbers,*

- 134 -

*I think we're feeling right now overall that we'll be able to support the demand that we would see in '12.*

229.   John Whoriskey also assured securities analysts during the call that the Company's inventory position was "normal" and "very good."   Specifically, when BofA Merrill Lynch analyst Bryan Spillane questioned *whether retail inventory for K-Cups and brewers were "at relatively normal levels* or at a level that's normal relative to what you would see this time of the year," Whoriskey responded:

> "*[Y]es ....* Coming out of the holiday season, I think we were well stocked going through the season, and *we come out in a very good inventory position to go forward as now we prepare for our spring season.*"

230.   KeyBanc analyst Akshay Jagdale also asked about the Company's "inventory position on K-Cups in weeks."   Defendant Rathke assured him that the Company had *reduced the inventory* they had *built up in the previous quarter*:

> I think *the reduction coming off of last quarter where we reduced our inventories by about $100 million that primarily came from brewers*, as planned. *And then the portion pack we did make some strides in reducing from the seven weeks forward estimate that we had last quarter end to about a week we dropped it by, but not all the way down to four weeks.*

231.   Securities analysts were deceived by defendants' explanations regarding the Company's inventory buildup and forecasts that increasing demand would correct excess channel inventories late in the fourth quarter.   For example, SunTrust's February 1, 2012 report, stated that Green Mountain's "inventories appear to be in check":

> *More importantly, inventories appear to be in check* (finished goods inventory -40% vs. 4Q). *Management indicated that post-holiday retail levels are in the best position in several years.* Recall, *GMCR was caught short on inventory the past two years due to stronger than expected demand and, accordingly, built inventory ahead of the 2011 season, leading some to believe that demand had slowed.*

232.   On February 21, 2012, defendants Blanford and Rathke spoke at the Consumer Analyst Group of New York Conference.   During that presentation, which took place less than

four-and-a-half weeks before the end of the quarter, Rathke once again reaffirmed the Company's fiscal year 2012 non-GAAP EPS guidance in the range of $2.55 to $2.65 per share.

233.    The Individual Defendants' statements during the February 1, 2012 earnings conference call regarding the Company's inventory position were misleading because they knew that the Company lacked sufficient internal controls over its inventory accounting.  They knew or recklessly disregarded that in the first quarter of fiscal 2012, the Company's inventory balance was 125.42% higher year-over-year, but its year-over-year inventory turnover was down 20.68% year-over-year, indicating that the Company's inventory balance exceeded demand for the Company's products, or, at a minimum, raising serious doubts about the reliability of the Company's inventory figures and reliability of key historical data used to forecast demand. The Individual Defendants knew or through the reasonable exercise of diligence should have known that it was only a matter of time before the ongoing data integrity issues at MBlock, continuing weaknesses in internal controls, inventory anomalies, and fundamental shortcomings of the Company's models caused another significant forecast miss.  They did not have to wait long.

    **2.    Green Mountain Misses the Individual Defendants' Sales Growth Projections for the Second Quarter of Fiscal 2012, Sending the Stock Price Tumbling**

234.    On May 2, 2012, the Individual Defendants issued a press release announcing the Company's second quarter 2012 earnings results.  The Company reported sales growth of only 37%, well below the February 1, 2012 estimates, provided by the Individual Defendants of 45% to 50%.  The Individual Defendants were forced to materially reduce the Company's fiscal 2012 non-GAAP EPS guidance – which they had affirmed just one month before – from the range of $2.55 to $2.65 down to a range of $2.40 to $2.50 per diluted share.  Buried amidst the hype, Green Mountain acknowledged once again that it had failed to accurately forecast K-Cup sales:

- 136 -

**Second Quarter Fiscal Year 2012**

- Net sales of $885.1 million, up 37% over net sales of $647.7 million in the year-ago quarter

- GAAP EPS of $0.58 compared to second quarter fiscal year 2011 GAAP EPS of $0.44; non-GAAP EPS of $0.64 increases 33% over $0.48 in the year-ago quarter

- GAAP operating income of $149.6 million compared to second quarter fiscal year 2011 GAAP operating income of $119.6 million; non-GAAP operating income of $162.3 million improves 22% over the year-ago quarter

- GAAP net income of $93.0 million compared to second quarter fiscal year 2011 GAAP net income of $65.4 million; non-GAAP net income of $101.7 million increases 42% over the year-ago quarter

"Over the past several years we achieved a strong net sales growth rate driven by consumers' rapid acceptance of our innovative Keurig® Single Cup Brewing system," said Lawrence J. Blanford, GMCR's president and CEO. "Additionally, during this timeframe we made a number of strategic acquisitions that strengthened our long-term position and contributed to our growth rate. During the second fiscal quarter our 37% net sales growth resulted from more consumers adopting the ease and convenience of Keurig's® Choose. Brew. Enjoy.™ approach to beverages. Despite *lower than-anticipated portion pack sales*, and to a lesser degree, brewer sales, in the quarter we were able to control sales, general and administrative expenses enabling us to achieve non-GAAP earnings per share growth of 33%."

* * *

**Company Estimates for Fiscal Year 2012**

The Company provided revised estimates for its fiscal year 2012:

- Total net sales in the range of $3.8 billion to $4.0 billion, or net growth of 45% to 50%, from $2.7 billion in fiscal year 2011.

- Fiscal year 2012 non-GAAP earnings per diluted share in a range of $2.40 to $2.50 per diluted share, excluding any acquisition-related transaction expenses; legal and accounting expenses related to the SEC inquiry and the Company's pending litigation; amortization of identifiable intangibles related to the Company's acquisitions; and any gain from the sale of the Filterfresh business.

- Capital expenditures in the range of $525 million to $575 million.

235.    The Individual Defendants' re-assuring comments about inventory rising to meet increasing demand and confidence in their sales forecast amplified the damage to the Company's credibility when Green Mountain announced that it had substantially missed the aggressive sales growth projections issued for the second fiscal quarter of 2012. The impact on the Company's market capitalization was nothing short of catastrophic. On the news of the miss, **_Green Mountain's stock price plunged 48%, down from $49.52 the previous day to close at $25.87_** on May 3, 2012. In the wake of the miss, even those securities analysts who reported that the holiday quarter vindicated management following the miss in the fourth quarter of fiscal 2011 now openly questioned the Company's ability to reliably forecast demand and sales.

236.    Contrary to the Individual Defendants' assurances, demand did not come close to "normalizing" Green Mountain's inventory levels. Green Mountain's explosive inventory growth continued, while inventory turnover continued its accelerating decline. The May 2, 2012 press release, noted that inventory had almost doubled since the same quarter the previous year: "Inventories were $602.1 million at March 24, 2012 compared to $300.8 million at March 26, 2011." As inventory continued to rise, inventory turnover decreased by over 33% year-over-year. During the second quarter of fiscal 2012, the Company's inventory was taking over ninety-six days to sell – **_more than 50% longer than it had taken during the same period in the previous year_**.

237.    Knowing that management had lost control of inventory trends and rates of inventory turnover and could not reliably predict demand, the Individual Defendants turned to the shopworn "unseasonable weather" excuse to explain the lower than anticipated sales and massive inventory buildup. This was especially misleading in light of the Individual Defendants' explicit assurances that their guidance had taken into account the "unseasonably warm weather"

the country had experienced during the 2011-2012 winter, and highlighted their inability to manage inventory or reliably forecast demand and sales.

238.    During the earnings conference call held that same day, defendant Blanford acknowledged that brewer sales were historically unpredictable, but insisted despite the numbers that the Company's inventory position was "better" than it had been historically.  Ignoring the rate at which inventory had grown year-over-year during the preceding eight quarters and the slowing rate of inventory turnover during those same periods, Blanford speculated that meeting 2011 holiday season demand had reduced 2012 restocking demand.  Blanford was forced to admit, however, that increases in obsolete inventory contributed to the material decline in gross margin to 35.4% from 37.5% in the prior year period.  Defendant Blanford stated:

> While we sold 1.4 million brewers in the quarter, our brewer sales were lower than anticipated.  ***Historically, quarterly brewer sales have proven to be very challenging to predict with accuracy.***  We believe ***at least part of the delta between actual brewer sales and our forecast resulted from the fact that as intended, we achieved a better in-stock inventory position coming into and through the important 2011 holiday season compared to prior years, and consequently did not see restocking demand as strong as we had in previous years.  We also had lower than anticipated portion pack sales in the quarter.  We think that the unseasonably warm weather experienced in many parts of the US adversely affected sales of our seasonal beverages such as hot cocoa and hot apple cider.***  While our sales of seasonal varieties were up over last year, they were not up to the extent we anticipated.  T***his not only impacted our sales for the quarter, but also resulted in a higher obsolete inventory.***

239.    During the May 2, 2012 call, defendant Rathke also tried to claim that the doubling of inventory over the prior year period was the result of a "deliberate" attempt to meet increasing demand – even claiming that portion pack inventory was "in line with our expectations":

> Turning to inventories, inventories were $602.1 million at March 24, 2012, compared to $300.8 million in the year-ago period. Included in inventory is a $159.7 million or 188% increase in raw materials, most notably from an increase in green coffee volume and a 24% average green coffee cost increase.  In addition, we had a $141.6 million or 66% increase in finished goods inventory

with approximately 54% of the increase due to Keurig brewers on-hand. You'll also recall that *this time last year, we were having trouble meeting orders for both brewers and portion packs. The year-over-year inventory increase reflects our deliberate decision to carry more weeks of portion pack inventory on-hand so as to better respond to our customers' ordering patterns and demand*. Specifically, *we deliberately increased our portion pack inventory coverage from four weeks to between five and six weeks*. Consequently, at the end of our second quarter, *portion pack forward inventory of approximately six weeks is in line with our expectations*.

### 3. The Individual Defendants Admit that the Company's Demand Forecasts Were Based on Unreliable Models

240.    During the May 2, 2012 earnings conference call, defendant Blanford admitted that defendants were not sure why the Company had missed their sales estimates. He told analysts his team was struggling to forecast demand for K-Cups, which in fiscal 2011 had generated about 64% of the Company's sales. It was only after analysts expressed doubt as to management's credibility in the wake of the second quarter miss that the Individual Defendants finally began to evaluate the Company's demand forecasting practices and acknowledged the need to change them.

241.    On the May 2, 2012 call, defendant Blanford admitted that, apart from the impact of weather, which the Individual Defendants had repeatedly said was accounted for in the forecast, Green Mountain did not understand what caused the forecast to depart so far from actual results, and acknowledged that they could not determine the degree to which a myriad factors might have affected the second quarter or how they might affect demand in future quarters:

> I think related to the demand, we certainly as I mentioned and Fran mentioned, *we certainly were able to understand the portion of the demand*, our miss against our estimates for Q2 *related to brewers and seasonal products*, which we learned a lot on seasonals this particular quarter that we won't forget as temperatures across the country were very, very *unseasonably warm* and we learned a lot about the fact that hot cocoa is very much temperature sensitive. So a big learning for us and we'll manage that better going forward. *The rest of the miss as Fran indicated, we're still trying to really understand*. And we have a number of

*efforts under way to better really understand the overall portion pack demand*. And those include *consumption patterns of consumers*, weather related, *did weather in fact cause* even some *issues with* our cough my *coffee sales* in the quarter. *Channel shifts* that are going on, *trade inventory levels, customer and partner order patterns*. These are all things and I would say also we've taken two 10% price increases over the last year. And we're trying to understand the *sensitivity of consumption to pricing* as well. So these are all factors. *We don't honestly know to what degree each of those contributed to our miss in Q2, or to what extent they will manifest themselves as we go forward in Q3 and Q4*.

*   *   *

*We are currently examining other factors like consumption patterns, weather related trends, channel shifts, trade inventory levels as well as customer and partner order patterns to better understand each of those input's variability*. Given our dynamic business, we continue to make refinements to our portion pack demand estimates as we work through additional analysis on the quarter and our go-forward expectations.

242.    Defendant Blanford also admitted the degree to which the Individual Defendants had relied on unreliable bottom-up sales forecasts generated by the sales organization:

*We basically determined our sales forecast by rolling up our estimates from our sales organization, bottom's up for the next quarter out*, and I think the numbers that we have projected for Q3 are from that process and I think *all of us are trying to take into account kind of these underlying factors and we're still trying to understand them.*

243.    Securities analysts were especially disturbed by the Individual Defendants' admissions that they had published forecasts knowing that they could not accurately forecast consumer demand for the Company's products. For example, Canaccord Genuity's May 3, 2012 report, took particular note of the "*inability to forecast is the concern that exacerbates the lower outlook*," and cut their price target by approximately 20%. Canaccord Genuity's previous suspicions that there was not a "complete understanding of the driver behind softer ordering patterns at the end of the quarter" were confirmed.

244.    Even formerly supportive analysts, such as William Blair's Jon Andersen, who had repeated the Individual Defendants' demand story and then explanations for growing

inventory, now complained that "*the large sales variances, both negative and positive, experienced over the past several quarters call into question the company's ability to forecast the business and beg the question why.*"

245.     KeyBanc analyst Akshay Jagdale had expressed confidence in the Individual Defendants' assurances that the inventory buildup following the fiscal 2011 fourth quarter earnings miss was preparation for "holiday demand," but now warned investors in his May 3, 2012 note that "[a]s a result of the ... disappointing results, *management's credibility is yet again under question.*"

246.     SunTrust analyst William Chappell, also had accepted defendants' assurances that inventories were "in check," but now commented: "[W]e have *diminished faith in [Green Mountain's] forecasting abilities following misses in two of the last four quarters.*"

247.     Dougherty securities analysts Gregory J. McKinley and Peter Mahon now reported that "*[h]igh inventory levels and robust* (albeit moderated) *capital expenditures* continue to *weigh on earnings quality and remain a risk focus* for investors. *These balance sheet items tend not to matter until they matter and softer than expected portion pack volumes mean that time is now.*"

248.     Following the second-quarter miss, discussions of the Einhorn Presentation resurfaced in the media. Reports observed that the Individual Defendants' inability to explain the inventory buildup and sales forecast miss gave weight to Einhorn's findings. *The New York Times* reported on May 3, 2012, that Green Mountain's second quarter financial results "*added weight to the contentions of the hedge fund manager David Einhorn and others that the company had been inflating sales and that its high-growth days were over.*"

249.    Similarly, in a July 30, 2012 article entitled, "Green Mountain CEO Faces

Percolating Issue of Who's Boss," *Bloomberg* reported:

> Green Mountain faces questions about how it accounted for a tripling of revenue
> in the past two years.    The U.S. Securities and Exchange Commission is
> investigating, and hedge fund manager David Einhorn has hammered the
> company for a perceived lack of transparency.

Citing Miami-based analyst Rick Munarriz, *Bloomberg* concluded that "[t]he question for

investors is whether Blanford ... can shake off the influence of founder Robert P. Stiller ... *"it's*

*time for Blanford to show that he's credible."*

250.    On August 2, 2012, *The Wall Street Journal* also referenced Einhorn's

Presentation, and noted that the Company's "suspect" earnings projections were the result of the

failure to implement sufficient internal controls as the Company grew:

> *Green Mountain's rapid expansion since acquiring the rest of the Keurig
> business in 2006 has made it difficult for the company to forecast its sales of
> K-cup portion packs, making every earnings projection suspect.*
>
> \*      \*      \*
>
> Green Mountain's trouble with investors took flight *in October*, when *Greenlight
> Capital Chairman David Einhorn presented a now-legendary 110-page
> slideshow complaining of a lack of transparency and accounting errors in
> Green Mountain's financial reports. Then in May, Green Mountain's shares
> lost nearly half their value in one day when it announced its fiscal second-
> quarter earnings had also been plagued by over-estimating how many portion
> packs it would sell.*
>
> *Green Mountain now says the company's inability to anticipate sales was in
> part because it didn't understand the impact of weather, rising K-cup prices and
> shifts in where people buy K-cups.* Mr. Blanford said it's still working to improve
> and automate the new system, "but it takes a while to get there."
>
> Even if it gets its forecasting under control, some analysts argue that increased
> competition for K-cups will force Green Mountain to lower its prices and spend
> more money on promotions, further squeezing its profit margin. Green Mountain
> says it has taken both factors into account.

The Waterbury, Vt. Company's stock has taken a beating since it reached nearly $116 in September. *Even counting Thursday's surge, the stock is still down about 50% this year*.

251.     On August 1, 2012, Green Mountain filed with the SEC a Form 8-K containing the Individual Defendants' revised forecast, which reduced earnings forecast for fiscal 2012 to $2.26 from $2.50 per share.  During the teleconference with analysts held that same day, defendant Blanford confirmed material deficiencies in the Company's demand forecasting model, citing "changes to our forecasting methodology" as the reason for the revised forecast.

252.     In an interview the following day, defendant Blanford confirmed the Company's previous forecast methodology was unreliable and that the Individual Defendants had not examined the Company's forecasting model until after the second quarter miss, noting that the Company had spent the past ninety days "working hard to analyze the disconnect between our expectations and consumer demand for K-cups."  According to Blanford, "[a]fter the second quarter, we made [forecasting sales for K-cup portion packs] the highest priority, and we found a better way of doing it that gives us a much better handle on consumer demand going forward."  Blanford confirmed that the Company's historical model "started to break down as we reached a certain level of saturation ... and consumers were saying they consumed more than they did."  Blanford did not address the deficiencies in internal controls over the MBlock operations or the continuing anomalies in the Company's inventory numbers.

XI.     **DEFENDANTS STILLER AND DAVIS PLEDGE HUNDREDS OF MILLIONS OF DOLLARS OF GREEN MOUNTAIN STOCK TO SECURE PERSONAL DEBT AND CONTRIBUTE TO THE COLLAPSE IN GREEN MOUNTAIN'S MARKET CAPITALIZATION BY DUMPING STOCK TO MEET MARGIN CALLS**

253.     Since at least 2007, defendant Stiller has pledged tens of millions of dollars' worth of Green Mountain stock as collateral to secure margin loans to fund his lavish lifestyle, including purchases of a 164-foot yacht, a $17.5 million New York City apartment, and a $10

million home in Palm Beach, Florida.  Stiller has also used these loan proceeds to fund his

investments in other businesses, including Heritage Aviation LLC ("Heritage Aviation"), a

company which flies executives around the U.S. and whose services Green Mountain has

employed since 2002, when it was acquired by Stiller.

254.    As detailed in the chart below, from 2007 through 2011, defendant Stiller pledged

significant amounts of his Green Mountain stock to secure ever-larger debts.  By January 2008,

Stiller held over thirteen million shares of Green Mountain stock in leveraged margin accounts.

The following year, that figure rose to *over nineteen million shares* of Green Mountain stock

pledged as collateral for margin loans.  Stiller continued to hold at least nine million shares in

margin accounts in the years that followed.  Stiller had pledged 92.3% of his Green Mountain

stock in 2009, and nearly 80% of his total holdings through 2011.

| Robert Stiller Margin Account Holdings[1] (Split-Adjusted)[1] | | | | | | | |
|---|---|---|---|---|---|---|---|
| As of: | 1/22/2007 | 1/15/2008 | 1/16/2009 | 1/13/2010 | 1/10/2011 | 1/26/2012 | 5/7/2012 |
| Number of Shares Held in Margin Accounts | N/A | 13,757,082 | 19,685,124 | 9,220,089 | 13,504,837 | 12,545,933 | 9,529,858 |
| Total Common Stock Holdings | 31,243,405 | 28,878,201 | 21,328,776 | 19,487,343 | 16,953,110 | 15,997,209 | 5,990,194 |
| Percentage of Holdings Held in Margin Accounts | - | 47.6% | 92.3% | 47.3% | 79.7% | 73.4% | 65.4% |
| Value of Margin Account Holdings[2] | N/A | $220,542,290.76 | $182,292,036.31 | $263,325,741.84 | $454,248,406.45 | ▄▄▄▄▄▄▄▄ | $258,675,752.40 |
| (1) Holdings prior to 2011 have been adjusted to account for the 3-for-1 stock split effective May 17, 2010, 3-for-2 stock split effective June 8, 2009, and 3-for-1 stock split effective July 30, 2007, where applicable. | | | | | | | |
| (2) The "Value of Margin Account Holdings" figures were calculated using GMCR's closing stock price on each of the dates mentioned above. | | | | | | | |

255.    The Director Defendants knew that Green Mountain's founder, former CEO and

current Chairman had pledged the lion's share of his Green Mountain stock to secure margin

debt.  The facts were reported in the Company's Proxy Statements filed for the years 2008-2012.

Several media reports have quoted defendant Stiller as stating that "[t]he board knew I had these

margin things."

256.    The Director Defendants knew – but failed to disclose – that Green Mountain's

Lead Director, defendant Davis, also had pledged tens of millions of dollars in Green Mountain

stock awarded to him by the Company and held in margin accounts to secure personal debt.

Reflective of Green Mountain's lax internal controls environment and the Director Defendants'

dismissive attitude towards disclosure compliance, defendant Davis' stock pledges were not

disclosed in the Company's Proxy Statements as required by Item 403(b) of Regulations S-K and

S-B – a violation defendants later attributed to "an inadvertent clerical error." The Company has

never disclosed when Davis' pre-2012 stock pledges occurred or the amounts, but they were

clearly material. Even after selling over 400,000 shares on May 4, 2012, to meet a margin call

(*see* ¶262, *infra*), as of May 7, 2012, Davis still held 400,188 shares in margin accounts, or

99.3% of his total Green Mountain common stock holdings.

| William Davis Margin Account Holdings | |
|---|---|
| **As of:** | **5/7/2012** |
| Shares Held in Margin Accounts | 400,188 |
| Total Common Stock Holdings | 402,888 |
| *Percentage of Holdings Held in Margin Accounts* | *99.3%* |
| *Value of Margin Account Holdings[1]* | *$9,724,568.40* |
| (1) The "Value of Margin Account Holdings" figure was calculated using GMCR's closing stock price on May 7, 2012. | |

257.    The Director Defendants, and especially Governance Committee members

Carlini, Daft, Davis, del Vecchio, Mardy, Miller, and Moran, who were responsible for ensuring

that Green Mountain kept pace with developments and best practices in corporate governance,

failed for years to implement any formal policy concerning insider pledges of Company stock.

The Director Defendants consciously disregarded the serious risks that large pledges of the magnitude made by Green Mountain's two most important directors – its Chairman and its Lead Director – would: (i) induce directors charged with policing the fidelity of executives and other directors to place their own interests or their over-leveraged colleagues' interests above the interests of the Company and its shareholders; and (ii) damage the Company and its shareholders in times of stress should margin calls cause corporate fiduciaries abruptly to dump large blocks of stock into the market, accelerating and deepening price declines and damaging the Company's credibility among investors.

258.    These risks were well-understood by the Board and especially the Governance Committee directors charged with safeguarding the integrity of Green Mountain's corporate governance practices. Prominent corporate law firms and leading corporate governance experts advised publicly that sound corporate governance regimes should include policies prohibiting key insiders from pledging large amounts of company stock in margin accounts to secure debt due to the risks of conflicts of interest and the likelihood that a large sale of company shares by an insider would create a negative market reaction and damage the company's market capitalization. For example, corporate governance advisory firm Institutional Shareholder Services Inc. ("ISS") has repeatedly identified insider stock pledging and hedging as a "problematic" practice, and supports shareholder proposals calling for companies to prohibit executives from holding company stock in margin accounts. Mark Borges, a compensation and SEC disclosure expert at Compensia, Inc., has similarly advised that "[a]ny company that is well advised would prohibit" insiders from pledging shares to margin accounts. Akin Gump Strauss Hauer & Feld LLP's corporate practice group also warned of potential conflicts of interest when

"the insider asks the board for help to avoid a massive sell-off that could depress the company's stock price."

259.     Green Mountain's Board knew these practices were highly problematic.   On January 1, 2012, the Board adopted a policy restricting insiders from pledging Company stock in margin accounts.   Notwithstanding their recognition of the problems such insider pledges created, however, the Board bowed to defendant Stiller's demands that they "grandfather" in the enormous pledges that he and his longtime friend and business partner (and Company Lead Director) defendant Davis[21] – the two most important guardians of Company and shareholder interests – had outstanding at the time the policy was adopted.

260.     Despite this concession, defendant Davis blatantly and consciously violated the Company's policy by pledging approximately 204,000 new shares to his margin loan *after the January 1, 2012 prohibition was adopted* – a fact acknowledged in the Company's May 8, 2012 press release.

261.     The Board also took no effective steps to timely reduce defendants Stiller's and Davis' outstanding pledges, despite the conflicts of interest they presented and the serious risk they posed to Green Mountain shareholders – Stiller was permitted to continue holding over twelve million shares in margin accounts after the policy was implemented.   Stiller's position as Company founder, Chairman of the Board, former CEO, and "partner" and "advisor" to his successor CEO defendant Blanford enabled him to ensure that his stock pledging practices were allowed to continue in spite of the conflicts of interest they presented and the serious risk they posed to Green Mountain shareholders, and the Board's willingness to place Stiller's interests

---

[21] Defendant Stiller and Davis have served on several boards together, including the Howard Bank and the Vermont Business Roundtable.  Davis has served on Green Mountain's Board since the Company went public in 1993.

above Company shareholders' interests is not surprising. Stiller has been able to retain virtual control over the Company he founded by populating the Board with close family and business associates who he will yield to his wishes. For example, defendant del Vecchio, a member of the Governance Committee at the time it recommended the Company implement the policy prohibiting insider pledges but grandfathered in Stiller's and Davis' pledges, is Stiller's brother-in-law. The Board also has approved Green Mountain's transactions with Stiller-owned Heritage Aviation – paying Heritage Aviation a total of $3.1 million since 2002 for its travel services, which undoubtedly included private jet service for Stiller. These are not the decisions of an independent Board guided sales by Green Mountain's best interests.

262.    The effects of the Board's failure to prevent the improper insider stock pledges were evident in the wake of the Individual Defendants' May 2, 2012 announcement, that the Company had failed to meet their second quarter 2012 projections. The following day, Green Mountain's stock price fell 48%, predictably subjecting defendants Davis and Stiller to margin calls. On May 4, 2012, Davis sold approximately 400,000 Green Mountain shares from his margin account for proceeds of over $10.1 million even at prices that had been cut in half by the announcement. On May 7, 2012, Davis sold an additional 148,000 shares from his margin account for proceeds of $3.7 million in violation of Company insider-selling restrictions. That same day, Stiller sold approximately *five million shares* from his margin account *for proceeds of over $123.4 million*.

263.    The Director Defendants' failure to prevent and/or reduce defendants Stiller's and Davis' large pledges of stock in margin accounts violated the Company's Code of Ethics and its Corporate Governance Principles, because of the serious conflicts of interest these stock pledges presented. The Code of Ethics requires that Company directors and employees "avoid conflicts

- 149 -

of personal interests with [Green Mountain] interests and even situations that may appear to constitute a conflict of interest." It further provides that directors and employees should "avoid[] relationships that might impair loyalty to [Green Mountain] or affect personal judgment regarding what is in the company's best interests." The Corporate Governance Principles state that "[i]f an actual or potential conflict of interest arises … the Director shall promptly inform the Chairman of the Board, if any, the Lead Director, if any, the Chief Executive Officer or the Secretary." Even if any Director Defendant had reported the potential conflicts in accordance with the Corporate Governance Principles, however, Stiller's position as Chairman of the Board and Davis' position as Lead Director virtually ensured that they would go ignored.

264.     Defendants Stiller's and Davis' May 2012 stock sales also violated an internal Company policy – and SOX section 306(a) – prohibiting insider sales of company stock within a set number of trading days prior to or following the release of earnings figures. The Board acknowledged in a Company press release issued May 8, 2012, that these sales "were inconsistent with the Company's internal trading policies" because they occurred during a blackout period in which Company insiders were prohibited from selling their personally-held Company stock:

> On Friday, May 4, 2012, as the result of a margin call on pledged GMCR stock, approximately 400,000 shares and on Monday, May 7, 2012 approximately 148,000 shares of GMCR stock were sold from Mr. Davis' brokerage account *at a time when the trading window in GMCR stock was closed pursuant to the Company's internal trading policy*.

265.     Green Mountain also disclosed that defendant Davis had pledged another 204,000 shares just four months after the Board specifically prohibited another pledge of Company stock to secure personal debt:

> *In addition, during the Company's review of the May 4 trade, it learned that, inconsistent with the Company's policy, Mr. Davis had pledged approximately 204,000 new shares to his margin loan after January 1, 2012.*

266.    As a result of these improper stock pledges and sales, the Board removed defendant Stiller from his position as Chairman of the Board and removed defendant Davis from his position as Lead Director.  In response, Stiller commented, "I didn't think the consequences for what happened would be as great…[,]" reflecting his utter disregard for his duty of fiduciary loyalty and the effects his self-interested actions had on the Company's shareholders.

267.    On August 13, 2012, defendant Davis resigned from the Board.  Defendant Stiller remains on the Company's Board.

## XII.    INSIDER SALES

268.    The Insider Selling Defendants (including eight Board members: Blanford, Del Vecchio, Miller, Moran, Davis, Carlini, Mardy, and Stiller; and three senior officers: Stacy, McCreary, and Rathke) each sold significant amounts of their personally-held shares of Green Mountain at highly suspicious times, including just before significant announcements that drove the Company's stock price down.

269.    These sales began in August 2010, just before the Individual Defendants announced the "accounting error" that led to the Restatement, while the Insider Selling Defendants possessed material, non-public information concerning the Company's inadequate internal controls over accounting and financial reporting.  The Insider Selling Defendants continued to sell their personally-held stock throughout 2011 up until May 2012, all the while knowing that serious internal controls deficiencies continued to exist at Green Mountain despite having claimed to have remediated the material weaknesses in the Company's internal controls over financial reporting identified in the Restatement.  The Company's lax controls over the order fulfillment, invoicing, and inventory management functions outsourced to MBlock remained unaddressed facilitating entirely accounting manipulation and making significant

overstatement of demand and misleading sales forecasts inevitable. The Individual Defendants

knew that these control deficiencies left the Company with no reliable inventory and historical

demand data with which to reliably model and predict demand and sales, that rising inventory

while inventory turnover fell, predicted falling demand and sales, and, that their published

guidance for fiscal 2011 and 2012 therefore lacked a reasonable basis. While knowing that the

Company's stock price was artificially inflated by their overly aggressive and unreliable

guidance, the Insider Selling Defendants sold hundreds of millions of dollars of their personally-

held Green Mountain stock, as set forth in the following chart:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| BLANFORD | 5/5/2011 | 51,573 | $68.34 | $3,524,369.89 |
| | 8/16/2011 | 45,000 | $99.62 | $4,482,733.50 |
| | 9/20/2011 | 45,000 | $111.43 | $5,014,206.00 |
| | 10/18/2011 | 45,000 | $80.21 | $3,609,459.00 |
| | 2/28/2012 | 54,002 | $66.43 | $3,587,115.25 |
| **Total:** | | **240,575** | | **$20,217,883.64** |
| | | | | |
| CARLINI | 8/4/2011 | 108,000 | $106.42 | $11,493,252.00 |
| **Total:** | | **108,000** | | **$11,493,252.00** |
| | | | | |
| DAVIS | 5/5/2011 | 40,000 | $68.34 | $2,733,500.00 |
| | 2/7/2012 | 10,000 | $68.70 | $686,972.00 |
| | 2/23/2012 | 15,000 | $69.49 | $1,042,423.50 |
| | 2/27/2012 | 35,000 | $66.37 | $2,322,827.50 |
| **Total:** | | **100,000** | | **$6,785,723.00** |
| | | | | |
| DEL VECCHIO | 8/8/2011 | 6,750 | $91.19 | $615,532.50 |
| | 8/11/2011 | 13,500 | $98.11 | $1,324,485.00 |
| | 8/11/2011 | 8,732 | $105.00 | $916,866.99 |
| | 8/12/2011 | 10,000 | $105.10 | $1,051,016.00 |
| | 8/12/2011 | 6,268 | $105.02 | $658,235.27 |
| | 2/27/2012 | 20,000 | $66.93 | $1,338,560.00 |
| **Total:** | | **65,250** | | **$5,904,695.76** |
| | | | | |
| MARDY | 8/5/2011 | 20,000 | $97.48 | $1,949,606.00 |
| **Total:** | | **20,000** | | **$1,949,606.00** |

| | | | | |
|---|---|---|---|---|
| MCCREARY | 8/18/2010 | 200,000 | $33.08 | $6,615,260.00 |
| | 8/4/2011 | 100,000 | $106.77 | $10,676,800.00 |
| **Total:** | | **300,000** | | **$17,292,060.00** |
| | | | | |
| MILLER | 8/4/2011 | 60,000 | $108.08 | $6,484,614.00 |
| | 8/10/2011 | 10,000 | $96.71 | $967,091.00 |
| | 2/3/2012 | 25,000 | $66.06 | $1,651,410.00 |
| | 2/17/2012 | 26,500 | $70.06 | $1,856,669.50 |
| **Total:** | | **121,500** | | **$10,959,784.50** |
| | | | | |
| MORAN | 5/5/2011 | 8,883 | $68.34 | $607,042.01 |
| | 8/5/2011 | 10,000 | $98.50 | $985,000.00 |
| **Total:** | | **18,883** | | **$1,592,042.01** |
| | | | | |
| RATHKE | 8/5/2011 | 337,500 | $96.87 | $32,692,612.50 |
| **Total:** | | **337,500** | | **$32,692,612.50** |
| | | | | |
| STACY | 8/13/2010 | 30,000 | $30.95 | $928,626.00 |
| | 9/13/2010 | 5,000 | $35.40 | $177,000.00 |
| | 9/21/2010 | 4,375 | $37.00 | $161,875.00 |
| | 9/21/2010 | 625 | $37.00 | $23,125.00 |
| | 11/5/2010 | 10,000 | $35.00 | $350,000.00 |
| | 2/7/2011 | 10,000 | $40.00 | $400,000.00 |
| | 2/7/2011 | 5,561 | $40.00 | $222,440.00 |
| | 2/14/2011 | 10,000 | $45.13 | $451,300.00 |
| | 3/10/2011 | 9,375 | $55.54 | $520,719.38 |
| **Total:** | | **84,936** | | **$3,235,085.38** |
| | | | | |
| STILLER | 2/10/2011 | 6,360 | $41.36 | $263,049.60 |
| | 3/15/2011 | 11,144 | $58.99 | $657,384.56 |
| | 5/5/2011 | 310,000 | $68.34 | $21,184,625.00 |
| | 8/4/2011 | 18,050 | $107.43 | $1,939,171.07 |
| | 8/4/2011 | 500,000 | $107.43 | $53,716,650.00 |
| | 11/23/2011 | 200,350 | $50.13 | $10,043,545.50 |
| | 11/29/2011 | 20,000 | $48.92 | $978,400.00 |
| | 2/15/2012 | 500,000 | $65.94 | $32,969,650.00 |
| | 2/24/2012 | 500,000 | $66.68 | $33,342,300.00 |
| | 3/27/2012 | 19,065 | $51.91 | $989,664.15 |
| **Total:** | | **2,084,969** | | **$156,084,439.88** |
| | | | | |
| **TOTAL:** | | **3,481,613** | | **$268,207,184.66** |

### A. The Timing of Defendant Stacy's August and September 2010 Sales Is Suspicious and the Circumstances Surrounding Her Reporting of These Sales Is Highly Suspicious

270. Defendant Stacy sold 30,000 shares on August 13, 2010 and 5,000 shares on September 13, 2010. Additionally, Stacy sold 5,000 shares on September 21, 2010 for $37 per share, one day after the Individual Defendants claim the Company was first notified of the SEC's inquiry into the Company's relationship with MBlock, but seven days before the Individual Defendants disclosed this inquiry to the public and the purportedly "immaterial accounting error" that later resulted in the Company's Restatement of nearly five years of financial statements.

271. Defendant Stacy made these stock sales while in possession of material, non-public information that, once disclosed, caused the Company's stock price to fall. As the President of Green Mountain's Keurig business division, Stacy was responsible for overseeing Green Mountain's intercompany transactions with Keurig. She knew first-hand that the Company did not maintain effective controls over its accounting and financial reporting and that Green Mountain did not accurately account for its K-Cup inventory balance at the Keurig Business Unit. She also knew that the method used by the Company to identify intercompany transactions with Keurig did not properly account for these transactions. These facts were material because they caused Green Mountain to overstate its net sales and understate cost of sales and inflate reported pretax and after tax earnings. This information had not been publicly disclosed at the time of Stacy's August 13, 2010 and September 13, 2010 stock sales.

272. As the President of Green Mountain's Keurig business division, defendant Stacy was primarily responsible for overseeing the functions MBlock performed, including the warehousing and maintenance of Keurig's inventory and the processing and shipment of Keurig product orders, and maintains regular contact with the CEO. Therefore, Stacy was one of the first to learn about the SEC's inquiry into the Company's relationship with MBlock when it

- 154 -

requested documents and information on September 20, 2010. Defendant Stacy sold her stock the following day, before this material fact was publicly disclosed.

273.    On September 28, 2010, after the market closed, Green Mountain filed with the SEC the Form 8-K which disclosed that the Company's management had discovered an error relating to its accounting for intercompany transactions with Keurig and that the SEC had begun an inquiry into Green Mountain's revenue recognition practices and relationship with MBlock. The following day, Green Mountain's stock price fell by over 16%, closing at $31.06 on September 29, 2010, from the previous day's closing price of $37.01.

274.    Defendant Stacy's August and September 2010 stock sales are also particularly suspicious due to the circumstances surrounding her reporting of these sales. On October 28, 2010, Stacy belatedly filed with the SEC amended Form 4 reports and claimed she established a Rule 10b5-1 trading plan on August 13, 2010, which would "cover" her August and September 2010 trades. Stacy then amended her prior-filed Form 4 filings for her stock sales on September 13 and September 21, 2012, to reflect her 10b5-1 trading plan. However, Stacy's sale of 30,000 shares on August 13, 2010 was not pursuant to a 10b5-1 trading plan. According to Stacy's amended SEC filings, her 10b5-1 trading plan only covered future stock transactions. Stacy's 10b5-1 trading plan was not filed with the SEC until *after* Stacy had made her trades in August and September 2010, almost three months later.

### B.    Defendants McCreary, Stiller, Carlini, Rathke, Mardy, Moran, and Del Vecchio's August 2011 Sales Were Suspicious in Timing and Amount

275.    Defendant McCreary sold 100,000 shares of his stock on August 4, 2011, for proceeds of over $10 million, at a time when the Company's stock was trading at $106.77, *within 5% of its all-time high*. This was his only sale of stock during the previous year, and was made in the middle of the Company's fourth fiscal quarter of 2011. As Green Mountain's COO and

President, McCreary had direct responsibility for the oversight of the Company's manufacturing practices and sales strategies, and received and reviewed reports concerning demand for the Company's products and inventory management. Further, as President of the Specialty Coffee Business Unit, McCreary received and reviewed reports concerning the financial results and sales forecasts for that unit. The fourth quarter of 2011 was the first quarter in over eight quarters that the Company was tracking to miss its sales growth estimates – a critical fact central to Green Mountain's operational performance that could not have escaped McCreary's notice when he made his August 4, 2011 stock sale.

276.    Defendant Stiller sold 518,050 shares of his Green Mountain stock on August 4, 2011, at a time when the Company's stock was trading within 5% of its all-time high, for proceeds of *over $55 million*. At the time of this stock sale, Stiller knew that the Company failed to maintain adequate controls over its demand forecasting practices and that the sales growth guidance the Individual Defendants issued lacked a reasonable basis. Further, because he worked closely with CEO defendant Blanford in an advisory capacity, Stiller had access to reports concerning the Company's financial results and sales forecasts, and therefore knew or recklessly disregarded at the time he made his August 4, 2011 stock sale, that Green Mountain was likely to miss its sales growth estimates for that quarter. The fourth quarter of 2011 was the first quarter in over eight quarters that the Company was tracking to miss its sales growth estimates – a critical fact central to Green Mountain's operational performance that could not have escaped Stiller's notice when he made his August 4, 2011 stock sale.

277.    Defendant Carlini *sold 100%* of her Green Mountain stock on August 4, 2011. Carlini's sale was highly suspicious in amount and timing. *Carlini liquidated 100% of her holdings when the Company's stock was trading within 5% of its all-time high during the first*

*quarter in eight that Green Mountain missed its sales estimates.* At the time of this stock sale, Carlini knew that the Company failed to maintain adequate controls over its demand forecasting practices and that the sales growth guidance the Individual Defendants issued lacked a reasonable basis. Further, as a member of the Company's Audit Committee, Carlini was required to review the Company's financial results and therefore knew or recklessly disregarded that Green Mountain was likely to miss its sales growth estimates for that quarter. The fourth quarter of 2011 was the first quarter in over eight quarters that the Company was tracking to miss its sales growth estimates – a critical fact central to Green Mountain's operational performance that could not have escaped Carlini's notice when she made her August 4, 2011 stock sale.

278.    Defendant Rathke sold *over 86%* of her total stock in Green Mountain on August 5, 2011, in the middle of the Company's fourth fiscal quarter of 2011. The timing and amount of Rathke's sale was highly suspicious. *Rathke's sale of 86% of her holdings was her only sale of stock during the previous four calendar years,* and was made while the Company's stock price was trading at $96.87, within 12% of its all-time high. As the Company's CFO, Rathke received and reviewed reports on the financial performance of all of Green Mountain's business units, including reports of historical and current sales within these units. The fourth quarter of 2011 was the first quarter in over eight quarters that the Company was tracking to miss its sales growth estimates – a critical fact central to Green Mountain's operational performance that could not have escaped Rathke's notice when she made her August 5, 2011 stock sale.

279.    Defendants Mardy and Moran also sold significant amounts of their Green Mountain stock on August 5, 2011, when the Company's stock price was trading within 12% of its all-time high. The timing and amount of these sales were particularly suspicious. This was the *first time that defendant Mardy had ever sold any of his Green Mountain stock, and he*

*sold 78% of his total holdings* for proceeds of over $1.9 million. Defendant *Moran sold more than 87% of his Green Mountain stock* on August 5, 2011, for proceeds of over $1.5 million. At the time of these stock sales, Mardy and Moran knew that the Company failed to maintain adequate controls over its demand forecasting practices and that the sales growth guidance they issued lacked a reasonable basis. Further, as a member of the Company's Audit Committee, Mardy was required to review the Company's financial results and therefore knew or recklessly disregarded that Green Mountain was likely to miss its sales growth estimates for that quarter. The fourth quarter of 2011 was the first quarter in over eight quarters that the Company was tracking to miss its sales growth estimates – a critical fact central to Green Mountain's operational performance that could not have escaped either Mardy or Moran's notice when they executed their August 5, 2011 stock sales.

280.   Defendant del Vecchio also sold significant amounts of his Green Mountain stock in August 2011 for proceeds of over $4.5 million. Specifically, del Vecchio sold stock on August 8, August 11, and August 12, 2011, while in possession of material, non-public information indicating that Green Mountain was likely to miss its sales growth estimates for that quarter. Defendant del Vecchio knew that the Company failed to maintain adequate controls over its demand forecasting practices and that the sales growth guidance the Individual Defendants issued lacked a reasonable basis. Further, as a member of the Company's Audit Committee, defendant del Vecchio was required to review the Company's financial results and therefore knew or recklessly disregarded that Green Mountain was likely to miss its sales growth estimates for that quarter. The fourth quarter of 2011 was the first quarter in over eight quarters that the Company was tracking to miss its sales growth estimates – a critical fact central to Green Mountain's operational performance that could not have escaped del Vecchio's notice when he

executed his August 2011 stock sales.  The timing of defendant del Vecchio's August 2011 sales

was particularly suspicious because *he had not sold any Green Mountain stock since 2008*.

### C.   Defendants Stiller, Miller, Blanford, Davis, and del Vecchio's February 2012 Stock Sales Were Suspicious in Timing

281.    Defendant Stiller sold 500,000 shares on February 15, 2012 at $65.94 and another

500,000 shares on February 24, 2012 at $66.68 per share for proceeds of more than $66 million.

Defendants Miller, Blanford, Davis, and del Vecchio also sold close to $10 million worth of

stock combined during February 2012.

282.    These sales took place just prior to a significant announcement by Italian coffee

maker Luigi Lavazza S.p.A. ("Lavazza") on February 27, 2012.  On August 10, 2010, the

Individual Defendants had announced that Green Mountain had entered into an agreement with

Lavazza, whereby Lavazza agreed to purchase $250 million in newly issued Green Mountain

shares and to partner with the Company to develop single-serve espresso machines and single-

serve espresso capsules to be manufactured by Lavazza.  On February 24, 2012, Lavazza

disclosed in an amended 13D filing its 5.5%, or 8,513,752 share, stake in Green Mountain.

Then, on February 27, 2012, Lavazza announced that it had cut its stake in Green Mountain to

4.99%, but said it did not currently intend to sell any additional shares.  Specifically, Lavazza

stated, "[c]onsistent with its continuing intention to maintain a long-term relationship with

[Green Mountain], Lavazza currently intends to continue to hold all or a significant part of its

current investment."

283.    The Lavazza trades pushed Green Mountain stock lower and led to news articles

questioning Green Mountain's future prospects.  Defendants Davis, Stiller, Blanford, Miller, and

del Vecchio each sold significant amounts of Green Mountain stock just before its stock price

fell on the news of Lavazza's sales.  These defendants were privy to the material, non-public

information that these Lavazza sales would take place, as Lavazza indicated in its February 24, 2012 13D that they occurred only after "discussions" with Green Mountain officials which amended the purchase agreement under which Lavazza had acquired Green Mountain stock in August 2010:

> Lavazza remains committed to its long-term cooperative and strategic relationship with the Issuer. In light of global economic conditions, and particularly those in Europe and in Italy, however, Lavazza has reviewed its minority investment in the Issuer and considered ways in which some of the value of such equity investment can be either ensured or monetized. Under the SPA, Lavazza is precluded from entering into any hedging or similar transaction with the same economic effect as a sale of any shares of Common Stock. *In its consideration of alternatives, Lavazza asked the Issuer if it would consent to Lavazza hedging a portion of its investment. Following these discussions, Lavazza and the Issuer agreed to amend certain provisions of the SPA with respect to the sale or hedging of shares of Common Stock held by Lavazza pursuant to a Second Amendment to Common Stock Purchase Agreement, dated as of February 23, 2012.*

284.    Defendants Davis, Stiller, Blanford, Miller, and del Vecchio's February 2012 stock sales also took place just prior to the March 8, 2012 announcement, that industry leader, nascent competitor, and then-Kuerig K-Cups partner, Starbucks Corp., would be launching a single-serve espresso machine which would compete with Green Mountain's Keurig machine. Defendants Stiller, Miller, Blanford, Davis, and del Vecchio knew through their negotiations with Starbucks concerning the companies' partnership and close evaluation and monitoring of the competitive threat posed by the September 2012 lapse of the critical K-Cup patents that Starbucks would announce its plans to enter into the single-serve coffee brewing market. In fact, *Starbucks' spokeswoman Alisa Martinez later confirmed that Starbucks had informed Green Mountain of its plans to enter into the single-serve coffee brewing market prior to its March 8, 2012 public unveiling of its single-cup home-brewing machine.*

285.    These well-timed February sales occurred only a few short weeks before the stock plunged from near $70 to $50 in only six trading days, after it was revealed that the Company

had missed its sales growth estimates for the second fiscal quarter of 2012 and the Individual Defendants reduced their guidance for fiscal 2012.

### D. Defendants Stiller's and Davis' May 4 and May 7, 2012 Stock Sales Violated Green Mountain's Insider Selling Policies

286. The Board acknowledged in its May 8, 2012 press release that defendants Stiller's and Davis' May 4, 2012 and May 7, 2012 stock sales, which were purportedly made as a result of margin calls on Company stock that Stiller and Davis had pledged as collateral, "were inconsistent with the Company's internal trading policies." These sales, which occurred during a blackout period in which Company insiders were prohibited from selling their personally-held Company stock, collectively netted over $126 million in proceeds.

287. In total, the Insider Selling Defendants sold more than *3.4 million shares for total proceeds of more than $268 million* while in possession of material, inside information and at times when insider trading was prohibited by internal Company policies.

### XIII. DAMAGES TO GREEN MOUNTAIN

288. As a result of the Individual Defendants' wrongful conduct, Green Mountain published materially inaccurate financial statements and disclosures that misrepresented the Company's financial condition from fiscal years 2006 through 2009 and the first three quarters of fiscal 2010, which were required to be restated. The Company incurred substantial costs in connection with the Restatement, including costs incurred in connection with the internal investigation undertaken in connection with the Restatement, costs associated with the Restatement, including auditor fees, and costs associated with implementing the Remediation Plan.

289. The Individual Defendants' wrongful conduct has also made Green Mountain the target of an SEC inquiry, which has been going on for nearly two years. The Company has

incurred costs in connection with responding to the SEC inquiry and may incur future costs associated with defending and/or settling a possible enforcement action brought by the SEC.

290.    As a result of the Individual Defendants' wrongful conduct, throughout fiscal 2011 and during the first quarter of fiscal 2012 Green Mountain disseminated improper statements and sales and earnings guidance that lacked a reasonable basis due to the Company's unreliable demand forecasting practices which had the effect of misrepresenting the Company's true financial health.

291.    Green Mountain is now the subject of *three* shareholder class action lawsuits alleging securities laws violations in connection with the Company's improper financial reporting. The Company will face substantial costs in connection with these lawsuits.

292.    Further, as a direct and proximate result of the Individual Defendants' conduct, Green Mountain has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred in connection with remediating the Company's inadequate internal controls over accounting and financial reporting, inventory management, and demand forecasting; and

(b)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to Green Mountain.

293.    Moreover, as reflected in the Company's $12.9 billion loss in market capitalization,[22] the Individual Defendants' misconduct has severely damaged Green Mountain's corporate reputation, goodwill, and credibility in the capital markets. As a result, Green

---

[22] On September 19, 2011, the Company's stock price closed at an all-time high of $111.62.  On September 21, 2012, the Company's stock price closed at $26.76.

Mountain's cost of capital has increased in amounts that are presently ascertainable for past periods and reasonably estimable for future periods with the aid of discovery and expert opinion.

## XIV.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

294.    Plaintiffs bring this action derivatively in the right and for the benefit of Green Mountain to redress injuries suffered, and to be suffered, by Green Mountain as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Green Mountain is named as a nominal defendant solely in a derivative capacity.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

295.    Plaintiffs will adequately and fairly represent the interests of Green Mountain in enforcing and prosecuting its rights.

296.    Plaintiffs were shareholders of the Company at the time of the wrongs complained of, have continuously been shareholders since that time, and are current shareholders.

297.    The current Board of Green Mountain consists of the following eight (8) individuals: defendants Blanford, Stiller, Carlini, del Vecchio, Mardy, Miller, Moran (the "Director Defendants")[23] and non-defendant Norman H. Wesley.  Plaintiffs have not made a pre-suit demand on the Green Mountain's Board to bring these derivative claims because such demand would be a futile and useless act and, therefore, is legally excused.

298.    To establish demand futility, Plaintiffs need only allege facts raising a reasonable doubt that a majority of the Board – here, *four of the eight directors* – is capable of making a

---

[23] For purposes of the demand futility section, "Director Defendants", "Audit Committee Defendants," and Governance Committee Defendants" refers only to the current members of the Board.

disinterested and independent decision about whether to initiate litigation. Plaintiffs allege several reasons why demand on the Board would be futile and is therefore excused.

(a)     Plaintiffs allege facts raising a reasonable doubt that *the entire Board* lacks independence from defendant Stiller, who dominates and controls the Board, and who faces a substantial likelihood of liability for his breaches of fiduciary duty. Defendants Stiller, Blanford, del Vecchio, and Miller – *four members of the Board* – each lack independence for other reasons. The Company acknowledges in its 2011 Form 10-K that Stiller and Blanford are not independent. Additional facts indicate that del Vecchio and Miller have longstanding personal and business relationships with Stiller that raise a reasonable doubt as to their independence from Stiller.

(b)     In addition, all of the Director Defendants – *seven members of the Board* – each face a substantial likelihood of liability for their breaches of fiduciary duty, and therefore, lack disinterestedness, and their actions (and conscious inaction) were not valid exercises of business judgment. The Director Defendants each face a substantial likelihood of liability for breaching their fiduciary duties in at least the following ways: (i) by failing to implement adequate internal control infrastructure commensurate with the Company's growth; (ii) by failing to implement an adequate internal control Remediation Plan; (iii) by failing to properly investigate and remediate material inventory anomalies; (iv) by permitting Green Mountain to issue sales and earnings guidance they knew or but for conscious disregard of red flags, would have known was unreliable; and (v) by selling Green Mountain stock while in possession of material, non-public information. Each of the Director Defendants also faces potential liability for securities fraud in the various class actions.

(c)     The named Audit Committee Defendants, Mardy, Carlini, del Vecchio, and Miller – *four members of the Board* – also face a substantial likelihood of liability for their breaches of fiduciary duties in at least the following ways: (i) by failing to implement adequate accounting and financial reporting infrastructure required by the Company's strategic growth initiatives or commensurate with the growth in the complexity and scope of operations and transaction volumes; (ii) failing to adequately oversee the Company's accounting and financial reporting processes; (iii) failing to adequately monitor the implementation of the Remediation Plan and recommend necessary changes to the plan indicated by myriad red flags including ongoing material inventory anomalies and Einhorn's investigation findings.

(d)     All of the Director Defendants – *seven members of the Board* – and especially the Governance Committee Defendants Mardy, Carlini, del Vecchio, Miller, and Moran – *five members of the Board* – face a substantial likelihood of liability for breaching their fiduciary duties by allowing defendants Stiller's and Davis' improper stock pledges, and specifically by: (i) failing to implement (until January 2012) any formal policy concerning insider pledges of Company stock; and (ii) "grandfathering" in Stiller's and Davis' existing pledges once they did adopt a policy. Further, Stiller faces a substantial likelihood of liability for breaching his fiduciary duty by improperly pledging large amounts of his Company stock as collateral for margin loans.

## A.     Demand Is Futile Because a Majority of the Board Lacks Independence and Is Dominated and Controlled by Defendant Stiller

299.     Demand is futile because the Green Mountain Board is dominated and controlled by defendant Stiller. Under the weight of this domination and control, the Board has participated in and permitted Stiller's improper self-dealing, exhibiting a pattern and practice of deferring to Stiller rather than acting for the benefit of Green Mountain and its shareholders.

- 165 -

300.    Defendant Stiller is the founder of Green Mountain, has been a director since 1993.    Stiller served as Chairman of the Board from May 2007 to May 2012, when his Chairmanship was terminated after he sold over $120 million worth of Green Mountain stock to meet margin calls in violation of the Company's insider trading policies, as discussed in detail herein.    Stiller remains a member of the Board.    Stiller served as the Company's President and CEO for almost twenty-six years, from July 1981 through May 2007.

301.    Defendant Stiller is currently Green Mountain's fourth-largest shareholder (he was the third-largest shareholder before the 2012 margin calls), and he has long dominated decision-making by Green Mountain's executive team and Board.    In a July 30, 2012, article entitled, "Green Mountain CEO Faces Percolating Issue of Who's Boss," *Bloomberg* reported the conclusion of Paul Hodgson, senior research associate at New York-based corporate governance consulting firm GMI Ratings, that Stiller continued to exert dominating influence over Green Mountain's operations and strategy, despite stepping down as CEO in 2007, and even after being removed as Chairman in May 2012 for violating Company policy.    Hodgson stated that well after defendant Blanford became CEO, analysts and investors continue to call Stiller following quarterly earnings reports because *the founder, not Blanford, is calling the shots*.    According to Hodgson, "[i]f they're still doing that, then *there's a perception that [Stiller is] still running the company ... that's not healthy when you have a CEO*."

302.    The article also cited a GMI Ratings report written by Paul Hodgson that gave Green Mountain's Board a *"D" grade, "which is shared by [only] about 20 percent of North American public companies*."    The GMI Ratings report concluded that "*the [Green Mountain] board was 'entrenched,' meaning its directors have been members for too long and are insufficiently independent*."    Indeed, defendant Stiller hand-picked a majority of the members of

Green Mountain's Board (including himself), many of whom have now served on the Board with Stiller for ten, fifteen, and even twenty years. For example, defendant del Vecchio has served on the Green Mountain Board with Stiller since 1993, having had a longstanding and close personal relationship with Stiller for years (described further at ¶¶313-16). In 1999, defendant Miller introduced herself to Stiller, knowing that he was primarily responsible for picking the Company's Board members. Shortly thereafter, she secured a position on Green Mountain's Board, and remains a director of the Company today. In 2007, Stiller personally pursued and pitched defendant Blanford on becoming the Company's President and CEO (and member of the Board). Defendants Moran and Carlini are also longstanding members of Green Mountain's Board; Moran has been a Board member since 1999; and Carlini has been a Board member since April 2002.

303.    These long-serving, entrenched directors are beholden to defendant Stiller, having enjoyed enormous financial and other benefits as a result of Stiller's support for their positions on the Board. Simply put, as set forth in the following chart (which indicates only the proceeds the Director Defendants have obtained from sales of their Green Mountain stock, based on available data), Stiller made each of these long-tenured Board members very, very rich.

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| BLANFORD | 5/27/2009 | 36,392 | $19.02 | $692,246.39 |
| | 6/4/2009 | 36,396 | $20.01 | $728,369.69 |
| | 5/5/2011 | 51,573 | $68.34 | $3,524,369.89 |
| | 8/16/2011 | 45,000 | $99.62 | $4,482,733.50 |
| | 9/20/2011 | 45,000 | $111.43 | $5,014,206.00 |
| | 10/18/2011 | 45,000 | $80.21 | $3,609,459.00 |
| | 2/28/2012 | 54,002 | $66.43 | $3,587,115.25 |
| **Total** | | **313,363** | | **$21,638,499.72** |
| | | | | |
| CARLINI | 8/4/2011 | 108,000 | $106.42 | $11,493,252.00 |
| **Total** | | **108,000** | | **$11,493,252.00** |

| | | | | |
|---|---|---|---|---|
| DAVIS | 3/18/2004 | 13,500 | $1.48 | $20,000.00 |
| | 5/10/2004 | 1,350 | $1.46 | $1,968.00 |
| | 5/13/2004 | 8,100 | $1.44 | $11,701.62 |
| | 5/13/2004 | 4,050 | $1.48 | $6,000.00 |
| | 5/27/2004 | 13,500 | $1.48 | $20,000.00 |
| | 6/22/2004 | 6,750 | $1.36 | $9,150.00 |
| | 6/23/2004 | 6,750 | $1.35 | $9,125.00 |
| | 7/1/2004 | 13,500 | $1.35 | $18,260.00 |
| | 8/5/2004 | 13,500 | $1.47 | $19,800.00 |
| | 5/5/2011 | 40,000 | $68.34 | $2,733,500.00 |
| | 2/7/2012 | 10,000 | $68.70 | $686,972.00 |
| | 2/23/2012 | 15,000 | $69.49 | $1,042,423.50 |
| | 2/27/2012 | 35,000 | $66.37 | $2,322,827.50 |
| | 5/4/2012 | 25,000 | $25.13 | $628,362.50 |
| | 5/4/2012 | 370,000 | $25.33 | $9,372,026.00 |
| | 5/4/2012 | 5,000 | $25.01 | $125,042.00 |
| | 5/7/2012 | 148,000 | $25.17 | $3,725,559.60 |
| **Total** | | **729,000** | | **$20,752,717.72** |
| | | | | |
| DEL VECCHIO | 7/2/2003 | 12,150 | $1.42 | $17,217.00 |
| | 7/2/2003 | 22,950 | $1.41 | $32,249.00 |
| | 7/2/2003 | 3,105 | $1.40 | $4,347.00 |
| | 7/2/2003 | 945 | $1.44 | $1,362.90 |
| | 7/2/2003 | 8,100 | $1.42 | $11,508.00 |
| | 7/2/2003 | 12,150 | $1.42 | $17,253.00 |
| | 7/2/2003 | 8,100 | $1.41 | $11,460.00 |
| | 7/2/2003 | 2,700 | $1.42 | $3,824.00 |
| | 11/29/2004 | 608 | $1.81 | $1,098.90 |
| | 11/29/2004 | 6,750 | $1.80 | $12,126.35 |
| | 11/29/2004 | 4,793 | $1.80 | $8,608.75 |
| | 11/29/2004 | 8,100 | $1.81 | $14,640.00 |
| | 8/18/2006 | 6,750 | $2.83 | $19,075.00 |
| | 8/18/2006 | 4,577 | $2.83 | $12,936.24 |
| | 8/18/2006 | 1,350 | $2.83 | $3,817.00 |
| | 8/18/2006 | 3,051 | $2.83 | $8,633.20 |
| | 8/18/2006 | 2,700 | $2.83 | $7,650.00 |
| | 12/5/2008 | 166,059 | $8.03 | $1,333,708.39 |
| | 12/8/2008 | 49,941 | $8.01 | $399,963.04 |
| | 8/8/2011 | 6,750 | $91.19 | $615,532.50 |
| | 8/11/2011 | 13,500 | $98.11 | $1,324,485.00 |
| | 8/11/2011 | 8,732 | $105.00 | $916,866.99 |

| | 8/12/2011 | 10,000 | $105.10 | $1,051,016.00 |
|---|---|---|---|---|
| | 8/12/2011 | 6,268 | $105.02 | $658,235.27 |
| | 2/27/2012 | 20,000 | $66.93 | $1,338,560.00 |
| **Total** | | **390,128** | | **$7,826,173.53** |
| | | | | |
| **MARDY** | 8/5/2011 | 20,000 | $97.48 | $1,949,606.00 |
| **Total** | | **20,000** | | **$1,949,606.00** |
| | | | | |
| **MILLER** | 5/5/2008 | 22,500 | $8.30 | $186,650.00 |
| | 5/6/2008 | 22,500 | $8.61 | $193,750.00 |
| | 6/16/2008 | 22,500 | $9.78 | $220,002.50 |
| | 12/29/2008 | 26,771 | $8.78 | $234,985.50 |
| | 1/5/2009 | 6,980 | $8.78 | $61,264.50 |
| | 1/26/2009 | 11,250 | $9.00 | $101,250.00 |
| | 2/3/2009 | 22,500 | $9.18 | $206,600.00 |
| | 5/6/2009 | 13,500 | $16.77 | $226,358.70 |
| | 8/4/2011 | 60,000 | $108.08 | $6,484,614.00 |
| | 8/10/2011 | 10,000 | $96.71 | $967,091.00 |
| | 2/3/2012 | 25,000 | $66.06 | $1,651,410.00 |
| | 2/17/2012 | 26,500 | $70.06 | $1,856,669.50 |
| **Total** | | **270,000** | | **$12,390,645.70** |
| | | | | |
| **MORAN** | 1/2/2008 | 33,750 | $8.84 | $298,200.00 |
| | 12/8/2008 | 81,171 | $8.11 | $658,387.00 |
| | 12/9/2008 | 78,480 | $8.11 | $636,560.00 |
| | 12/10/2008 | 42,849 | $8.40 | $359,934.46 |
| | 5/5/2011 | 8,883 | $68.34 | $607,042.01 |
| | 8/5/2011 | 10,000 | $98.50 | $985,000.00 |
| **Total** | | **255,133** | | **$3,545,123.47** |

304. As a result of their entrenchment, the Director Defendants have consistently participated in and/or acquiesced in defendant Stiller's frequent decisions to place his personal interests ahead of the interests of Green Mountain and its shareholders.

305. Perhaps the best evidence of defendant Stiller's control over the Board is his success in pressing his fellow directors to permit him to create a serious potential conflict of interest with Green Mountain by pledging hundreds of millions of dollars' worth of Company stock to secure personal loans to support his lavish lifestyle. (*See* discussion at ¶¶253-54, *supra*).

The Board's decision-making only got worse when it decided to grandfather in Stiller's pledges even after it had concluded in January 2012 that such pledges should be prohibited to protect the Company's interests in avoiding potential conflicts of interest and threats to the stock's price stability in times of crisis. These decisions were not valid exercises of business judgment. They served the interests of one person – Chairman Stiller – and were contrary to the interests of the Company and its shareholders.

306. Since at least 2007, defendant Stiller has pledged Green Mountain stock as collateral to secure margin loans to fund (among other things) purchases of a 164-foot yacht, a $17.5 million New York City apartment, a $10 million home in Palm Beach, Florida, and investments in other businesses, including a flight-operations company, Heritage Aviation, and an environmental firm. From 2007 through 2011, Stiller pledged significant amounts of his Green Mountain stock to secure ever-larger debts, including up to nineteen million shares and 92% of his Green Mountain holdings at one time or another. The Board was well aware that Stiller had pledged nearly all of his Green Mountain stock to secure margin debt (the numbers were reported in the Company's Proxy Statements filed in 2008-2012), a fact Stiller openly acknowledged, stating that "[t]he Board knew I had these margin things." Notwithstanding the clear conflict of interest inherent in Stiller's enormous insider stock pledges (namely, that Stiller may place his own interests above the interests of Green Mountain's and that the Company would face additional harm if margin calls forced Stiller to sell large amounts of stock), the Board acquiesced in Stiller's self-serving ways. The Director Defendants—and in particular the Governance Committee Defendants—did not, until January 2012, adopt *any* policy prohibiting, or even regulating, insider stock pledges. (*See* discussion at ¶¶257-59, *supra*). Moreover, even when the Board finally adopted the new policy in January 2012, Stiller succeeded in caused the

Board to "grandfather" in his existing pledges of Company stock in margin accounts, despite the obvious and acknowledged problems this created for Green Mountain. The Board also failed to timely reduce Stiller's outstanding pledges. *Id.* Stiller also succeeded in pressing the Board to take no action to correct Lead Director Davis' material stock pledges.

307.   As alleged above, rather than fulfill their duties of care and loyalty, the Audit Committee directors and the rest of the Board also followed Stiller's lead in dismissing out of hand Einhorn's serious and credible allegations of accounting improprieties and fatal lack of internal controls of the inventory and order fulfillment operations outsourced to MBlock, despite myriad red flags indicating serious problems and even intentional misconduct calculated to inflate reported results and deceive the Company's auditors. *See* ¶¶174; 187; 189; 191-200, *supra*.

308.   The Director Defendants' approvals of transactions that have personally benefited defendant Stiller are further evidence of his domination and control over the Board. For example, since 2002, Green Mountain has paid Heritage Aviation a total of $3.1 million for its travel services.[24]

309.   The Board also has a long history of approving similar, related-party transactions that have provided no benefit to Green Mountain, but have benefited Company insiders, including not only defendant Stiller, but also defendant Davis, Stiller's longtime friend and business partner. Indeed, defendant Stiller used his control over the Board to benefit Davis —

---

[24] Green Mountain's 2012 Proxy disclosed the following regarding its payments to Heritage Aviation: "The Company uses travel services provided by Heritage Flight, a charter air services company owned by Mr. Robert P. Stiller, the Company's current Chairman of the Board. During fiscal years 2011, 2010, and 2009, the Company was billed a total of $0.7 million, $0.4 million, and $0.2 million, respectively, by Heritage Flight for travel services provided to various employees of the Company. The use of Heritage Flight services was reviewed and approved by the Audit Committee in accordance with our policy set forth above."

who Stiller appointed to the Board in 1993 when the Company went public and with whom Stiller has served on several boards, including the Howard Bank and the Vermont Business Roundtable — to the detriment of Green Mountain's interests.

310.    For example, from January 2000 to June 2001, defendant Davis was President and CEO of ChefExpress.net, Inc., an e-commerce based company that sells ingredients and specialty foods online.  On March 21, 2000, while Davis was a member of Green Mountain's Audit Committee and defendants Stiller, del Vecchio, Moran, and Miller were on the Company's Board, the Board approved a loan from Green Mountain to ChefExpress.net for $100,000.  The loan had an annual interest rate of 8% that would mature on or before May 31, 2000. ChefExpress.net had the right to extend the promissory note for a period not exceeding ninety days (until August 29, 2000) without cost or penalty, and Green Mountain had the option to convert the loan into an equity investment of Chef Express.net's initial private placement offering.  In the Company's Form 10-Q filed with the SEC on August 14, 2000, Green Mountain disclosed that due to a delay in the private placement, Green Mountain recorded a 50% reserve against Chef Express.net's loan.  However, on September 20, 2000, even though there existed a 50% reserve against the loan, Green Mountain converted the loan into an equity investment in ChefExpress.net at the original cost of $104,000 ($100,000 being the initial loan plus $4,000 of interest).  During the second quarter of fiscal 2001, Green Mountain recorded an impairment charge of $52,000 against its original $104,000 minority ownership investment.  During the second quarter of fiscal 2002, Green Mountain suffered another $52,000 impairment charge against its investment, "reducing the value of that investment to zero."  Green Mountain's investment in ChefExpress.net was ultimately worthless.

311.    The above facts show a Board comprised of hand-picked, long-serving, entrenched directors who have benefited financially as a result of their appointments as directors, and who have consistently and repeatedly acquiesced to the wishes of the Company's Founder and long-time President, CEO, and Chairman (who continues to exercise significant control over the Board despite no longer serving as Chairman or an executive officer). The Green Mountain Board is dominated and controlled by defendant Stiller, and the Director Defendants are, therefore, unable to impartially consider a demand to pursue the claims brought by Plaintiffs in this case. Demand is futile on this ground.

312.    Even setting aside defendant Stiller's domination and control of the entire Board, a majority of the Director Defendants lack independence for purposes of demand futility. As an initial matter, in its Form 10-K filed with the SEC on January 20, 2012, Green Mountain concedes (as it must) that defendants Blanford (the Company's CEO) and Stiller (the Company's Founder and former President and CEO) are not independent. Thus, demand is futile if just two of the remaining Board members lack sufficient independence. For the reasons discussed below, defendants del Vecchio and Miller are not sufficiently independent and, therefore, demand is futile.

313.    Defendant del Vecchio has a long-standing personal and financial relationship with defendant Stiller that raises reason to doubt del Vecchio's independence from Stiller.

314.    Defendants Stiller and del Vecchio attended college together. Both received four-year degrees from Parsons College in Fairfield, Iowa, in 1967.

315.    According to Green Mountain's 1998 – 2006 Proxy Statements, defendants del Vecchio's and Stiller's wives were sisters. Del Vecchio and his wife, Phyllis, were married from

at least 1996 until she passed away in March 2006.  Stiller and his wife, Christine, have been married since 1983.

316.    Further, according to public records, defendant Stiller was listed as the co-owner of defendant del Vecchio's property in New York in 2007.  Del Vecchio has also co-owned horses with Stiller's daughter, Julian, as recently as 2012.

317.    Given these long-standing personal and financial relations, there is reason to doubt defendant del Vecchio's independence from defendant Stiller.  For the reasons described below at ¶¶322-24; 326-40; 342, Stiller faces a substantial likelihood of liability in this derivative action.  Because del Vecchio lacks independence from Stiller, he will not initiate any action against him for the wrongdoing alleged in this derivative action.  Therefore, any demand on defendant del Vecchio is futile.

318.    There is also reason to doubt defendant Miller's independence from defendant Stiller.  Miller is a Democratic member of the Vermont state Senate and has received financial backing from Stiller, Stiller's daughter (Julian), and Green Mountain from at least 2002 through 2004 in connection with Miller's 2004 state Senate bid.

319.    Defendant Miller, in turn, co-sponsored a bill in the Vermont Senate in 2008 honoring defendant Stiller for his "achievements" at Green Mountain.  *See* No. R-472 Senate Concurrent Resolution Honoring Robert Stiller for His Entrepreneurial Achievements and Vision (S.C.R. 52).

320.    In addition, defendant Stiller is currently a member of the University of Vermont's Board of Advisors for the School of Business Administration.  Defendant Miller served on the same Board of Advisors.  Because Miller lacks independence from Stiller, she will not initiate

any action against him for the wrongdoing alleged in this derivative action. Therefore, any demand on defendant Miller is futile.

321.     For the foregoing reasons, demand on the Green Mountain Board is futile, both because of Stiller's domination and control and because a majority of the Director Defendants lack the requisite independence from the primary wrongdoers.

**B.     Demand Is Futile Because a Majority of the Board Faces a Substantial Likelihood of Liability and the Board's Actions Were Not Valid Exercises of Business Judgment**

**1.     Demand on Defendants Stiller and Blanford Is Futile**

322.     Demand on defendants Stiller and Blanford is futile because they face a substantial likelihood of liability for their breaches of fiduciary duties owed to Green Mountain, and their actions (and conscious inaction) were not valid exercises of business judgment.

323.     As set forth in the Company's 2012 Proxy: (i) as Chairman of the Board, defendant Stiller was charged with presiding over all Board and shareholder meetings and providing advice and counsel to the Company's CEO and other Company officers regarding Green Mountain's business and operations; and (ii) as the Company's founder and former CEO, Stiller was (and is) uniquely qualified to provide insight, guidance, and counsel to the Company's CEO regarding the Company's operations and strategy. The Company has noted "Stiller's deep and ongoing interest in the trusteeship of the Company," has represented that Stiller would "work in partnership with Blanford [the Company's new CEO] to ensure its continued success," and has "recognized Mr. Stiller's unique importance to the Company as its founder and Mr. Stiller's continued role with the Company," including acting as "an advisor" to defendant Blanford.

324.     In addition to his obligation as a director and Chairman of the Board to stay sufficiently informed about Company operations to exercise meaningful oversight of the management of Green Mountain's business, defendant Stiller's unique role as Company founder,

long-time CEO and Chairman, and partner and close advisor to CEO defendant Blanford kept Stiller involved in the day-to-day management of the Company and allow him to exercise control over the Board. In fact, as discussed above, analysts and investors continue to reach out to Stiller because he is still involved in Green Mountain's day-to-day management and strategic direction and is still "running the Company" despite the fact that Blanford currently serves as the CEO. *See* ¶79.

325.    As CEO since May 2007, defendant Blanford is "responsible for the general management, oversight, leadership, supervision and control of the day-to-day business and the affairs of the Company, and ensures that all directions of the Board are carried into effect." The Company describes Blanford as its "Chief Operating Decision Maker," who uses input from the Company's presidents and functional leaders to "make[] all key operating decisions, determine[] the allocation of resources, and make[] assessments of performance." Blanford receives and utilizes in connection with his decision-making (among other things) monthly business unit profit and loss schedules, weekly sales reports for the Specialty Coffee Business Unit and Keurig Business Unit, and quarterly financial statements. He is also responsible for communicating with shareholders and securities analysts during investor conference calls.

326.    As directors and officers of Green Mountain, defendants Stiller and Blanford had a duty to ensure that an adequate system of controls over accounting and financial reporting was in place at the Company. Stiller and Blanford were also required by SOX and SEC regulations to implement and maintain an effective system of internal controls over accounting and financial reporting and to certify that they had evaluated the Company's internal controls over accounting financial reporting and to present an accurate assessment of their effectiveness during the periods in which they were the Company's CEO.

327.    Defendants Stiller and Blanford also had the duty to exercise well-informed business judgment, which required them to ensure that they availed themselves of all reasonably available information concerning the Company's accounting and financial reporting processes, inventory management practices (which necessarily included oversight of Green Mountain's relationship with MBlock), and the Company's demand forecasting models.  Moreover, Stiller and Blanford had the responsibility to conduct a reasonable inquiry and investigation upon learning of any evidence of potential accounting manipulations and/or significant or material deficiencies in the Company's internal controls over accounting and financial reporting.

328.    Defendants Stiller and Blanford also owed an unremitting duty of loyalty to Green Mountain.  They were not permitted to use their positions of trust and confidence to further their private interests.  They were required to not only affirmatively act to protect Green Mountain's interests, but also to refrain from doing anything that would work injury to the Company or deprive the Company of any profit or advantage.  They had a duty to ensure that there was never any conflict between their duty of loyalty to Green Mountain and their own self-interest.  Stiller and Blanford had to put the best interests of Green Mountain and its shareholders ahead of their own personal interests.  As Chairman, President, and former CEO, and as CEO and a director of Green Mountain, respectively, defendants Stiller and Blanford had a duty to ensure that no transactions were conducted by parties that were not disinterested and independent and that all transactions avoided even the appearance of impropriety or actual and/or potential conflicts of interest that could be actualized.

329.    Defendants Stiller and Blanford failed to fulfill all of these duties and, therefore, they face a substantial likelihood of liability.

330.    **Breach of Fiduciary Duty for Failing to Implement Adequate Infrastructure Commensurate with Company's Growth:** As alleged above, beginning in at least 2006, defendants Stiller and Blanford directed Green Mountain in an aggressive growth strategy comprised of four initiatives: (i) expanding the Company's manufacturing capacity in order to increase direct sales of K-Cups and brewers; (ii) entering into licensing agreements that gave third-party coffee roasters the right to manufacture, distribute, and sell K-Cups in exchange for royalty payments to Green Mountain; (iii) subsequently acquiring certain of these third-party roasters in order to prevent them from becoming competitors when the Company's K-Cup patents expire; and (iv) outsourcing the Company's warehousing, inventory maintenance, order processing, and shipping functions to fulfillment vendor MBlock.   Each of these aspects of Green Mountain's growth strategy significantly increased the size and complexity of the Company's operations and the volume and complexity of transactions the Company had to control, account for, and report in its financial statements. Stiller and Blanford knew or consciously disregarded the fact that this growth strategy would require substantial investments in new staff, new training, the development of new policies, practices and procedures, and new information technology to have any hope of maintaining an internal control infrastructure sufficient to cope with the enormous increases in the scope and complexity of Green Mountain's operations and the volume and complexity of transactions.

331.    Defendants Stiller and Blanford (and their fellow directors and officers), however, utterly failed to ensure that the Company developed sufficient internal controls and internal control infrastructure necessary to keep up with its explosive growth.   Specifically, Green Mountain lacked documented accounting policies and standardized methods of applying those policies across business units; its accounting and finance personnel were under-trained and

under-staffed; its information systems were outmoded and under-resourced; it lacked key management, financial reporting, and control and policy positions; and as a result, it was unable to identify and remedy even the most obvious and persistent violations of GAAP and basic accounting and reporting rules. Indeed, they admitted in the Restatement that Green Mountain had "material weaknesses" in its "internal control over financial reporting" — many of which were directly related to the Company's failure to accurately account for transactions arising from its growth initiatives — and specifically attributed these material weaknesses to "the Company's rapid growth, both organically and through acquisitions, outpacing the development of the Company's accounting infrastructure." As a result, Green Mountain's sales and revenues were manipulated and its financials were overstated.

a.      First, the lack of effective internal controls permitted Green Mountain to improperly account for intercompany transactions (i.e., between the Company and its own subsidiaries) after acquiring third-party coffee roasters, in violation of GAAP. As Chairman of the Board (until May 2012) and the Company's Founder and President for nearly sixteen years, defendant Stiller understood that the complexities of integrating the financial statements of the companies Green Mountain acquired into Green Mountain's financial statements required that the Company apply a higher level of scrutiny to the consolidated financial statements of Green Mountain and its subsidiaries. Similarly, as Green Mountain's CEO since 2007, defendant Blanford understood that the complexities of integrating the financial statements of the companies Green Mountain acquired into Green Mountain's financial statements required that the Company apply a higher level of scrutiny to the consolidated financial statements of Green Mountain and its subsidiaries. Defendants Stiller and Blanford therefore knew that the companies Green Mountain had acquired were third-party roasters that paid Green Mountain

royalty fees, and that these royalty fees were a material part of Green Mountain's revenue. They also knew that any revenues Green Mountain generated from the royalty fees paid by these companies were required to be eliminated after Green Mountain acquired these companies. At a minimum, Stiller and Blanford had a duty to ensure that the Company had sufficient systems and controls in place to eliminate from Green Mountain's financials any revenues Green Mountain generated from the royalty fees paid by the acquired companies. They utterly failed to do so in breach of their fiduciary duties.

b.    Second, the lack of effective internal controls permitted management to recognize revenue on an as-needed basis by creating and recognizing sham royalty revenues through circular transactions between Green Mountain and third-party licensees, in violation of GAAP. Defendants Stiller and Blanford repeatedly touted the Company's royalty income as a primary driver of revenues and growth in Company press releases and SEC filings, and they were, therefore, required to investigate the underlying metrics supporting these statements. For example, during the Company's July 31, 2008 conference call, Blanford stated that "[u]ltimately, our growth potential here is driven by the number of installed brewers, the number of K-Cup portion packs consumed per day per brewer, and the royalty rate per K-Cup." Stiller and Blanford knew that Green Mountain purchased K-Cups from third-party licensees for resale and that the Company's revenue recognition policy permitted it to recognize royalty income upon shipment by these third parties, because he signed the Company's Forms 10-K that disclosed this policy. They also knew (or recklessly disregarded) that Green Mountain's inventory was on the rise throughout the relevant time period, which indicated (among other things) that the Company may be increasing the amount of K-Cups it was purchasing from third parties for resale. Stiller and Blanford were likewise aware of the possibility that Green Mountain was using "round-trip"

- 180 -

transactions as a way to increase revenues — a common method of manipulating revenue recognition — and improperly recognizing revenues from royalty income associated with these "round-trip" transactions. At a minimum, defendants Stiller and Blanford utterly failed to ensure that an adequate system of controls was in place at Green Mountain that would prevent and uncover this pattern of improper "round-tripping" at the Company.

        c.     Third, as a result of the lack of internal controls, the Company failed to accrue liabilities and adjust the cost and selling price of inventory that was sold in connection with marketing and customer incentives (as required by GAAP), which had the effect of artificially inflating the Company's reported revenues by accounting for inventory that was effectively sold at a discount (net of the incentives) as though it were sold at full price. Defendant Stiller has decades of experience in the sales industry and defendant Blanford is also a sophisticated businessman with years of experience in the sales industry. *See* ¶¶77-79. They, therefore, knew that in the sales industry, it is customary to provide customers with discounts and incentives and that these costs had to be accounted for in cost of goods sold. They also knew or recklessly disregarded that, consistent with industry practice, Green Mountain provided its customers with certain incentives, and that these incentives were required to be treated as a reduction in sales price. Yet, Stiller and Blanford utterly failed to implement and oversee a system of controls sufficient to ensure that Green Mountain complied with GAAP in connection with accounting for these marketing and customer incentives.

        332.    Defendants Stiller and Blanford's failure to fulfill their fiduciary duties to ensure an adequate system of internal controls over accounting and financial reporting was in place at Green Mountain resulted in Green Mountain's publication of financial statements that materially misstated the Company's financial results and position for the fiscal years 2006, 2007, 2008, and

2009 and the first three quarters of fiscal year 2010. Stiller signed and certified the Company's materially inaccurate financial statements for fiscal year 2006 and the first quarter of fiscal year 2007, which were required to be restated. Stiller also signed, reviewed, and/or approved the Company's materially inaccurate financial statements for fiscal years 2007, 2008, and 2009, which were required to be restated. He also signed the Forms 10-K and 10-Q for these periods which improperly stated that the Company's internal controls over accounting and financial reporting "were effective." Blanford signed and certified the Company's materially inaccurate financial statements for fiscal years 2007, 2008, 2009, and the first three quarters of fiscal 2010, which were required to be restated. He also signed the Forms 10-K and 10-Q for these periods which improperly stated that the Company's internal controls over accounting and financial reporting "were effective." They face a substantial likelihood of liability for his participation in the dissemination of false and misleading financial statements, which they knew to be false and/or had no basis for making and certifying.

333. **Breach of Fiduciary Duty for Failing to Implement Adequate Remediation Plan:** In connection with the Restatement necessitated by the above internal controls failures and corresponding false financial statements, defendants Stiller and Blanford (together with their fellow Board members) adopted the substandard Remediation Plan that failed to address the substantial risks the Company's relationship with MBlock posed to the integrity of Green Mountain's accounting and financial reporting. Stiller and Blanford were well aware of the material risks inherent in Green Mountain's relationship with MBlock due to the red flags brought to their attention.

a.    First, defendants Stiller and Blanford knew that the outsourcing of the warehousing, inventory maintenance, order processing, and shipping functions to MBlock was a

major part of Green Mountain's strategy for growing sales without investing in a massive build-out of Green Mountain's facilities and administrative infrastructure. The financial significance and import of these functions should have prompted Stiller and Blanford to review and confirm how, following outsourcing, the functions would be subject to internal controls designed to safeguard the integrity of Green Mountain's accounting and financial reporting and ensure that that the Company's sales and earnings guidance rested on a sound foundation (as well as ensure periodic scrutiny to confirm that the controls were working). Stiller and Blanford, however, took no action to ensure the implementation or maintenance of such a system of controls. It took Einhorn, for example, just a few interviews with current and former MBlock employees to determine that there were serious deficiencies and accounting manipulations being conducted by Green Mountain managers through MBlock.

b.    Second, as Chairman of the Board and CEO, defendants Stiller and Blanford should have insisted upon and directly overseen a thorough inquiry to determine the extent to which the internal controls problems cited in the Restatement affected those operations that, as a result of the outsourcing, were the most difficult to monitor and control (i.e., MBlock's warehousing, inventory maintenance, order processing, and shipping functions). Stiller and Blanford, however, failed to take any action whatsoever to ensure a system of adequate internal controls existed in connection with the Company's relationship with MBlock. Green Mountain's Board had outsourced these functions to MBlock specifically to evaluate Green Mountain to grow more rapidly. Stiller and Blanford were obliged to ensure that, at a minimum, Green Mountain established thorough and effective oversight and controls over the integration of the inventory and sales data generated through MBlock.

c.     Third, defendants Stiller and Blanford disregarded the fact that the SEC was scrutinizing the Company's revenue recognition practices and its relationship with MBlock. Stiller and Blanford knew (or were reckless in not knowing) that material distributor relationships (like the relationship with MBlock) are common targets of SEC and Self-Regulatory Organization inquiries because of the known history of manufacturers using such relationships to boost or manage reported revenues through strategically timed and improperly recorded shipments to or from distributor warehouses, and recognizing revenue upon shipment to the warehouse, rather than when product is actually sold.   Green Mountain's increasing dependence on MBlock, combined with the SEC's scrutiny of that relationship in the context of a restatement necessitated by the failure of Green Mountain's internal control environment, should have prompted immediate scrutiny, and sustained remedial action, by Stiller and Blanford. Yet, Stiller and Blanford took no action, thereby breaching their fiduciary duties.

d.     Fourth, defendants Stiller and Blanford consciously disregarded MBlock's well-publicized involvement in accounting frauds uncovered by the SEC.  Their failure to subject MBlock to heightened scrutiny and include it in the Restatement-prompted Remediation Plan was an inexcusable breach of duty.

334.   **Breach of Fiduciary Duty for Failing to Sufficiently Investigate and Remediate Inventory Issues:** Defendant Stiller prejudged, without reasonable inquiry, Einhorn's findings regarding MBlock.  Stiller did not hide his hostility toward the serious allegations raised in the Einhorn Report, including those allegations concerning Green Mountain's relationship with MBlock.  Stiller immediately denied the truth of the allegations, calling Einhorn's revelations "a joke."  He made clear that he would not ever speak with Einhorn to learn more about them.  During a CNBC interview, in response to a question about whether he

would ever discuss the allegations with Einhorn, Stiller said "I don't think I would, I'm not going to deal with people like himself." Stiller's dismissiveness makes clear that he, like the other members of the Green Mountain Board, never took the allegations seriously and did nothing to ensure that a thorough investigation was conducted into Einhorn's serious and credible findings. Stiller utterly failed to address the mechanics of the scheme uncovered by Einhorn or the allegations of systematic over-production and under-reporting of expired inventory. The Audit Committee directors and the rest of the Board followed Stiller's lead, concluding less than three weeks later that there was nothing to Einhorn's investigation findings. The SEC did not take such a dismissive attitude – its investigation of Green Mountain's relationship with MBlock is ongoing.

335.   Defendants Stiller and Blanford also consciously disregarded facts indicating that the Company had built up inventory that did not match the apparent demand for its products, including the faster than expected rate of increase in inventory and falling rates of inventory turnover.   These facts – which corroborated Einhorn's allegations – suggested potential accounting manipulation and fraud and, at a minimum, should have prompted a thorough inquiry into the quality of the Company's demand, sales, and inventory data.  In breach of their fiduciary duties, however, Stiller and Blanford failed to ensure that the Company conducted a reasonable investigation of the serious and credible allegations of the Einhorn Presentation.

336.   **Breach of Fiduciary Duty for Issuing Improper Sales and Earnings Guidance:** The failure to establish and maintain an adequate system of internal controls over the Company's key inventory management function ultimately called into question whether Green Mountain could reasonably forecast demand without reliable inventory and sales figures with which to build their demand and sales models.   Specifically, the Company had no reliable

inventory and historical demand data with which to reliably model and predict demand and sales. Defendant Blanford nonetheless made multiple statements touting the demand for the Company's products on investor conference calls held on December 9, 2010 ("*We are in fact dealing right now with very strong demand*, and are struggling to support our customers in a way we would want. So we are working vigorously to increase our capacity."), February 2, 2011 ("*[D]emand is definitely stretching our ability to supply.  And we've not quite caught up with that demand curve yet.*"), and July 27, 2011 ("As we have continued to add portion pack production capacity in Q3, *we were able to fulfill customer demand that had pent-up in the system over the prior two quarters.*"). *See* ¶¶204-05; 207.  Blanford made similar statements in Green Mountain's November 9, 2011 Form 8-K ("*We are seeing continued evidence of strong consumer demand for both brewers and portion packs from our customers and from third party sources that track consumer purchases* ..."). *See* ¶213.  In a February 1, 2012 earnings conference call, Blanford expressed "confidence" in the Company's demand forecasting model as a basis for the guidance, and re-emphasized that the increased inventory ("stock position") would capitalize on increased consumer interest the following quarter. *See* ¶227.  Stiller and Blanford (together with their fellow Board members) also issued, reviewed, and/or approved the Company's improper sales and earnings guidance for fiscal year 2012, which they knew lacked any reasonable foundation and were unreliable because the Company did not maintain internal controls sufficient to permit the Company to construct accurate forecasting models.  In so doing, Stiller and Blanford consciously disregarded their duty to ensure that the sales and earnings guidance Green Mountain published had a reasonable basis.

337.   **Breach of Fiduciary Duty for Insider Selling:** Defendants Stiller and Blanford's conscious disregard and disdain for their duty of loyalty to Green Mountain and its shareholders

extended to their personal trading in Green Mountain stock. As set forth above, Stiller and Blanford routinely took advantage of their access to material, undisclosed information to profit from well-timed sales of Green Mountain stock. They personally benefited from the increases in Green Mountain's stock price achieved through the improper accounting and reporting practices. While in possession of material, non-public information concerning Green Mountain's inadequate internal controls and improper business and accounting practices, Stiller sold 2,084,969 shares of his Green Mountain stock for $156,084,439.88 in proceeds. While in possession of material, non-public information concerning Green Mountain's inadequate internal controls and improper business and accounting practices, Blanford sold 240,575 shares of his Green Mountain stock for $20,217,883.64 in proceeds. By engaging in the insider trading alleged herein, Stiller and Blanford breached their fiduciary duty of loyalty to the Company and, therefore, are not in a position to exercise independent business judgment with respect to the claims alleged herein.

338. **Breach of Fiduciary Duty in Connection With Improper Stock Pledges:** Since 2007, defendant Stiller has pledged millions of shares of his Green Mountain stock held in margin accounts as collateral to secure hundreds of millions of dollars in margin loans he used to fund his personal business interests and lavish lifestyle. Stiller had pledged 92.3% of his Green Mountain stock in 2009, and nearly 80% of his total holdings through 2011.

339. Large pledges of this magnitude: (i) induce directors charged with policing the fidelity of executives and other directors to place their own interests or their over-leveraged colleagues' interests above the interests of the Company and its shareholders; and (ii) damage the Company and its shareholders in times of stress should margin calls cause corporate fiduciaries abruptly to dump large blocks of stock into the market, accelerating and deepening price

declines. These risks were well-known to Stiller, and he had a special duty as Chairman of the Board not to create these potential conflicts of interest between himself and Green Mountain, or to ask other directors to compromise their own integrity by permitting him to make these self-interested pledges. Prominent corporate law firms and leading corporate governance experts advised publicly that sound corporate governance regimes should include policies prohibiting key insiders from pledging large amounts of company stock in margin accounts to secure debt due to the risks of conflicts of interest and the likelihood that a large sale of company shares by an insider would create a negative market reaction and damage the company's market capitalization.

340. Nonetheless, defendant Stiller pledged enormous amounts of Green Mountain stock as collateral and used his control over the Board to ensure that his pledges were "grandfathered" in, notwithstanding a new Board policy adopted on January 1, 2012, that restricted insiders from pledging Company stock in margin accounts. When Green Mountain (unsurprisingly) missed its second quarter 2012 projections, Stiller was subjected to margin calls and sold approximately five million shares from his margin account for proceeds of over $123.4 million. These stock sales violated an internal Company policy (and SOX section 306(a)) prohibiting insider sales of company stock within a set number of trading days prior to or following the release of earnings figures. Stiller's actions were not taken in the best interests of Green Mountain, as he placed his own personal interests ahead of those of the Company he purports to serve. He, therefore, breached his duty of loyalty and faces a substantial likelihood of liability, rendering demand futile.

341. Defendant Blanford (like his fellow Board members, and particularly the Governance Committee Defendants) breached his fiduciary duties by failing to implement (until

- 188 -

January 2012) any formal policy concerning insider pledges of Company stock. For the reasons described above at ¶¶257-58, Blanford knew of the large amounts of Company stock defendants Stiller and Davis had pledged as collateral for margin loans, and knew of the risks these pledges posed to the Company. Nonetheless, Blanford (and his fellow directors) failed to take any action to prevent or halt these pledges. Moreover, even when Blanford and his fellow Board members finally adopted a policy restricting insiders from pledging company stock in margin accounts, they "grandfathered in" Stiller's and Davis' existing pledges and took no effective steps to timely reduce these outstanding pledges. These breaches of fiduciary duties exposed Green Mountain shareholders to the risk that Stiller and Davis would abruptly dump large amounts of stock into the market to meet margin calls – risks that were realized in May 2012 when the Company failed to meet its sales growth projections. Blanford's actions (and conscious inaction) placing the interests of Stiller and Davis ahead of the interests of Green Mountain represent breaches of the duty of loyalty. For this, Blanford faces a substantial likelihood of liability, and any demand on him is, therefore, futile.

342. **Potential Liability for Securities Fraud:** Defendant Blanford is named as a defendant in the *Horowitz* class action, where he is alleged to have violated sections 10(b) and 20(a) of the Exchange Act in connection with the Company's Restatement. Defendants Stiller and Blanford are named as defendants in the pending *LAMPERS* class action, where they are alleged to have violated sections 10(b) and 20(a) of the Exchange Act and sections 11, 12(a)(2), and 15 of the Securities Act by filing false financial statements in connection with the MBlock scheme. Finally, Stiller and Blanford are named as defendants in the pending *Fifield* class action, where they are alleged to have violated sections 10(b) and 20(a) of the Exchange Act by making improper statements in connection with the Company's fiscal 2012 earnings guidance.

Because Stiller and Blanford face potential liability in these related cases arising out of similar allegations to those raised herein, they are not sufficiently disinterested to be able to objectively consider a demand. Demand on Stiller and Blanford is, therefore, futile.

### 2. Demand on the Audit Committee Defendants Is Futile

343. The Audit Committee Defendants — defendants Mardy, Carlini, del Vecchio, and Miller — face a substantial likelihood of liability for their breaches of fiduciary duties owed to Green Mountain, and their actions (and conscious inaction) were not valid exercises of business judgment.

344. Defendant Mardy has been a director of Green Mountain and Chairman of the Audit Committee since April 2007. Defendant Carlini has been a director of Green Mountain since April 2002 and a member of Green Mountain's Audit Committee since January 2006. Defendant del Vecchio has been a director of Green Mountain since 1993 and a member of the Audit Committee since at least October 2009. Defendant Miller has been a director of Green Mountain since 1999 and a member of the Audit Committee from at least January 2006 through December 2008.

345. As directors of Green Mountain, the Audit Committee Defendants were responsible for overseeing the management of Green Mountain's business and were charged with staying informed about the operations of the Company. Furthermore, as members of the Audit Committee, the Audit Committee Defendants were responsible for overseeing the Company's accounting and financial reporting processes and reviewing the Company's financial statements that were included in the Forms 10-K and 10-Q. They were also charged with evaluating and responding to deficiencies in the Company's internal controls. Specifically, the Audit Committee Defendants were responsible for overseeing Green Mountain's accounting and financial reporting

processes and the audits of its financial statements, including monitoring: (i) the integrity of the Company's financial reports and other financial information; (ii) the Company's compliance with legal and regulatory requirements; (iii) the Company's systems of internal controls regarding finance, accounting, legal compliance, and ethics that management and the Board have established; and (iv) the independence and performance of the Company's registered public accounting firm and the Company's auditing, accounting, and financial reporting processes generally.    The Audit Committee Defendants were also responsible for "encourag[ing] continuous improvement of, and [fostering] adherence to, the Company's policies, procedures and practices at all levels." They also had the duty to exercise well-informed business judgment, which required them to avail themselves of all reasonably available information concerning the Company's accounting financial reporting processes, inventory practices, relationship with MBlock, and demand forecasting models.  Moreover, they had the responsibility to conduct a reasonable inquiry and investigation upon learning of potential accounting manipulations and of significant or material deficiencies in the Company's internal controls over accounting and financial reporting.

346.    Notwithstanding the above, the Audit Committee Defendants, under the weight of defendant Stiller's domination and control over the Board, failed to fulfill their responsibilities and duties owed to Green Mountain and, therefore, face a substantial likelihood of liability.

347.    **Breach of Fiduciary Duty for Failing to Implement Adequate Infrastructure Commensurate with Company's Growth:** At the same time Green Mountain was pursuing the aggressive growth strategy described above, the Audit Committee Defendants utterly failed to ensure that the Company developed sufficient internal controls and internal control infrastructure necessary to keep up with its explosive growth — a fact these defendants admitted in Green

Mountain's 2010 Form 10-K. The Audit Committee Defendants permitted an utterly under-staffed, under-trained, and under-resourced accounting and financial infrastructure and insufficient corporate policy, oversight, and information technology infrastructure necessary to comply with even the most basic GAAP and basic accounting and reporting rules. As a result, Green Mountain's sales and revenues were manipulated and its financials were overstated for the same reasons described above at ¶¶134-54.

        a.      As members of Green Mountain's Audit Committee (including, in particular, defendant Mardy, who served as the Audit Committee Chairman since April 2007 and is designated as a "financial expert"), the Audit Committee Defendants understood that the complexities of integrating the financial statements of the companies Green Mountain acquired into Green Mountain's financial statements required that the Company apply a higher level of scrutiny to the consolidated financial statements of Green Mountain and its subsidiaries. The Audit Committee Defendants were required to review the consolidated financial statements of Green Mountain and its subsidiaries and, therefore, knew or recklessly disregarded that the statements did not include the requisite entries eliminating these intercompany transactions. The Audit Committee Defendants had the same information described above at ¶137, which would enable them to easily determine that Green Mountain had failed to eliminate the revenues associated with these transactions from the Company's financial statements. At a minimum, the Audit Committee Defendants had a duty to ensure that the Company had sufficient systems and controls in place to eliminate from Green Mountain's financial statements any revenues Green Mountain generated from the royalty fees paid by the acquired companies. They utterly failed to do so in breach of their fiduciary duties.

b.     The Audit Committee Defendants repeatedly touted the Company's royalty income as a primary driver of revenues and growth in Company press releases and, therefore, they were required to investigate the underlying metrics supporting these statements. The Audit Committee Defendants were aware of the red flags described above at ¶¶139; 145, which indicated the possibility that Green Mountain was improperly recognizing revenues from royalty income associated with "round-trip" transactions in violation of GAAP. At a minimum, the Audit Committee Defendants utterly failed to ensure that an adequate system of controls was in place at Green Mountain that would prevent and uncover this pattern of improper "round-tripping" at the Company.

c.     The Audit Committee Defendants (including "financial expert" defendant Mardy) are sophisticated businessmen. They knew that in the sales industry, it is customary to provide customers with discounts and incentives, and that Green Mountain did provide certain marketing and customer incentives. Yet, the Audit Committee Defendants utterly failed to implement and oversee a system of controls sufficient to ensure that Green Mountain complied with GAAP in connection with marketing and customer incentives.

348.   **Breach of Fiduciary Duty for Failing to Oversee the Company's Accounting and Financial Reporting Processes:** The Audit Committee Defendants were specifically required by the terms of the Audit Committee's Charter to "oversee the accounting and financial reporting processes and the audits of the financial statements of [the Company], including ... the Company's systems of internal controls regarding finance [and] accounting." The Audit Committee Defendants' failure to fulfill their fiduciary duties to ensure an adequate system of internal controls over accounting and financial reporting resulted in Green Mountain's publication of financial statements that materially misstated the Company's financial results and

- 193 -

position for the fiscal years 2006, 2007, 2008, and 2009 and the first three quarters of fiscal year

2010. Defendants Carlini, del Vecchio, and Miller signed, reviewed, and/or approved the

Company's materially inaccurate financial statements for fiscal years 2006, 2007, 2008, and

2009, which were required to be restated, while defendant Mardy signed the false financial

statements for fiscal years 2007, 2008, and 2009. The Audit Committee also signed the Forms

10-K for these years, which improperly stated that the Company's internal controls over

accounting and financial reporting were "were effective." The Audit Committee Defendants face

a substantial likelihood of liability for their participation in the dissemination of false and

misleading financial statements, which they knew to be false and/or had no basis for making and

certifying.

349. **Breach of Fiduciary Duty for Failing to Implement Adequate Remediation**
**Plan:** The Audit Committee Defendants bore primary responsibility for reviewing, investigating,

and formulating a plan for remediating the material deficiencies in internal controls and

accounting and finance infrastructure that led to the Restatement (which was necessitated by the

above internal controls failures and corresponding false financial statements). According to

Green Mountain's 2010 Form 10-K, the Audit Committee directed management to develop a

detailed plan and timetable for the implementation of remedial measures, and the Audit

Committee was to monitor implementation of such measures. In addition, the Audit Committee

was to direct management in its review of, and implementation of necessary changes to, the

overall design of the Company's internal control environment, as well as policies and procedures

to improve the overall effectiveness of internal control over financial reporting. However, while

the Audit Committee Defendants purportedly conducted an internal investigation into the SEC's

inquiry about Green Mountain's relationship with MBlock, in less than one month's time the

Audit Committee Defendants concluded that there was no misconduct by Green Mountain employees and that none of the financial statement errors related to MBlock. The Audit Committee Defendants were well aware of the material risks inherent in Green Mountain's relationship with MBlock due to the red flags brought to their attention, including: (i) the volume of transactions the Company ran through MBlock and their financial significance to Green Mountain; (ii) the material internal controls deficiencies that existed at Green Mountain, including over the critical inventory function that the Company had outsourced to MBlock; (iii) the SEC inquiry into the Company's relationship with MBlock; and (iv) MBlock's well-publicized involvement in accounting frauds uncovered by the SEC. ¶163. Yet, the Audit Committee Defendants (together with their fellow Director Defendants) adopted a substandard Remediation Plan that failed to address any of the risks inherent in the Company's relationship with MBlock — namely, the significant risks posed to the integrity of Green Mountain's accounting and financial reporting.

350.   **Breach of Fiduciary Duty for Failing to Sufficiently Investigate and Remediate Inventory Issues:** The Audit Committee Defendants also consciously disregarded facts indicating that the Company had built up inventory that did not match the apparent demand for its products, including the faster than expected rate of increase in inventory and falling rates of inventory turnover. These facts — which corroborated Einhorn's allegations — suggested potential accounting manipulation and fraud and, at a minimum, should have prompted a thorough inquiry into the quality of the Company's demand, sales, and inventory data. The Einhorn Presentation raised serious questions about the adequacy of the Audit Committee's "investigation" and the efficacy of the Remediation Plan in light of material deficiencies in controls applicable to the functions outsourced to MBlock. However, rather than take the time to

thoroughly investigate Einhorn's allegations and evaluate further improvements in internal controls to address them, the Audit Committee Defendants quickly attempted to sidestep the allegations.  Just three weeks after the Einhorn Presentation, during the Company's regularly scheduled November 9, 2011 earnings teleconference, defendant Blanford noted that the Audit Committee had "reviewed the allegations" and determined there was no "misconduct."  Any reasonable investigation would have revealed fundamental deficiencies in the internal controls applied to the MBlock operations, as well as evidence of cross-shipping, sham sales, and stockpiling of expired inventory.  The Audit Committee Defendants breached their fiduciary duties by failing to conduct a reasonably thorough investigation.

351.    The Audit Committee Defendants issued, reviewed, and/or approved the Company's improper earnings guidance for fiscal year 2012, which they knew or recklessly disregarded lacked any reasonable foundation and were unreliable because the Company did not maintain internal controls sufficient to permit the Company to construct accurate forecasting models, as explained above at ¶¶191-200; 240-52.  The Audit Committee also failed to ensure that the Company maintained effective internal controls over demand forecasting, inventory management, and accounting.   In so doing, the Audit Committee Defendants consciously disregarded their duty to ensure that the sales and earnings guidance Green Mountain published had a reasonable basis.

352.    **Potential Liability for Securities Fraud:**    All of the Audit Committee Defendants (as well as fellow Director Defendant and Governance Committee member defendant Moran) are named as defendants in the pending *LAMPERS* class action, where they are alleged to have violated sections 11, 12(a)(2), and 15 of the Securities Act by signing the Company's 2011 offering documents which incorporated the Company's false financial

statements. Because these defendants (representing a majority of the Board) face potential liability in this related case arising out of similar allegations to those raised herein, they are not sufficiently disinterested to be able to objectively consider a demand. Demand on the Audit Committee Defendants (and defendant Moran) is, therefore, futile.

### 3.    Demand on the Governance Committee Defendants Is Futile

353.    The Governance Committee Defendants – defendants Mardy, Carlini, del Vecchio, Miller, and Moran – face a substantial likelihood of liability for their breaches of fiduciary duties owed to Green Mountain, and their actions (and conscious inaction) were not valid exercises of business judgment. The Governance Committee Defendants succumbed to defendant Stiller's domination and control and put the interests of Stiller and Stiller's longtime friend and cohort, then-Lead Director defendant Davis, ahead of the best interests of the Company. Demand on the Governance Committee Defendants is, therefore, futile.

354.    Defendant Mardy was a member of Green Mountain's Governance Committee from a least October 2007 to at least September 2009. Defendant Carlini was a member of Green Mountain's Governance Committee from a least October 2005 to at least September 2008. Defendant del Vecchio has been a member of Green Mountain's Governance Committee since at least October 2009. Defendant Miller has been a member of Green Mountain's Governance Committee since at least October 2005, was Chairman of the Governance Committee from October 2005 to September 2009, and currently serves as the Governance Committee Chairman (this stint since May 2012). Defendant Moran was a member of Green Mountain's Governance Committee from at least October 2005 through September 2009.

355.    The Governance Committee Defendants breached their fiduciary duties by failing to implement (until January 2012) any formal policy concerning insider pledges of Company

stock.  The Governance Committee Defendants were responsible for reviewing and evaluating the Company's corporate governance principles, including the Company's policies concerning insider pledges of Company stock.  The corporate risks of stock pledges of this magnitude are well-known, particularly to the Governance Committee Defendants, who knew of the large amounts of stock pledged by defendants Stiller and Davis for the reasons described above at ¶¶257-58.  Nonetheless, under the pressure of Stiller's domination and control over the Board, the Governance Committee Defendants failed to report to the Board that it should implement a policy preventing or limiting these pledges to sufficiently mitigate the risks they posed to Company shareholders.

356.    Even when they finally adopted a policy restricting insiders from pledging Company stock in margin accounts based on these and other concerns, the Governance Committee Defendants put defendant Stiller's interests before Green Mountain's "grandfathering" Stiller's and defendant Davis' existing pledges.  These breaches of fiduciary duties exposed Green Mountain shareholders to the risk that Stiller and Davis would abruptly dump large amounts of stock into the market to meet margin calls – risks that were realized in May 2012 when the Company failed to meet its sales growth projections.  The Governance Committee Defendants' actions (and conscious inaction) placing the interests of Stiller and Davis ahead of the interests of Green Mountain represent breaches of the duties of loyalty and care.  For this, the Governance Committee Defendants face a substantial likelihood of liability, and any demand on them is, therefore, futile.

### 4.      Demand on the Insider Selling Defendants Is Futile

357.    In addition to defendants Stiller and Blanford (who face a substantial threat of personal liability for misappropriating corporate information and selling their Green Mount stock

on the basis of that non-public information, as discussed above), demand is also futile as to defendants Mardy, Carlini, del Vecchio, Miller, and Moran in light of their liability for insider selling. While in possession of material, non-public information concerning Green Mountain's inadequate internal controls and improper business and accounting practices (as discussed in detail above), these defendants sold the following: (i) defendant Mardy sold 20,000 shares of his Green Mountain stock for $1,949,606 in proceeds; (ii) defendant Carlini sold 108,000 shares of her Green Mountain stock for $11,493,252 in proceeds; (iii) defendant del Vecchio sold 62,250 shares of his Green Mountain stock for $5,904,695.76 in proceeds; (iv) defendant Miller sold 121,500 shares of her Green Mountain stock for $12,390,645.70 in proceeds; and (v) defendant Moran sold 255,133 shares of his Green Mountain stock for $10,959,784.50 in proceeds. By engaging in the insider trading alleged herein, defendants Mardy, Carlini, del Vecchio, Miller, and Moran breached their fiduciary duty of loyalty to the Company and, therefore, are not in a position to exercise independent business judgment with respect to the claims alleged herein.

## C.      Other Reasons Why Demand Is Futile

358.     The acts complained of constitute violations of the fiduciary duties owed by Green Mountain's officers and directors and these acts are incapable of ratification.

359.     Each of the Director Defendants of Green Mountain authorized and/or permitted the improper statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the improper statements and are principal beneficiaries of the wrongdoing alleged herein and thus, could not fairly and fully prosecute such a suit even if such suit was instituted by them.

360.    Green Mountain has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Green Mountain any part of the damages Green Mountain suffered and will suffer thereby. Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by Plaintiffs, the current Board has failed and refused to seek to recover for Green Mountain for any of the wrongdoing alleged by Plaintiffs herein.

361.    Plaintiffs have not made any demand on the shareholders of Green Mountain to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    Green Mountain is a publicly held company with over 155 million shares outstanding and thousands of shareholders;

(b)    making demand on such a number of shareholders would be impossible for Plaintiffs who have no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)    making demand on all shareholders would force Plaintiffs to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

### For Breach of Fiduciary Duty Against the Individual Defendants

362.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

363.    As alleged in detail herein, the Individual Defendants, by reason of their positions as officers and/or directors of Green Mountain and because of their ability to control the business

and corporate affairs of Green Mountain, owed Green Mountain fiduciary obligations of due care and loyalty, and were and are required to use their utmost ability to control and manage Green Mountain in a fair, just, honest, and equitable manner.

364.   The Individual Defendants, Blanford, Stiller, Miller, Carlini, del Vecchio, Davis, Moran, Mardy, Daft, Rathke, McCreary, and Stacy violated their fiduciary duties of care and loyalty by failing to ensure that the Company maintained effective internal controls over accounting, financial reporting, inventory management, and demand forecasting.

365.   The Audit Committee Defendants, del Vecchio, Mardy, Carlini, Davis and Miller, violated their fiduciary duties of care and loyalty by failing to oversee the Company's financial and reporting process as required by the Audit Committee Charter.

366.   Defendants Rathke, Blanford, Stiller, Carlini, Davis, Del Vecchio, Mardy, Miller, and Moran, violated their fiduciary duties of care and loyalty by signing and/or certifying the Company's financial statements for fiscal years 2006 through 2009 and the first three quarters of 2010, which were required to be restated.

367.   Defendants Stiller, Blanford, Rathke, McCreary, and Stacy violated their fiduciary duties of care and loyalty by directing the Company to engage in, or at a minimum, knowingly or recklessly disregarding that the Company was engaging in, improper accounting practices including the inventory manipulation scheme conducted through MBlock.

368.   The Director Defendants, Blanford, Stiller, Miller, Carlini, del Vecchio, Davis, Moran, Mardy, and Daft, violated their fiduciary duties of care and loyalty by issuing, reviewing, and/or approving the Company's improper sales and earnings guidance throughout fiscal 2011 and for the first two quarters of fiscal 2012, because they knew that they had no reasonable basis

- 201 -

for this guidance in light of the Company's inadequate internal controls and demand forecasting models.

369.    Defendants Blanford and Rathke violated their fiduciary duties of care and loyalty by making improper public statements during Company conference calls concerning demand for the Company's products and the Company's inventory, and by making improper public statements reaffirming the Company's earnings guidance for fiscal year 2012, which they knew or recklessly disregarded that the Company would not meet because they knew that the Company did not maintain adequate internal controls and forecasting models.

370.    The Director Defendants, Blanford, Stiller, Miller, Carlini, del Vecchio, Davis, Moran, Mardy, and Daft, violated their fiduciary duties of care and loyalty by failing to implement policies preventing or curtailing insiders from pledging Company stock as collateral for loans prior to 2011 and by "grandfathering in" Stiller's and Davis' existing pledges in 2011, which unjustifiably exposed Green Mountain shareholders to risk.  Furthermore, the Governance Committee Defendants, Carlini, del Vecchio, Miller, and former members Daft, Davis, Mardy, and Moran, violated their fiduciary duties of care and loyalty by failing to recommend that the Board implement sufficient policies preventing or curtailing insiders from pledging Company stock as collateral for loans prior to 2011 in accordance with the terms of their Committee Charter.  Carlini, del Vecchio, Miller, Daft, and Davis also violated their fiduciary duties of care and loyalty by recommending that the Board "grandfather in" Stiller's and Davis' existing pledges in 2011 when the Company finally implemented such a policy.

371.    The Insider Selling Defendants, Blanford, del Vecchio, Miller, Moran, Davis, Carlini, Mardy, Stiller, Stacy, McCreary, and Rathke violated their fiduciary duties of loyalty by making improper insider sales while in possession of material, non-public information

concerning Green Mountain's inadequate internal controls and improper business and accounting practices. Stiller and Davis further breached their fiduciary duties of loyalty by violating the Company's internal trading policies in connection with their May 4, 2012 and/or May 7, 2012 sales of stock pursuant to margin calls.

372. But for the abdication of the Individual Defendants' fiduciary duties, the Company would not have been damaged. Accordingly, all of the Individual Defendants breached their fiduciary duties.

373. As a direct and proximate result of Individual Defendants' failure to perform their fiduciary obligations, Green Mountain has sustained significant damages, as alleged herein. As a result of the misconduct allege herein, these defendants are liable to the Company.

## COUNT II

### For Waste of Corporate Assets Against the Individual Defendants

374. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

375. As a result of the misconduct described above, the Individual Defendants wasted corporate assets: (i) by failing to maintain sufficient internal controls over the Company's financial reporting, which has resulted in the Company incurring substantial costs in connection with the Restatement, SEC investigation, and federal securities class fraud actions; (ii) by failing to maintain sufficient internal controls over demand forecasting and inventory management, which has resulted in costs incurred in connection with the SEC investigation and securities class actions and the implementation of remedial measures on an emergency basis that should have been implemented incrementally over time as the Company grew; and (iii) by paying undeserved

compensation to the Company's officers and directors while they were breaching their fiduciary duties to Green Mountain.

376.    As fiduciaries of Green Mountain, the Individual Defendants are liable to the Company for this waste of corporate assets.

## COUNT III

### For Unjust Enrichment Against the Individual Defendants

377.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

378.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Green Mountain. The Individual Defendants each received undeserved compensation and enjoyed the proceeds from the sale of shares awarded as compensation for their service as officers and/or directors of Green Mountain while breaching their fiduciary duties to the Company.

379.    The Insider Selling Defendants also received proceeds from their improper stock sales, which were made while they were in possession of material, non-public information concerning Green Mountain's inadequate internal controls and improper business and accounting practices, and which harmed the Company and its shareholders.

380.    Defendants Stiller and Davis were unjustly enriched by the margin loans for which they pledged their Company stock as collateral, which amounted to a conflict of interest and damaged the Company when they were forced to sell hundreds of millions of dollars of Green Mountain stock to meet margin calls, accelerating and deepening the collapse in market capitalization.

381.    Plaintiffs, as shareholders and representatives of Green Mountain, seek restitution from the Individual Defendants, each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants, each of them, from their wrongful conduct and fiduciary breaches.

382.    Plaintiffs, on behalf of Green Mountain, have no adequate remedy at law.

### COUNT IV

### Against the Individual Defendants for Contribution and Indemnification

383.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

384.    Green Mountain is alleged to be liable to private persons, entities, and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to the Individual Defendants' liability to Green Mountain.

385.    Green Mountain's alleged liability on account of the wrongful acts and practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal, and/or bad faith acts or omissions of the Individual Defendants.

386.    Green Mountain is entitled to contribution and indemnification from each of the Individual Defendants in connection with all such claims that have been, are, or may in the future be asserted against Green Mountain by virtue of the Individual Defendants' wrongdoing.

## XV.    PRAYER FOR RELIEF

Plaintiffs therefore request, on behalf of Green Mountain, judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches

of fiduciary duties, waste of corporate assets, unjust enrichment, and for contribution and indemnification;

      B.     Directing Green Mountain to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Green Mountain and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

      1.     a proposal to strengthen the Company's management- and Board-level controls over financial reporting and accounting;

      2.     a proposal to strengthen the Company's management- and Board-level controls over guidance and forecasting;

      3.     a proposal to strengthen management- and Board-level controls over the Company's disclosure procedures;

      4.     a proposal to effectively control and oversee insider selling and insider stock pledges;

      5.     a proposal to ensure that the Board is made up of individuals who have significant substantive experience in areas applicable to service on the Board's committees, and to establish mandatory term limits and rigorous new independence standards for directors;

      6.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

7.   a proposal to enhance the transparency of executive compensation decisions, to better align executive and director compensation with long-term value creation, and require the clawback of excess compensation paid to executives on the basis of misstated financial results; and

8.   a proposal to permit the shareholders of Green Mountain to nominate at least three candidates for election to the Board;

C.   Awarding to Green Mountain restitution from the Individual Defendants, each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

D.   Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.   Granting such other and further relief as the Court deems proper.

## XVI.   JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: October 3, 2012                    ROBBINS UMEDA LLP

CRAIG W. SMITH

BRIAN J. ROBBINS
CRAIG W. SMITH
JULIA M. WILLIAMS
GINA STASSI
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

THE SHUMAN LAW FIRM
KIP B. SHUMAN
885 Arapahoe Avenue
Boulder, CO  80302
Telephone: (303) 861-3003
Facsimile: (303) 484-4886

Co-Lead Counsel for Plaintiffs

LANGROCK SPERRY & WOOL, LLP
ERIN MILLER HEINS
210 College Street
P. O Box 721
Burlington, VT 05402
Telephone: (802) 864-0217
Facsimile: (802) 864-0137

Liaison Counsel for Plaintiffs

707173

- 208 -